# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**IN RE: MCCORMICK & COMPANY, INC., PEPPER PRODUCTS MARKETING AND SALES PRACTICES LITIGATION**

_____

This Document Relates To:

**ALL CONSUMER CASES**

**MDL Docket No. 2665**
**Misc. No. 15-1825 (ESH)**

## <u>MEMORANDUM OPINION</u>

Plaintiffs, who are retail purchasers of black pepper supplied by defendant McCormick & Co., claim that they were deceived about the amount of pepper in the containers and paid inflated prices for them as a result of a conspiracy between McCormick and its retailers, including defendant Wal-Mart.  Plaintiffs claim that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), violated consumer protection statutes in twenty-five different states (Count II), and were unjustly enriched under the laws of all fifty states and the District of Columbia (Count III).  Defendants have moved to dismiss all three counts.  The Court grants their motions with respect to Count I, but it denies them without prejudice with respect to Counts II and III.

Plaintiffs originally filed separate class actions in federal courts in several states, but the Judicial Panel on Multi-District Litigation consolidated them before this Court, along with a suit by McCormick's competitor Watkins, which claims that Watkins lost sales as a result of the same deception that the consumer plaintiffs allege.  *See In re McCormick & Co., Inc., Pepper*

*Prods. Mktg. & Sales Practices Litig.*, Misc. No. 15-1825, 2016 WL 6078250 (D.D.C. Oct. 17, 2016) (dismissing Watkins' claim of unfair competition but not its claims under the Lanham Act and state unfair trade practices statutes).  After consolidation of the cases before this Court, the consumer plaintiffs filed a consolidated complaint on March 2, 2016.  (*See* Consol. Am. Class Action Compl., ECF No. 34 ("Compl.").)  According to the complaint, McCormick and its retailers agreed to implement a price increase by decreasing the quantity in both the branded McCormick pepper containers and the store-branded containers which were also supplied by McCormick.  Furthermore, plaintiffs claim that defendants misled them about the reduction in quantity by keeping the non-transparent containers the same size.  Plaintiffs sue on behalf of "[a]ll persons in the United States who purchased McCormick-brand black pepper, Walmart's Great Value-brand black pepper, Publix-brand black pepper and/or McCormick-filled private-label black pepper between January 1, 2015, and the present, for their personal or household use."  (*Id.* at ¶ 64.)

Defendants have moved to dismiss.  (*See* McCormick's Mot. Dismiss, ECF No. 38; Wal-Mart's Mot. Dismiss, ECF No. 40.)  First, they argue that this Court should dismiss the antitrust claim (Count I) because plaintiffs have not adequately alleged (1) an anticompetitive agreement; (2) antitrust injury; or (3) relevant markets.  (*See* McCormick's Mem. at 3-13, ECF No. 38-1; Wal-Mart's Mem., ECF No. 40-1.)  Second, they argue that named plaintiffs have standing to raise state-law claims (Counts II and III) only under their own states' laws, so this Court should dismiss all class claims under other states' laws.  (*See* McCormick's Mem. at 14-18.)  Finally, they argue that this Court should dismiss all of the state-law claims for class treatment because of (1) variation among states' laws; and (2) the need for individualized factual inquiries.  (*See id.* at 18-38.)  Plaintiffs filed their opposition on April 27, 2016.  (*See* Pls.' Opp., ECF No. 43.)

Defendants filed their replies on May 18, 2016.  (*See* McCormick's Reply, ECF No. 47; Wal-Mart's Reply, ECF No. 49.)  This Court held a hearing on October 25, 2016.

For the reasons stated below, defendants' motions to dismiss consumer plaintiffs' complaint are granted in part and denied without prejudice in part.

## FACTUAL ALLEGATIONS

According to plaintiffs, "McCormick controls as much as 70% of the black pepper retail market." (Compl. at ¶ 58.)  McCormick is the "clear market leader in the sale of spices (including black pepper)."  (*Id.* at ¶ 1.)  In addition to supplying retailers with black pepper under the McCormick brand, it "supplies about half of the store-brand spices sold annually in the United States," including Wal-Mart's Great Value brand.  (*Id.* at ¶¶ 3, 48.)  Plaintiffs allege that for decades prior to 2015, McCormick sold ground black pepper in "non-transparent metal tins" whose "sizes have become the industry norm."  (*Id.* at ¶ 35.)  The tin measuring 3 1/16" tall contained 2 ounces of pepper, the tin measuring 3 10/16" tall contained 4 ounces, and the tin measuring 4 10/16" tall contained 8 ounces.  (*Id.*)  McCormick also sold a small peppercorn grinder containing 1.24 ounces and a large grinder containing 3.1 ounces.  (*Id.* at ¶¶ 44, 47.)  Wal-Mart's Great Value tins are "of a similar size and shape" as McCormick's and, until 2015, contained the same quantities of pepper that the McCormick-branded tins did.  (*Id.* at ¶¶ 48, 51-52.)

Plaintiffs allege that "[s]ince 2010 the cost of raw black pepper has increased by approximately 500%," with a particularly steep increase in 2014.  (*Id.* at ¶ 31.)  "In 2015, unable to meet its cost savings targets without a substantial reduction in costs or increase in prices, McCormick began shipping millions of pepper tins and grinders to retail stores containing 25% and 19% less black pepper, respectively, than the containers were designed to hold."  (*Id.* at

¶ 34.)  The containers "note the [new] weight in small print" on the front, but they are the "exact same size" as before.  (*Id.* at ¶¶ 38-40, 45.)  In addition, "McCormick and the Retailers agreed that McCormick would reduce the amount of ground black pepper contained in the McCormick-supplied, store-branded tins, even though the actual size of the store-branded tins has, at all relevant times, remained the same."  (*Id.* at ¶ 50.)

Plaintiffs further allege that "McCormick and the Retailers agreed to, and did, maintain the same retail prices (as if the black pepper tins and grinders were full) for the now slack-filled black pepper containers."  (*Id.* at ¶ 62.)  There are no allegations about specific communications or documents evidencing such an agreement, but plaintiffs allege that "McCormick and each of the Retailers had regular opportunities to meet, exchange information, and agree with one another as to the fill of the pepper containers."  (*Id.* at ¶ 59.)  Furthermore, "McCormick and the Retailers had a motive to maintain their profit margins" and "McCormick was in a position to act as the 'hub' in a 'hub-and-spoke' conspiracy."  (*Id.* at ¶ 61.)  As a result of this "conspiracy in restraint of trade to artificially fix, raise, maintain, and stabilize prices for pepper," plaintiffs claim that they paid "supra-competitive, artificially inflated prices for pepper."  (*Id.* at ¶¶ 74, 76.)

According to plaintiffs, they were also harmed because the non-transparent tins "falsely appear[ed] to contain the same amount of ground black pepper" as they had before.  (*Id.* at ¶¶ 38-40.)  The named plaintiffs allege that they "reasonably expected that the tin was full of black pepper" and "did not know that in fact the tin contained just 75% of the pepper that the tin was designed to hold."  (*Id.* at ¶¶ 9-23.)  They "would not have paid for Defendants' black pepper had they known that the containers were under-filled."  (*Id.* at ¶ 90.)  Thus, plaintiffs assert that defendants engaged in "unfair and deceptive acts."  (*Id.* at ¶ 87.)

## ANALYSIS

## I.       ANTITRUST CLAIM

Section 1 of the Sherman Act bars contracts and conspiracies in restraint of trade.  15

U.S.C. § 1.  Defendants argue that plaintiffs have failed to state a claim under Section 1 because

they have not plausibly alleged an agreement in restraint of trade, an antitrust injury, or relevant

product and geographic markets.  Because the Court finds that defendants are correct about the

first two arguments, it will dismiss Count I without reaching the third argument.

### A.  Agreement in Restraint of Trade

Plaintiffs have alleged and briefed two alternative agreements that they contend violated

Section 1 of the Sherman Act.  First, they allege that McCormick agreed with Wal-Mart and

other retailers to reduce the weight of pepper in store-branded containers supplied by

McCormick at the same time that McCormick made the same reduction in weight for containers

that bore its own brand name.  (Compl. at ¶¶ 4, 5, 50; *see* Pls.' Opp. at 11.)  Second, they allege

that McCormick and its retailers not only agreed on the weight of pepper but also agreed on the

retail price.  (Compl. at ¶ 62; *see* Pls.' Opp. at 9-11.)  At the hearing on the motion to dismiss,

plaintiffs stated that they were claiming an agreement only on quantity of pepper.  (Mot. Hr'g Tr.

at 69, 93, Oct. 25, 2016 ("Tr.") (COURT: "You are arguing there is an explicit agreement on

price . . . or are you saying something about quantity then gets translated into cost?"  MS.

FEGAN: "So, Your Honor, the answer is the latter.").)  However, the Court will address the

adequacy of pleading for both alternative agreements because plaintiffs' pleadings and some of

their arguments at the hearing seemed to suggest an agreement on price.

1.   Agreement on Price

To state a claim for violation of Section 1 of the Sherman Act, plaintiffs' allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely … conduct that could just as well be independent action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  The Supreme Court has explained that there is a "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement" so that courts can avoid sending parties into expensive discovery without a sufficient likelihood that the plaintiffs can support their claim.  *Id.* at 557-59.  In *Twombly*, plaintiffs claimed that local telephone carriers must have entered into an illegal agreement not to compete in each other's territory, but the Supreme Court found that "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 568.  Given this "obvious alternative explanation," the Court concluded that there was no plausible suggestion of conspiracy and therefore the complaint should be dismissed.  *Id.* at 567-70.

Following *Twombly*, courts dismiss Section 1 complaints when there is an independent business justification for the observed conduct and no basis for rejecting it as the explanation for the conduct.  For example, in a case involving parallel reductions in the commissions that airlines paid to travel agents, the Sixth Circuit concluded that "each defendant had a reasonable, independent economic interest in adopting a competitor's commission cut" and therefore there was no reason to infer agreement.  *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 908-09 (6th Cir. 2009).  The Second Circuit dismissed a parallel pricing complaint because it found that the similar contract terms could reflect similar bargaining power and commercial goals.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).  In the Northern District of

Illinois, a judge explained why an industry-wide increase in text-messaging prices did not permit an inference of agreement: "The far more likely inference from Sprint-Nextel's price 'leadership' is that it raised per-message prices to push more subscribers to purchase bundled calling and texting plans. . . .   The defendant companies had self-interested reasons to follow Sprint-Nextel's lead . . . ."   *In re Text Messaging Antitrust Litig.*, No. 08 C 7082, 2009 WL 5066652, at *11 (N.D. Ill. Dec. 10, 2009).   The common theme in all of these cases is that if the most natural explanation for defendants' conduct is not collusion, merely alleging that the conduct was collusive does not make it plausible.

To make their allegations of conspiracy plausible, plaintiffs must allege plus-factors, such as details about the making of the agreement, reasons a supposed business justification seems pretextual, or motivations for defendants to make the agreement.   In this district, a judge refused to dismiss a price-fixing complaint because plaintiffs had identified the meetings at which the agreement was reached and alleged that defendants had used hurricanes as a pretext to withhold supply and raise prices, when in fact the natural gas resource base had not decreased.   *City of Moundridge v. Exxon Mobile Corp.*, 250 F.R.D. 1, 4-6 (D.D.C. 2008).   The judge handling the Apple e-books litigation denied defendants' motion to dismiss the complaint, which alleged a conspiracy between Apple and publishers to raise the price of e-books, because the complaint described specific conversations from which it was fair to infer an agreement and because it alleged motives for both Apple and the publishers to join the conspiracy.   *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 682-83, 690 (S.D.N.Y. 2012).   The fact that defendants had opportunities for communication contributes to making an alleged agreement plausible, but feasibility is not enough on its own to support a reasonable inference of agreement.   *In re Text Messaging*, 2009 WL 5066652, at *7.   Therefore, in the absence of specific allegations about the

making of the agreement, an alleged agreement is not plausible without allegations that the defendants had a motive to make the agreement and would not have had independent business justifications for their conduct.

Plaintiffs' complaint fails to plausibly suggest an agreement between McCormick and Wal-Mart or any other retailer to fix retail prices.  In the language of *Twombly*, there is an "obvious alternative explanation" for the continuity in retail prices that does not require any agreement.  550 U.S. at 567.  That "natural explanation," *id.* at 568, is that McCormick maintained its wholesale prices when it reduced the fill level of pepper to offset the increased cost of raw pepper, and retailers in turn maintained their retail prices to preserve their usual allowance for operating costs and their traditional profit margin.  Retailers could well have expected that most consumers would be insensitive to the precise amount of pepper in a container and therefore willing to pay the same retail prices as before.  Retailers could also have expected their competitors to reach the same conclusions, and therefore, they did not worry that they needed to reduce their traditional profit margins in order to avoid being undercut by their competitors.  *Cf.* VI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1434c (3d ed. 2010) (explaining that a significant rise in raw material costs is an independent explanation, other than an agreement, for an oligopolist's price increase).

Plaintiffs have offered no basis for rejecting this logical and lawful explanation. Although they make a conclusory allegation of agreement, they do not allege a single fact that plausibly suggests agreement.  First, while they allege that McCormick and its retailers would have had an opportunity to make an agreement on prices at the same time that they communicated about their supply agreements, mere feasibility is insufficient to make agreement

plausible.  Plaintiffs do not allege any specific communications from which an agreement can be inferred.  Second, they allege no facts to suggest that defendants would have been acting against their independent economic self-interest if they had chosen the same prices as charged before without having an agreement about them.  Indeed, plaintiffs conceded at the hearing that each retailer would have had an independent economic motive to maintain the retail price if McCormick reduced the amount of pepper without reducing the wholesale price.  (Tr. at 86.)

Finally, plaintiffs fail to allege any motivations for McCormick and the retailers to make an agreement about retail prices.  Without an agreement, the retailers could each choose to maintain their traditional prices, because plaintiffs have not alleged any reason that retailers would have had to fear being undercut by competitors.  Meanwhile, there is no apparent incentive for McCormick to insist on maintaining retail prices.  As the preeminent antitrust treatise explains, "manufacturers ordinarily maximize their profits through intense competition among dealers."  VIII *Areeda* ¶ 1601.  Although there are circumstances in which a manufacturer can benefit from restricting retail prices (and often do so without hurting consumers), *see id.*, plaintiffs have not offered any reason why this would be one of those circumstances.[1]

In sum, the complaint fails to plausibly suggest an agreement on prices because there is an obvious lawful explanation for the observed prices, no allegations of specific communications that suggest agreement, no allegations that defendants were acting against their independent economic self-interest, and no alleged motivations for defendants to make an agreement on price.

---

[1] For example, one reason a manufacturer might want to set retail prices is to encourage dealers to provide services without worrying that consumers will take advantage of the services while buying the product at a lower price from another dealer who does not provide such services.  VIII *Areeda* ¶ 1601e.

2.   Agreement on Quantity

a.   There is no restraint of trade.

Only agreements "in restraint of trade" can violate Section 1 of the Sherman Act.  15

U.S.C. § 1.  Agreements between suppliers and customers are ubiquitous, for they are necessary

to do business, so courts "need to be clear on which ones should be of concern to antitrust law."

VII *Areeda* ¶ 1437a*,* b.  In particular, an "ordinary sales contract fixes the transaction price, but it

does not restrain trade."  *Id.* at ¶ 1437a.   For example, car dealers who had contracts with

General Motors once tried to argue that GM had engaged in illegal price-fixing because the

contracts set prices at which GM would compensate its dealers for providing warranty repair

parts and services.  *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1467-68 (9th Cir.

1986).  The Ninth Circuit explained that the Sherman Act is not concerned with the agreement

between a buyer and a seller on the price for a particular item or service.  *Id.* ("Ordinary sales

contracts do not unlawfully restrain trade.")

The agreements between suppliers and buyers that are of concern to antitrust law are

generally categorized as either interbrand restrictions or distribution restraints.  VIII *Areeda*

¶ 1600a; I ABA Section of Antitrust Law, *Antitrust Law Developments* 136 (7th ed. 2012).  An

interbrand restriction is a restriction by a manufacturer that restrains its dealers from patronizing

other manufacturers.  VIII *Areeda* ¶ 1600a.  A distribution restraint restricts a dealer from

competing with other dealers selling the same product, such as by restricting the dealer's

freedom to set prices, sell in certain geographic areas, or sell to certain customers.  *Id.*

The agreement between McCormick and its retailers about the quantity of pepper in the

tins that McCormick was selling to retailers was an ordinary sales contract, not a restraint of

trade.  Retailers could not obtain pepper for their store brands from McCormick or any other

supplier without an agreement on the amount of pepper that would be in the supplied containers.

When a manufacturer specifies the characteristics of the product it is willing to sell, it neither

restrains its dealer from patronizing other dealers (which would be an interbrand restriction), nor

does it restrict the dealer from competing with other dealers of the same product (which would

be a distribution restraint).  Thus, this case does not involve any agreement that implicates

antitrust concerns.

> b.   The alleged agreement is not illegal *per se*.

Even when an agreement restrains trade, which is not the case here, plaintiffs cannot

survive a motion to dismiss without plausibly alleging that the agreement unreasonably restrains

trade.  *See Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284,

289 (1985) (Whether an agreement in restraint of trade "violates § 1 of the Sherman Act depends

on whether it is adjudged an *unreasonable* restraint.").  The Supreme Court labels categories of

restraints as illegal *per se* when they would always or almost always tend to restrict competition,

and therefore, it is not worthwhile to analyze the effects in a particular instance.  I *Antitrust Law

Developments* 54-55.  Horizontal agreements — agreements among competitors — to fix prices

or allocate markets are deemed illegal *per se*.  *Id.* at 54-61.  In contrast, some other horizontal

agreements and almost all vertical agreements — agreements between firms at different levels in

the chain of distribution — must be analyzed under the rule of reason, which requires the court to

look at the restraint's likely effect on competition.  *Id.* at 136-37.  Even vertical agreements

setting dealers' resale prices (known as "resale price maintenance") can sometimes have

procompetitive rather than anticompetitive effects.  *Leegin Creative Leather Prods., Inc. v.

PSKS, Inc.*, 551 U.S. 877, 889-90, 907 (2007).

There are two independent reasons that the alleged agreement on quantity is not illegal *per se*: (1) it is not a horizontal agreement; and (2) it is an agreement about standardizing products rather than an agreement on price. Beginning with the first point, plaintiffs have made two arguments for labeling the alleged agreement as horizontal. First, plaintiffs contend that they have alleged a hub-and-spoke conspiracy. (Pls.' Opp. at 15.) A hub-and-spoke conspiracy is one in which "an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *United States v. Apple Inc.*, 791 F.3d 290, 314 (2d Cir. 2015). Thus, the conspiracy involves a horizontal agreement among the spokes, in addition to vertical agreements between the hub and each spoke. *Id.* The Second Circuit has concluded that when there is express collusion among competitors, and a hub uses vertical agreements to organize that horizontal conspiracy, the hub is also subject to *per se* liability. *Id.* at 316, 324-25. Vertical arrangements do not give rise to *per se* liability, however, if there is *no* evidence of a horizontal agreement among the spokes. *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Assoc. of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 64-66 (1st Cir. 2016); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109-10 (2d Cir. 2002).

Here plaintiffs allege that "McCormick was in a position to act as the 'hub' in a 'hub-and-spoke' conspiracy," but their allegations focus on the relationship and communication between McCormick and each retailer. (*See* Compl. at ¶¶ 5, 57-62 ("McCormick also agreed with its retail customers . . . ."; "There is substantial evidence showing that McCormick agreed with the Retailers . . . ."; "McCormick and each of the Retailers had regular opportunities to meet . . . ."; "[T]he Retailers agreed with and permitted McCormick to roll out the scheme . . . . McCormick and the Retailers agreed to, and did, maintain the same retail prices . . . .").) There

is no explicit allegation that the retailers made an agreement with each other.  If there were such

an allegation, plaintiffs would also need to allege supporting facts.  Plaintiffs have not done this.

In fact, plaintiffs do not even name the retailers who allegedly made agreements, other than Wal-

Mart and Publix.  (*See* Compl. at ¶¶ 5, 48.)  Therefore, the alleged agreement on quantity cannot

be deemed illegal *per se* as a hub-and-spoke conspiracy.

Next plaintiffs argue that McCormick's alleged agreement with retailers is horizontal

because "McCormick sells pepper products that directly compete with the store-branded pepper

products."  (Pls.' Opp. at 15.)  Plaintiffs offer no precedent for this novel claim that when a

manufacturer supplies both its own branded product and generic products, agreements between

the manufacturer and the owner of the generic brand are horizontal and therefore illegal *per se*.

Rather, many courts have concluded that rule-of-reason analysis is necessary for any new factual

situations that are not readily identifiable as being equivalent to conduct that has been analyzed

in the past.  I *Antitrust Law Developments* 57.  In a similar vein, the Areeda treatise recommends

defaulting to an analysis under the rule of reason when alleged conduct seems to have some

characteristics of both horizontal and vertical restraints.  *See* VIII *Areeda* ¶ 1605a (discussing

dual distribution situations, where a manufacturer sells both to independent dealers and directly

to customers, so that in some ways the manufacturer-as-dealer competes with rival dealers); *see

also Bedi v. Hewlett-Packard Co.*, Civ. No. 07-12318, 2008 U.S. Dist. LEXIS 102672, at *3-*4

(D. Mass Nov. 17, 2008) (Where Staples sold both HP cartridges supplied by HP and Staples

brand cartridges obtained from a different supplier, "although Staples and HP brand cartridges

directly competed with one another, the relationship between HP and Staples is primarily a

vertical one.").  Our case presents both a new type of conduct for which there is no prior analysis

and a relationship that arguably has both horizontal and vertical aspects.  Therefore, the Court

13

cannot conclude that the agreement on quantity is obviously anticompetitive.[2]  Rather, it should be analyzed under the rule of reason.

Even if the agreement on fill level were characterized as horizontal, it would not qualify for *per se* treatment.  Horizontal agreements on price or a price element, such as financing, are illegal *per se*, but horizontal agreements to standardize a product are generally analyzed under the rule of reason.  *Compare* XII *Areeda* ¶ 2022a (price and price elements) *with* XIII *Areeda* ¶ 2136 (standard setting).  Plaintiffs argue that even without an agreement on price, the "slack-fill, in aggregate, results in a reduction of output, which would have the same effect of raising prices on consumers in violation of Section 1."  (Pls.' Opp. at 11.)  Admittedly, a horizontal agreement among producers to limit their output is equated with a price-fixing agreement because an artificial restriction of the total supply of a product will drive up the price of that product until demand matches the reduced supply.  *See, e.g., Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) ("Consumers will pay more when supply is scarcer . . . ."); *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 40 (D.D.C. 2007).  However, McCormick's agreement with retailers to fill individual containers with less pepper did not restrict the total supply of pepper, and therefore, the output-restriction cases are irrelevant to this case.  Even assuming *arguendo* that a horizontal agreement existed, any alleged

---

[2] The single case that plaintiffs cite in support of their argument for horizontal classification is of no help.  The case is *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975).  (*See* Pls.' Opp. at 15 n.62.)  Holiday Inn licensed some independent franchisees but also owned some of the franchisees, leading the Third Circuit to conclude that "since HI, in one of its capacities, was dealing on the same market level as its franchisees, its contracts that, in effect, foreclosed such franchisees from operating either Holiday Inns or non-Holiday Inns in cities where HI operated an inn, except with HI's permission, constitute market allocation agreements among competitors" and therefore are illegal *per se*.  *Am. Motor Inns*, 521 F.2d at 1254.  This case is inapposite because it is equivalent to a manufacturer owning some of its dealers, not to a manufacturer supplying an independent dealer with both a branded and a generic product.  Furthermore, the Areeda treatise explains that the court was wrong to characterize the agreement as illegal *per se*, because "[t]he legitimate reasons a manufacturer may have for limiting intrabrand competition among dealers are no less applicable when it owns one or more of the dealerships."  VIII *Areeda* ¶ 1605c.

agreement on quantity concerned not price or output but product standardization and thus must be analyzed under the rule of reason.

       c.   Plaintiffs have not satisfied the requirements of the rule of reason.

With limited exceptions not applicable here, analysis under the rule of reason requires a plaintiff to define a relevant market, show that the defendants have market power in that market, and demonstrate that the restraint is likely to have anticompetitive effects — that is, "to impair competition by creating, increasing, or maintaining that market power or by facilitating its exercise, or by otherwise harming consumers." I *Antitrust Law Developments* 70-73.  A demonstration of market power alone is not sufficient; plaintiffs must also show that the challenged practice is likely to harm competition.  *See, e.g.*, *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *General Leaseways*, 744 F.2d at 596.

Because anticompetitive effect is an essential element of a claim under the rule of reason, plaintiffs must plausibly allege it in their complaint.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ."); *see, e.g.*, *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071-74 (11th Cir. 2004) (requiring "specific allegations linking market power to harm to competition").  Conclusory allegations of supracompetitive prices are not sufficient.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339-40 (11th Cir. 2010) (dismissing complaint that made conclusory allegations of supracompetitive prices and elimination of price competition without alleging facts about what the competitive price should be or how the agreement harmed competition); *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 419-20 (5th Cir. 2010) (dismissing complaint that alleged that consumers had to pay artificially high prices for Brighton products without explaining why consumers would not buy from competitors instead,

alleged elimination of competition for purchase of Brighton products while ignoring the potential

benefits for competition between Brighton and other products, and did not allege that retailers

had driven the agreement for the sake of their own profit.)

Plaintiffs have failed to allege potential or actual anticompetitive effects.  They allege

that "[p]rices for pepper sold by McCormick and its co-conspirators have been fixed, raised,

maintained, and stabilized at artificially high, non-competitive levels" and "[p]rice competition

in the sale of pepper has been restrained." (Compl. at ¶ 76.)  However, there are no allegations

about how an agreement on the quantity of pepper in containers that McCormick supplies to

Wal-Mart would lead to artificially high prices for those containers.

Moreover, plaintiffs have been unable to offer in their pleadings or at the hearing any

satisfactory explanation for how an agreement on quantity would harm competition.  Plaintiffs

have repeatedly insisted that this agreement is an output restriction, but, as explained above, that

argument fails.  At the hearing, plaintiffs responded that even if the total supply of pepper is not

reduced, "the reduction of the amount of pepper in the can effectively raises the price per ounce

of the pepper in that can." (Tr. at 69.)  This argument ignores the fact that if there is no

agreement on retail price, decreasing the amount of pepper in the can does not automatically

increase the price per ounce.  Retailers are free to choose their prices.  If the retail price per

ounce did increase, as alleged, it suggests that the increased price was a competitive price given

wholesale prices and consumer demand.  As the Court has already explained, it is not surprising

that the retail price would rise due to an increase in raw pepper costs.

At the hearing plaintiffs also claimed that a wholesale price increase would leave Wal-

Mart free to choose whether to pass the price increase on to consumers, but this agreement was

anticompetitive because "Wal-Mart and McCormick came together to agree on . . . the action

they would take to affect consumers." (Tr. at 115.)  Again, plaintiffs ignore the fact that an

agreement on quantity does not restrict what retailers can charge consumers.  If retailers want to

charge the same price per ounce as they did before, they can do that.  If an increase in the

wholesale price per ounce drives retailers to increase the retail price per ounce, the relevant

inquiry is whether the wholesale price was supracompetitive, but there is no such claim here.

In their final attempt to portray the agreement on quantity as anticompetitive, plaintiffs

claim that "this case is not the first of its kind" because the Federal Trade Commission and

consumers have previously challenged an agreement between two gas companies to reduce the

amount of propane in their tanks. (Pls.' Opp. at 14.)  Each of the gas companies had proposed to

sell the reduced amount of propane to Wal-Mart without reducing the price, and when Wal-Mart

objected, the two companies agreed with each other that they would not relent on the reduction

and thereby would force Wal-Mart to accept the reduced fill.  *In re Ferrellgas Partners, L.P.*,

159 F.T.C. 1, 3 (Compl. at ¶¶ 4-7).  The FTC entered into a consent order with the companies.

*Id.* at 18-40.  The court dismissed the corresponding consumer class action without reaching the

merits.  Order, In re Pre-Filled Propane Tank Antitrust Litig., MDL No. 2567, Master Case No.

14-02567-MD (W.D. Mo. Jul. 2, 2015), ECF No. 162; Order, In re Pre-Filled Propane Tank

Antitrust Litig., MDL No. 2567, Master Case No. 14-02567-MD (W.D. Mo. Jan. 13, 2016), ECF

No. 229.

*Ferrellgas* does not demonstrate the unreasonableness of the agreement alleged in this

case.  The FTC filed its complaint under Section 5 of the Federal Trade Commission Act, 15

U.S.C. § 45, rather than Section 1 of the Sherman Act.  *In re Ferrellgas*, 159 F.T.C. at 2.  The

consent orders did not constitute an admission of any violation by the companies and did not

contain any findings of law.  *Id.* at 18, 29.  The commissioners expressed significant

disagreement about whether and why the challenged conduct was anticompetitive.[3]  *Id.* at 45-59.

Most importantly, the facts were quite different.  *Ferrellgas* concerned a horizontal agreement

between competitors, whereas McCormick's relationship to Wal-Mart and other retailers is

primarily vertical.  Even if that relationship has some horizontal features because consumers

choose between McCormick-branded and store-branded pepper, it is not equivalent to a

relationship that is clearly horizontal.  Furthermore, the result of the collusion in *Ferrellgas* was

that Wal-Mart accepted a price increase that it had refused to accept before the collusion.

Nothing like that happened in our case.  Given these important differences, plaintiffs cannot

claim an anticompetitive agreement by relying on *Ferrellgas*.  (*See* Pls.' Opp. at 14.)

In sum, the alleged agreement on quantity is nothing more than an ordinary sales contract

describing the product to be sold, which does not implicate antitrust concerns.  Alternatively, it is

certainly not illegal *per se*, and plaintiffs have failed to offer any facts or argument plausibly

suggesting that the agreement is anticompetitive.  Since plaintiffs have not made any plausible

allegations of an agreement that unreasonably restrains trade, the Court must dismiss Count I.

## B.  Antitrust Injury

Private plaintiffs claiming damages for an antitrust violation must also allege "antitrust

injury," which is "injury of the type the antitrust laws were intended to prevent and that flows

from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

*Inc.*, 429 U.S. 477, 489 (1977).  Plaintiffs cannot recover damages unless their injury "stems

from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v.*

*USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

---

[3] Note that the F.T.C. reporter erroneously labels the statement of Commissioner Joshua D. Wright as a Dissenting Statement, when the text shows that it is in fact a Concurring Statement.  *See id.* at 54.  In total, three commissioners voted for the consent order and one commissioner voted against it.

Here, the alleged antitrust injury is "receiving less pepper in a pepper tin or grinder and thus effectively paying higher prices for their pepper purchases than they would have paid in the absence of those [antitrust] violations."  (Compl. at ¶ 77.)  Since plaintiffs have not plausibly alleged that the increased price per ounce of pepper was a result of anticompetitive conduct, rather than simply reflecting the increasing global cost of raw pepper, the higher prices that plaintiffs paid do not constitute an antitrust injury.  If plaintiffs paid higher prices for pepper because McCormick's packaging misled them about the quantity and they would otherwise have chosen lower-priced pepper of another brand, their injury is not an antitrust injury.  *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526-27 (1983) ("common-law fraud or deceit" is "not subject to review under the federal antitrust laws"); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961) ("deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned").  The lack of antitrust injury is an independent basis for dismissing Count I.

## II.    CONSUMER PROTECTION AND UNJUST ENRICHMENT CLAIMS

Plaintiffs have claimed violations of the consumer protection statutes of twenty-five states, as well as unjust enrichment under the laws of all fifty states and the District of Columbia.  (Compl. at ¶¶ 89, 94-97.)  Defendants argue that the Court should dismiss all of these class claims because legal and factual variations among individuals and state laws bar class treatment.  In the alternative, defendants argue that this Court should dismiss claims under the laws of states where no named plaintiffs reside because they have no standing to pursue those claims.  As explained herein, the Court finds that none of defendants' arguments warrant dismissal of any state-law claims at this stage.

## A.  Legal Standard

To survive a motion to dismiss, plaintiffs must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The D.C. Circuit has not considered the application of the plausibility standard to class allegations, but several other circuits have held that Rule 12(b)(6) motions can be used to strike class allegations when it is apparent on the face of the complaint that they cannot satisfy the requirements of Rule 23.[4]  *See McCrary v. Stifel, Nicolaus, & Co.*, 687 F.3d 1052, 1059 (8th Cir. 2012) (holding that "class claims that fail to meet the requirements of Rule 23 may be properly dismissed by granting a Rule 12(b)(6) motion"); *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 947-49 (6th Cir. 2011) (dismissing suit brought under laws of many different states because the lack of common legal or factual issues would preclude class certification); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings.").  However, "courts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery" and refuse to grant motions to dismiss when the "complaint states a plausible claim for class-wide relief."  *Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 90-91 (D.D.C. 2013).

## B.  Variation Among States' Laws

Multi-state class claims should not be dismissed if it is possible that the plaintiffs could demonstrate a manageable grouping of the state laws.  On a motion for class certification, the

---

[4] In multi-district litigation, a transferee court should apply the law of its own circuit to federal issues, including procedural issues.  *Multidistrict Litigation Manual* § 9:18 (2016); *see In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1174-76 (D.C. Cir. 1987) (transferee court should apply its own law to federal issues); *In re Bridgestone/Firestone, Inc., ATX, ATX II*, 128 F.Supp.2d 1198, 1200 (S.D. Ind. 2001) (transferee court should apply its own law to procedural issues).

D.C. Circuit has explained that "to establish the commonality of the applicable law, nationwide class action movants must creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles'" because the "variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (quoting *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986)). In most cases, courts find plaintiffs' grouping proposals inadequate and conclude that the class action fails commonality, predominance, or superiority requirements.  *See, e.g., Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183-85 (3d Cir. 2014); *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 271 (D.D.C. 1990); *Agostino v. Quest Diagnostics, Inc.*, Civ. No. 04-4362, 2010 WL 5392688, at *12 (D.N.J. Dec. 22, 2010).  A few courts, however, have certified multi-state classes after finding grouping of state laws is possible.  The Third and Ninth Circuits have certified multi-state classes for settlement purposes, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 290, 315 (3d Cir. 1998); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998), and courts have also certified classes that were not so limited, *see, e.g.*, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 93-95, 107 (D. Mass. 2008); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 293-94 (S.D. Ohio 1997).[5] Therefore, the Court will not dismiss claims for which it does not yet know if grouping is possible.

---

[5] This Court will not follow the Sixth Circuit, which dismissed a multi-state class action complaint because it would be "measured by the legal requirements of different state laws," without even considering the possibility of grouping, *see Pilgrim*, 660 F.3d at 947-50, because that result contravenes the D.C. Circuit's recognition that multi-state classes can be certified if grouping is possible.

1.   Consumer Protection Statutes

Defendants assert without objection by plaintiffs that each plaintiff's consumer protection claim is governed by the law of the state where he lives and purchased the pepper. (McCormick's Mem. at 18-19.)  A transferee court handling multi-district litigation should apply the same state law that the transferor court would have applied, and it does so by applying the choice-of-law rules of the state where the transferor court was located.  *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 68 (D.D.C. 2003).  Thus, for each plaintiff's claim, this Court should apply the choice-of-law rules for the state where that plaintiff originally filed suit. However, defendants assert that it is unnecessary to look at specific states' choice-of-law rules for consumer protection statutes because they would universally point to the consumers' home states.  (McCormick's Mem. at 19.)  It is quite believable that every state's choice-of-law rules would apply consumers' home-state consumer protection law.  In any case, defendants have not asked the Court for dismissal on this basis, so the Court will assume for purposes of this motion that consumers' home-state laws will apply.  Since plaintiffs have brought claims under the consumer protection statutes of twenty-five different states, this Court must evaluate whether it is plausible that those state statutes could be grouped.

Courts have reached different results in different cases about whether state consumer protection statutes can be grouped sufficiently to permit class certification.  On the one hand, a district court judge in Massachusetts certified a nationwide class for multi-district litigation involving unfair and deceptive trade practices laws in over thirty states after finding that grouping made the statutes manageable.  *In re Pharm. Indus.*, 252 F.R.D. at 93-95, 107.  On the other hand, judges have refused to certify multi-state classes for consumer protection claims because the plaintiffs had not demonstrated how grouping would work.  *See Grandalski*, 767

F.3d at 183-85; *Agostino*, 2010 WL 5392688, at *12.  Furthermore, some judges have refused

class certification without considering the possibility of grouping state laws.  *See Pilgrim*, 660

F.3d at 947-50; *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 291 F.R.D. 13, 19 (D.

Mass. 2013).  Since grouping is possible in some cases, the fact that plaintiffs have alleged

violations of many states' statutes does not automatically make it impossible that they could

satisfy the requirements of Rule 23.

     To bolster their contention that the consumer protection statutes at issue are too variable

to permit class certification, defendants argue that the statutes incorporate multiple standards

about reliance and the availability of punitive damages.  (*See* McCormick's Mem. at 21-23.)

Specifically, defendants identify three different requirements with respect to reliance and two

categories for whether punitive damages are available.  (*See id.*)  The problem with this

argument is that it actually suggests the possibility of grouping.  Given that grouping of

consumer protection statutes might be possible, it would be inappropriate to dismiss plaintiffs'

claims without giving them an opportunity to demonstrate that there are workable groupings.

This is especially true because plaintiffs may not seek to certify a class under all of the states

pled in the complaint.  (*See* Tr. at 14 ("[T]he defendants [are] looking to argue class cert before it

is ripe, before they know what states we're looking to certify.").)  As defendants conceded at oral

argument, the Court can exercise its discretion and wait to address the differences among state

statutes at the class certification stage, when the parties will have presented a thorough analysis

of those differences.  (*See* Tr. at 53 ("If your Honor is asking me is there something that compels

you to decide it now, the answer is no.").)

2.   Unjust Enrichment

Mirroring their argument in the consumer protection context, defendants also assert that all choice-of-law rules will point to the unjust enrichment law of the states where plaintiffs purchased pepper.  (McCormick's Mem. at 25-26.)  Assuming that to be true for purposes of this motion, the Court must determine whether it is possible that the unjust enrichment laws of different states can be grouped.  Plaintiffs have made an unjust enrichment claim on behalf of a nationwide class, so it appears that they seek to include all fifty states.  (*See* Compl. at ¶¶ 94-97.)

Again, like the consumer protection issue, courts faced with the question of whether variations in the state law of unjust enrichment bar class certification have reached different outcomes.  *Compare, e.g.*, *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 19-21 (D. Mass. 2010) (stating that "unjust enrichment claims in different states are substantially similar" and certifying a 34-state class) *and In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (stating that the "standards for evaluating various states classes' unjust enrichment claims are virtually identical") *with Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 195 (5th Cir. 2010) (holding that plaintiff's "survey here fails to show that burden of proof standards do not vary or that differences in state unjust enrichment laws are insignificant"); *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 513-14, 519 (D. Minn. 2014) (holding that unjust enrichment laws differ substantially); *and Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008) (stating that "federal courts have generally refused to certify a nationwide class based upon a theory of unjust enrichment" and plaintiffs had failed to explain how to deal with the variation).

As already held, this Court cannot determine the manageability of grouping unjust enrichment laws without an extensive analysis of the states' laws.  Plaintiffs have the burden to

present such an analysis with their motion for class certification, *Walsh*, 807 F.2d at 1017, and

nothing prevents the Court from waiting and addressing this issue at the class certification stage.

### C. Standing to Pursue Claims Under Other States' Laws

Defendants contend that named plaintiffs do not have standing to pursue class claims

under the laws of states where they do not reside.  (McCormick's Mem. at 14-18.)  Although

plaintiffs have asserted consumer protection claims under twenty-five states' laws and unjust

enrichment claims on behalf of a nationwide class, there are not named plaintiffs from every

state.  In the complaint, there were named plaintiffs from eleven states.  (Compl. at ¶¶ 9-23.)

Only one of the named plaintiffs had purchased Wal-Mart's Great Value brand pepper.  (*See*

Compl. at ¶ 10.)  After defendants filed their motions to dismiss, some plaintiffs voluntarily

dismissed themselves from the suit, so the remaining named plaintiffs come from eight states.

(*See* Notice of Voluntary Dismissal, ECF No. 68.)  The single Great Value purchaser was one of

the plaintiffs dismissed.  (*See id.*)  As a result, Wal-Mart moved for leave to file a supplemental

memorandum arguing that all state-law claims against it should be dismissed because there was

no longer any named plaintiff with standing to sue Wal-Mart.  (Mot. Leave File Supplemental

Mem., ECF No. 79.)  Plaintiffs then moved to substitute a new named plaintiff who purchased

Great Value pepper.  (Mot. Substitute Party, ECF No. 83.)  The Court has granted plaintiffs'

motion as conceded.  (Order, Nov. 11, 2016, ECF No. 96.)  Therefore, Wal-Mart's argument in

its supplemental memorandum fails.  This leaves the Court to address whether named plaintiffs

can bring claims under other states' laws.

Outside the class-action context, "a plaintiff must demonstrate standing for each claim he

seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  For class actions,

the Supreme Court's cases show "tension" about "whether [a named plaintiff's ability to

represent unnamed class members with somewhat different claims] . . . is appropriately addressed under the rubric of standing or adequacy." *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003). For example, the Court has declared that a conclusion about the named plaintiff's individual standing "shift[s] the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.' Rule 23(a)." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975). However, the Supreme Court has also held that named plaintiffs do not have "standing" to represent other plaintiffs whose injuries are too dissimilar. *Lewis v. Casey*, 518 U.S. 343, 357-58 (1996).

Reflecting this ambiguity, courts have split on how to handle class actions in which named plaintiffs seek to represent classes bringing state-law claims in states where the named plaintiffs do not reside. Some courts dismiss claims under other states' laws on the ground that the named plaintiffs must have standing for every claim they raise. *See, e.g.*, *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 36 (D.D.C. 2008) ("[A] case or controversy requires a specific, identified plaintiff who can establish a personal injury under the claim asserted."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 151-55 (E.D. Pa. 2009); *In re Packaged Ice Antitrust Litig.*, 779 F.Supp.2d 642, 653-59 (E.D. Mich. 2011). Other courts reason that once a named plaintiff has standing to raise one claim, whether he can raise related claims for the class is a Rule 23 question, so related claims under other states' laws should not be dismissed at the outset for lack of standing. *See, e.g., Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. 2009) ("[T]he fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they purchased Defendants' calling cards is immaterial. The issue Defendants raise is one of predominance . . . ."); *In re Hyroxycut Mktg. & Sales Practices Litig.*, 801 F. Supp. 2d 993, 1104-05 (S.D. Cal.

2011) ("[T]he issue of individual standing is separate and distinct from the inquiry whether named plaintiffs can meet the requirements to certify a class under Rule 23."); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 376-77 (E.D.N.Y. 2010) ("[T]he sundry state law claims cannot be dismissed for lack of standing when there is no requirement that the named plaintiffs have standing to bring them").

It is more logical to consider named plaintiffs' ability to raise other state-law claims as a question of commonality, typicality, and adequacy under Rule 23, rather than a question of standing.  Generally, the named plaintiffs in a class action do not have individual standing for all of the claims that they raise, because one individual does not have standing to claim injury to another individual.  Therefore, standing analysis cannot address whether one plaintiff should be able to bring claims on behalf of others.  *See, e.g.*, *Bayer*, 701 F. Supp. 2d at 377 ("Whether the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states." (quoting *Ramirez*, 644 F. Supp. 2d at 505)). In contrast, "the requirements of Rule 23(a)—commonality, typicality, and adequacy—exist to test the relationship between the named plaintiff's claims and those of the class."  William B. Rubenstein, *Newberg on Class Actions* § 2:6 (5th ed. 2016).  Thus, when defendants are "not challenging Plaintiffs' standing to bring their own claims" but rather "their standing to bring claims on behalf of the class," "[t]his question would be appropriately, and more efficiently addressed at the class certification stage."  *Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Health Corp.*, C.A. No. 16-046, 2016 WL 6462137, at *6 (D.R.I. Nov. 1, 2016).[6]

---

[6] Analyzing this issue under Rule 23 rather than as a standing question does not leave courts helpless to prevent "lengthy class discovery" when plaintiffs "propos[e] to represent the claims of parties whose injuries and modes of redress they would not share."  *Wellbutrin*, 260 F.R.D. at 155.  A court can still dismiss a class claim or require additional named plaintiffs if it is apparent from the complaint that the original named plaintiffs will not satisfy the

Whether the named plaintiffs can adequately represent unnamed class members with claims under other states' laws depends on how variable the laws are.  If the laws are similar enough, or if they can be grouped into a small number of categories with named plaintiffs representing each category, it may be unnecessary to have a named plaintiff from every state. Defendants have conceded that the Court has discretion to wait until class certification to evaluate differences among state laws.  (Tr. at 53.)  Since the parties have not yet presented a complete analysis of variability among state laws, the Court cannot determine at this stage whether the named plaintiffs can adequately represent the entire class.

### D.  Individualized Factual Inquiries

This Court can dismiss class claims if factual variations among plaintiffs' experiences will prevent class certification.  To maintain a class action, plaintiffs must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  If such predominance is not plausible, a Rule 12(b)(6) motion can be used to strike class allegations.  *See supra* Section II.A; *Pilgrim*, 660 F.3d at 947-49 (dismissing suit because the lack of common legal or factual issues would preclude class certification); *McCrary*, 687 F.3d at 1058-59 (dismissing class claim that would require highly individualized facts).

### 1.  Unjust Enrichment

Defendants argue that "evaluation of Plaintiffs' unjust enrichment claim would require resolution of disparate issues of fact."  (McCormick's Mem. at 29.)  Defendants are correct that courts often refuse to certify classes for unjust enrichment claims because these equitable claims

---

adequacy and commonality requirements to represent a class under other states' laws. *Cf. In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (requiring the plaintiffs "to present a named class member who possesses individual standing to assert each state law's claims" because otherwise "there is a meaningful risk that the requirements of class certification under Rule 23 may not be met").

require courts to evaluate the plaintiffs' individual circumstances. *See Grandalski*, 767 F.3d at 185 ("[I]ndividual inquiries would be required to determine whether an alleged overbilling constituted unjust enrichment for each class member."); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274-75 (11th Cir. 2009) (stating that "common questions will rarely, if ever, predominate [in] an unjust enrichment claim, the resolution of which turns on individualized facts" and concluding there was a commonality problem because employees who understood the commission policy "cannot claim injustice when the company follows its compensation policies as expected and understood"); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 515 (7th Cir. 2006) (finding that there was not an identifiable and definite class for the plaintiffs' claim that they were deceived about whether Diet Coke contained saccharin, since the class of all purchasers could include many people who were not deceived); *In re Actiq Sales & Mktg. Practices Litig.*, 307 F.R.D. 150, 169-71 (E.D. Pa. 2015) (holding that common issues of fact did not predominate because it was necessary to make an "individualized inquiry into equitable circumstances").

Plaintiffs respond that some courts have certified classes for unjust enrichment claims. (Pls.' Opp. at 27.)  This is true, but all of the cases cited by plaintiffs involved special situations that allowed the plaintiffs to demonstrate injustice without addressing individual circumstances. For example, in cases where plaintiffs alleged anticompetitive conduct that artificially inflated prices, courts have found that they could demonstrate unjust enrichment because all purchasers would have paid more than they should have.  *In re Terazosin Hydrochloride*, 220 F.R.D. 672 at 698; *In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. C 04-1511 CW, C 04-4203 CW, 2007 WL 1689899, at *1-*2, *9-*10 (N.D. Cal. June 11, 2007); *see also Overka*, 265 F.R.D. at 18-21; *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 343 (N.D. Cal. 2010).

It seems likely that plaintiffs' unjust enrichment claims against McCormick and Wal-Mart will require individualized factual inquiries that bar class treatment. Some plaintiffs presumably bought McCormick pepper with full knowledge of the quantity of the pepper in the container, either because they understood that the listed weight had changed or because they had already purchased another container and seen the reduced quantity. Other plaintiffs might not have realized the quantity had been reduced but would have bought the pepper regardless. There would be no injustice in defendants' retaining what these plaintiffs paid for their pepper. Since plaintiffs have not made plausible allegations of anticompetitive conduct, this case is not like the cases where courts certified classes because all plaintiffs would have paid unfair prices.

However, because the parties have not yet provided analyses of all fifty states' unjust enrichment law, the Court cannot be certain that every state requires an individualized showing of injustice. Therefore, the Court will wait to address this issue at class certification.

2.  Consumer Protection Statutes

Defendants claim that no class is certifiable in this case because the alleged injury depends on individual consumers' state of mind at the time they purchased the pepper. (McCormick's Mem. at 31-35.) It is true that when a consumer fraud claim requires a showing that individual consumers were misled or relied upon defendants' deceptive conduct, class certification is not possible.[7] *Newberg on Class Actions* § 4:58; *Oshana*, 472 F.3d at 513-15; *Byrd v. Aaron's Inc.*, 784 F.3d 154, 167-69, 171 (3d Cir. 2015); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996). However, defendants' own memorandum demonstrates that many states' consumer protection statutes do not require reliance. (*See* McCormick's Mem. at 21-22.)

---

[7] Defendants treat this as a problem of overbreadth or ascertainability of the class. (*See* McCormick's Mem. at 31-35.) Some courts use those terms, but others treat this as a problem of predominance. *See, e.g., Byrd*, 784 F.3d at 167-69; *Castano*, 84 F.3d at 745.

Defendants' argument about the necessity of looking at individual consumers' states of mind does not specify any particular state's consumer protection statute.  (*See id.* at 31-35.)  Therefore, defendants have not fairly presented this argument, and the Court will not dismiss any consumer protection claims on this ground at this stage.[8]  The Court expects to confront this issue again at class certification, however, since it appears that Maryland's statute does require reliance, and perhaps other states as well.  (*See* McCormick's Mem. at 21-22 (citing *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 432 (D. Md. 2015)).)

## CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are granted in part and denied without prejudice in part.  Specifically, Count I is dismissed with prejudice.  A separate Order accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   November 11, 2016

---

[8] Any argument about manageability (*see* McCormick's Mem. at 36-37) is also premature.