UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MCCORMICK & COMPANY, INC., PEPPER PRODUCTS MARKETING AND SALES PRACTICES LITIGATION<br><br>This Document Relates To:<br><br>ALL CONSUMER CASES | MDL Docket No. 2665<br>Misc. No. 15-1825 (ESH) |

**MEMORANDUM OPINION**

Consumer plaintiffs claim that defendant McCormick & Co. conspired with its retailers, including defendant Wal-Mart, to reduce the amount of black pepper in containers, deceive consumers about the reduction, and inflate the prices that consumers paid. In a prior opinion, this Court dismissed plaintiffs' antitrust claim with prejudice but did not dismiss their consumer protection or unjust enrichment claims. *See In re: McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices Litig.*, Misc. No. 15-1825, 2016 WL 6678340 (D.D.C. Nov. 11, 2016). Plaintiffs now move the Court to amend its dismissal order to a dismissal without prejudice and to permit plaintiffs to file their proposed second amended complaint. The Court will grant plaintiffs' motion.

1

## BACKGROUND

**I.      Plaintiffs' Consolidated Amended Class Action Complaint**

Plaintiffs originally filed fourteen separate class actions in federal courts in several states, but the Judicial Panel on Multi-District Litigation consolidated them before this Court. Only one of these actions included an antitrust claim. *See* Compl. at 16-17, *Vladimirsky v. McCormick & Co.*, No. 15-cv-2215 (N.D. Ill. Sept. 15, 2015). After consolidation, plaintiffs filed a consolidated amended complaint. (*See* Consol. Am. Class Action Compl., ECF No. 34 ("Compl.").) The complaint asserted antitrust, consumer protection, and unjust enrichment claims. As alleged in the antitrust claim, McCormick and its retailers agreed, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to implement a price increase by decreasing the quantity of pepper in both the branded McCormick containers and the retailers' private-label containers, which were also supplied by McCormick. (*Id.* at ¶¶ 48-63, 73-80.)

To support their antitrust claim, plaintiffs alleged that "McCormick controls as much as 70% of the black pepper retail market." (Compl. at ¶ 58.) McCormick is the "clear market leader in the sale of spices (including black pepper)." (*Id.* at ¶ 1.) In addition to supplying retailers with black pepper under the McCormick brand, it "supplies about half of the store-brand spices sold annually in the United States," including Wal-Mart's Great Value brand. (*Id.* at ¶¶ 3, 48.) For decades prior to 2015, McCormick sold ground black pepper in "non-transparent metal tins" whose "sizes have become the industry norm." (*Id.* at ¶ 35.) Wal-Mart's Great Value tins were "of a similar size and shape" as McCormick's and contained the same quantities of pepper that the McCormick-branded tins did. (*Id.* at ¶¶ 48, 51-52.)

Plaintiffs alleged that "[s]ince 2010 the cost of raw black pepper has increased by approximately 500%," with a particularly steep increase in 2014. (*Id.* at ¶ 31.) "In 2015, unable

to meet its cost savings targets without a substantial reduction in costs or increase in prices, McCormick began shipping millions of pepper tins and grinders to retail stores containing 25% and 19% less black pepper, respectively, than the containers were designed to hold." (*Id.* at ¶ 34.) The containers "note the [new] weight in small print" on the front, but they are the "exact same size" as before. (*Id.* at ¶¶ 38-40, 45.) In addition, "McCormick and the Retailers agreed that McCormick would reduce the amount of ground black pepper contained in the McCormick-supplied, store-branded tins, even though the actual size of the store-branded tins has, at all relevant times, remained the same." (*Id.* at ¶ 50.) According to plaintiffs, the non-transparent tins "falsely appear[ed] to contain the same amount of ground black pepper" as they had before. (*Id.* at ¶¶ 38-40.)

Plaintiffs further alleged that "McCormick and the Retailers agreed to, and did, maintain the same retail prices (as if the black pepper tins and grinders were full) for the now slack-filled black pepper containers." (*Id.* at ¶ 62.) There were no allegations about specific communications or documents evidencing such an agreement, but plaintiffs alleged that "McCormick and each of the Retailers had regular opportunities to meet, exchange information, and agree with one another as to the fill of the pepper containers." (*Id.* at ¶ 59.) Furthermore, "McCormick and the Retailers had a motive to maintain their profit margins" and "McCormick was in a position to act as the 'hub' in a 'hub-and-spoke' conspiracy." (*Id.* at ¶ 61.) As a result of this "conspiracy in restraint of trade to artificially fix, raise, maintain, and stabilize prices for pepper," plaintiffs claimed that they paid "supra-competitive, artificially inflated prices for pepper" in violation of Section 1 of the Sherman Act, 15 U.S.C § 1. (*Id.* at ¶¶ 74, 76.)

This Court dismissed plaintiffs' antitrust claim. *McCormick*, 2016 WL 6678340, at *14. First, noting that plaintiffs had conceded at the motion hearing that there was no explicit

agreement on price, the Court held that plaintiffs' complaint did not plausibly suggest that McCormick and its retailers agreed on retail prices. *Id.* at *3-*5; *see* Mot. Hr'g Tr. at 69, 93, Oct. 25, 2016. The Court explained that "there is an obvious lawful explanation for the observed prices, no allegations of specific communications that suggest agreement, no allegations that defendants were acting against their independent economic self-interest, and no alleged motivations for defendants to make an agreement on price." *Id.* at *5. Second, with regard to McCormick's alleged agreements with retailers to supply private-label products that had the same quantity of pepper as McCormick's branded products, the Court held that plaintiffs had not plausibly alleged that such agreements unreasonably restrained trade. *Id.* at *5-*8. The agreements did not warrant antitrust scrutiny because they were "ordinary sales contract[s]," which had to specify the product to be sold. *Id.* at *5. But, even assuming the application of antitrust scrutiny, the Court explained that plaintiffs failed to state a claim because their complaint did not plausibly allege that an agreement on the amount of pepper in containers would have an anticompetitive effect, *id.* at *5-*8, for plaintiffs "have been unable to offer . . . any satisfactory explanation for how an agreement on quantity would harm competition," *id.* at *7.

In response to plaintiffs' claim that the agreement was an output restriction, the Court explained that "McCormick's agreement with retailers to fill individual containers with less pepper did not restrict the total supply of pepper." *Id.* Plaintiffs also argued that the agreement to reduce the amount of pepper in containers was effectively an agreement to increase the price per ounce, but the Court noted that "if there is no agreement on retail price, decreasing the amount of pepper in the can does not automatically increase the price per ounce. Retailers are free to choose their prices." *Id.* Plaintiffs also argued that the agreements prevented retailers

from choosing whether to pass on their cost increases to consumers, but again "plaintiffs ignore[d] the fact that an agreement on quantity does not restrict what retailers can charge consumers." *Id.* at *8.  Finally, the Court held that because plaintiffs had not plausibly alleged that the increase in price-per-ounce that accompanied the quantity reductions was the result of anticompetitive conduct, as opposed to the increased cost of raw pepper, they had not adequately alleged an antitrust injury.  *Id.* at *9.  The Court therefore dismissed plaintiffs' Sherman Act claim with prejudice.  *Id.* at *14.

**II.     Plaintiffs' Motion for Reconsideration**

Plaintiffs have moved for reconsideration of the Court's dismissal order, arguing that "dismissal of Count I *with prejudice* was in error" because their proposed second amended complaint contains allegations that can cure the deficiencies in the previous complaint.  (Pls.' Mot. Reconsideration at 11-12, ECF No. 107 (redacted version at ECF No. 105); *see* Prop. 2d Am. Compl. at ¶ 57, ECF No. 107-1 (redacted version at ECF No. 105-1).)  They ask for leave to file this proposed second amended complaint.  (Pls.' Mot. at 11-12.)  They argue that it addresses the Court's concerns because it shows that "McCormick and its private label competitors expressly agreed to reduce fill" and that "the agreements had an anticompetitive effect, namely the elimination of competition around fill levels between McCormick and its private label competitors."  (*Id.*)

Plaintiffs' proposed complaint adds a number of more detailed allegations based on documents obtained from defendants during discovery.  It alleges that McCormick decided to reduce fill in its branded products "'to accommodate commodity cost increases.'"  (Prop. 2d Am. Compl. at ¶ 56.)  McCormick wanted to avoid a price increase, because it was concerned that increases in the price gap between the branded products and less expensive private-label

5

products had hurt the branded products' market share over the past few years.  (*Id.* at ¶¶ 57-58.)  However, McCormick also "feared that a unilateral reduction [in quantity of pepper in a tin] might be 'deceptive and could very well back fire on us[,]' since the private label competitors would likely 'advertise '10% more vs [McCormick]'' and thus 'point[] this deception out to our loyal branded customer.'"  (*Id.* at ¶ 60.)

The proposed amended complaint also provides details about how McCormick approached retailers to propose fill reductions.  In July, McCormick contacted Wal-Mart "to 'float' the slack fill proposal."  (*Id.* at ¶ 65.)  In October, McCormick informed retailers by letter that it would be reducing the weights in its branded products and the private-label products that it supplied to retailers.  (*Id.* at ¶ 66.)  Next, it explained in individual phone calls to retailers that they could choose to accept the reduced weights in the private-label products or pay a higher price to keep the old weights.  (*Id.* at ¶¶ 68, 69.)  Nineteen retailers agreed to accept the reduced weights in the private-label products, while eight smaller retailers took a wholesale price increase either because they were not offered a choice to reduce weights or because they elected not to do so.  (*Id.* at ¶ 81.)  Publix agreed to the reduced weight after asking McCormick whether "'[i]t is legal to down-size 25% of the product without making a change in the packaging?'" and receiving assurances from McCormick that it is.  (*Id.* at ¶¶ 77-78.)  Ahold, another retailer, also expressed concern that "McCormick and the Retailers would appear to be 'pull[ing] a fast one' on consumers."  (*Id.* at ¶ 79.)

Plaintiffs now allege that McCormick's agreements with the nineteen retailers to reduce weight in private label products were anticompetitive because "competing on fill levels" would have "creat[ed] downward pressure on prices."  (*Id.* at ¶¶ 55, 81, 106.)  Their explanation is that "[b]y agreeing at the wholesale level to reduce fill on both McCormick and private label

products, McCormick ensured that private label products would not compete for retail customers based on price comparisons, i.e. more pepper for a lower price. Had McCormick acted unilaterally [to reduce fill in its own branded products] . . . retailers would have been free to compete based on price and volume comparisons to their 'full' private label products." (*Id.* at ¶ 94.) As in their previous complaint, plaintiffs also assert in an introductory paragraph that "McCormick and the retailers were able to effectuate a de facto price increase . . . without disclosing to consumers the corresponding deceptive fill tactics" (*id.* at ¶ 7), but little else is mentioned about deception in the context of the antitrust claim except for a statement about McCormick's motivation. (*See id.* at ¶ 60 (McCormick "feared that a unilateral reduction might be 'deceptive and could very well back fire on us[,]' . . . ."))

Echoing the proposed complaint, plaintiffs' motion for reconsideration argues that "the fill reduction agreements eliminated competition around fill level." (Pls.' Mot. at 19). At several points in their motion, however, plaintiffs interject the concept of deception into their discussion of anticompetitive effect. They argue that "McCormick sought fill reduction agreements to prevent private label competitors from 'advertis[ing] '10% more vs [McCormick]'' and 'pointing this deception out to our loyal branded customer.'" (*Id.* at 17.) According to plaintiffs, "McCormick's specific aim for these agreements was to implement an effective retail price increase 'in disguise' while *destroying competition* about the form of that deceptive increase." (*Id.* at 18.) Plaintiffs assert that such "competition about its deceptive fill reduction" would "likely [have] creat[ed] downward pressure on prices." (*Id.* at 19.)

McCormick argues that the Court should not permit plaintiffs to file their proposed second amended complaint, because their new allegations do not qualify as new evidence; allegations of an express agreement on fill level have no effect on the Court's prior dismissal

7

opinion; an agreement not to compete around fill levels does not restrain competition when there is no constraint on retail price; McCormick's preference about private-label fill levels is irrelevant if the effect of the agreement was not to restrain trade; and it is illogical to fault McCormick for offering retailers a choice about whether to buy private-label products in the same weights as McCormick's new branded items or to continue with their old weights. (McCormick Opp., ECF No. 110.) Wal-Mart adds that retailers were merely exercising business judgments when they responded to the choice that McCormick offered; it was normal for McCormick to consult a major buyer in advance about a proposed change; plaintiffs do not have standing to raise a claim about the wholesale market for black pepper; and plaintiffs have failed to plausibly allege that consumers could not turn to other suppliers for a satisfactory price. (Wal-Mart Opp., ECF No. 114 (redacted version at ECF No. 112).)

## ANALYSIS

The Court's analysis of plaintiffs' motion for reconsideration proceeds in two parts. First, the Court explains that it should not have dismissed the antitrust claim with prejudice. Second, the Court considers plaintiffs' proposed second amended complaint and finds that it cannot conclude at this stage that amendment would be futile, so the Court will grant leave to amend.

**I.      Dismissal with Prejudice**

Because the Court's dismissal of the antitrust claim did not dispose of all claims for all parties, Rule 54(b) governs plaintiffs' motion for reconsideration. Fed. R. Civ. P. 54(b); *Cobell v. Jewell*, 802 F.3d 12, 19 (D.C. Cir. 2015). "In general, a court will grant a motion for reconsideration of an interlocutory order only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error

in the first order." *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008) (internal quotation marks and citation omitted).  Plaintiffs argue that the Court made a legal error when it dismissed the antitrust claim with prejudice, rather than without prejudice.  (Pls.' Mot. at 11.)[1]

In the D.C. Circuit, "a complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to Rule 12(b)(6) but not dismissal with prejudice." *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006).  This is because a "dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations omitted).  The Court did not make that determination in its prior opinion, and therefore, it should not have dismissed the claim with prejudice, so it will grant plaintiffs' request to amend its Order to dismiss Count I without prejudice.

## II.    Leave to Amend

The Court has discretion to deny leave to amend if it is clear that amendment will not cure the deficiencies in the prior complaint.  Here, plausible allegations, as required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007), of an agreement with anticompetitive effect would cure the deficiencies that the Court identified.  The proposed complaint's allegations that the agreement on fill levels led to supracompetitive prices would not, as explained herein, satisfy *Twombly*.  However, plaintiffs seem to be intimating that their antitrust

---

[1] Plaintiffs' motion for reconsideration also referred to the new allegations in the proposed second amended complaint as "[n]ew evidence."  (Pls.' Mot. at 11.)  In response, defendants argued that all of the "new evidence" was available to plaintiffs four months before the hearing on their motions to dismiss, and therefore plaintiffs could not move for reconsideration on the basis of new evidence.  (McCormick Opp. at 4-7; Wal-Mart Opp. at 3-4.)  In reply, plaintiffs clarified that they are seeking reconsideration only on the basis of legal error.  (Pls.' Reply at 2-4, ECF No. 119 (redacted version at ECF No. 116).)

claim can be based on an alternative theory that defendants agreed to deceive consumers about the reduction in fill, and that agreement led to supracompetitive prices. Assuming plaintiffs are advocating such a claim, the Court is not in a position to assess its plausibility without the benefit of further briefing. Therefore, plaintiffs' motion for leave to file an amended complaint will be granted, but defendants will be permitted to renew their motions to dismiss to address the new antitrust theory.

### A. Legal Standard

Under Rule 15(a), a plaintiff may request the court's leave to amend its pleading when it can no longer do so as a matter of right. Fed. R. Civ. P. 15(a). "The court should freely give leave when justice so requires." *Id.* The Supreme Court has explained that "the grant or denial of an opportunity to amend is within the discretion of the District Court," but leave to amend should be freely given "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Elaborating on the futility ground, the D.C. Circuit has held that a "'district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss.'" *In re Interbank Funding Corp. Secs. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004), abrogated on other grounds by *Perry Capital LLC v. Mnuchin*, No. 14-5243, 2017 WL 677589, at *20 (D.C. Cir. Feb. 21, 2017)).

In their motion for reconsideration, plaintiffs argue that their proposed second amended complaint cures the deficiencies in their previous complaint because it (1) "resolves any doubt

that McCormick and its private label competitors expressly agreed to reduce fill," and (2) "demonstrates that the agreements had an anticompetitive effect, namely the elimination of competition around fill levels between McCormick and its private label competitors." (Pls.' Mot. at 11.) This Court's prior dismissal of the antitrust claim relied in part on the insufficiency of allegations that defendants made an agreement on retail prices, but it recognized that there were sufficient allegations that defendants agreed to reduce fill. *See McCormick*, 2016 WL 6678340, at \*3-\*9. Plaintiffs' claim based on agreements to reduce fill failed not because of a lack of an agreement, but rather, because there were only conclusory allegations that those agreements had an anticompetitive effect. *Id.*

As the Court explained in its prior opinion, plaintiffs' antitrust claim cannot survive a motion to dismiss if the complaint does not plausibly allege an actual or potential anticompetitive effect. *McCormick*, 2016 WL 6678340, at \*5-\*7; *see, e.g.*, *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999) (requiring plaintiffs to "allege facts demonstrating that Defendants' conduct has an anticompetitive effect"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (holding that "to state a viable § 1 claim, [the plaintiff] was required to allege facts which, if proven true, would demonstrate that [the defendants' agreements] were likely to result in an anticompetitive effect"). Conclusory allegations of supracompetitive prices are not sufficient. Instead, plaintiffs must provide "specific factual allegations" that demonstrate harm to competition or link defendants' market power to potential harm to competition. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339-40 (11th Cir. 2010). A complaint does not state a plausible claim when it alleges that defendants eliminated price competition and caused consumers to lose money but "provides no basis on

which a court could determine *how* harm to competition results from [the defendants'] agreements." *Jacobs*, 626 F.3d at 1339-40.  Likewise, alleged explanations of anticompetitive effect fail if they "def[y] the basic laws of economics" or ignore obvious realities about competition.  *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419-20 (5th Cir. 2010).  Nor is a defendant's anticompetitive intent itself sufficient to meet the adverse-effect requirement, but rather, such an intent is relevant only to the extent it helps a court interpret the effects of the defendant's conduct.  *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 130 (2d Cir. 1995).

### B. Agreement on Quantity (Fill Level)

Plaintiffs' proposed complaint bases its Sherman Act Section 1 claim on an agreement to "simultaneously reduc[e] fill in competing pepper products to avoid competing on fill levels." (Prop. 2d Am. Compl. at ¶ 106.)  According to the complaint, if there had been no agreement to reduce fill in private label products, "retailers would have been free to compete [with McCormick's branded products] based on price and volume comparisons to their 'full' private label products."  (*Id.* at ¶ 94.)  Plaintiffs assert that this "competi[tion] on fill levels" would have "creat[ed] downward pressure on prices."  (*Id.* at ¶¶ 55, 106.)  Their motion for reconsideration argues that "elimination of competition about retail fill levels" is the anticompetitive effect. (Pls.' Mot. at 19.)  But plaintiffs offer no reason why prices would be lower when private-label products contain different quantities of pepper than when they contain the same quantities as the branded items.  Rather, plaintiffs seem to assume that competing on more dimensions of the product will always lower prices, but they provide no support for such an assumption, and without any plausible explanation, plaintiffs' claim of an anticompetitive effect from agreeing on fill levels does not satisfy *Twombly*.  *See, e.g.*, *Jacobs*, 626 F.3d at 1339-40.

12

Even if selling different quantities would drive down prices, the Sherman Act does not require retailers to sell different quantities. Antitrust law maximizes consumer welfare by encouraging competition, not by dictating companies' products and prices. As then Circuit Judge Breyer explained, "'regulation' and 'antitrust' typically aim at similar goals—i.e., low and economically efficient prices, innovation, and efficient production methods—but they seek to achieve these goals in very different ways. Economic regulators seek to achieve them directly by controlling prices through rules and regulations; antitrust seeks to achieve them indirectly by promoting and preserving a process that tends to bring them about." *Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990); *see also United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998) ("Antitrust scholars have long recognized the undesirability of having courts oversee product design . . . .").

Plaintiffs recognize that the aim of antitrust law is the protection of competition when they assert that McCormick should have reduced the fill only in its branded products so that private label retailers would be "free to compete" on fill level by offering full products. (Prop. 2d Am. Compl. at ¶ 94.) What plaintiffs ignore is that their vision of proper conduct would actually have constrained private-label retailers' freedom to compete by *forcing* them to sell private-label products with the old weights (or else switch suppliers). Such interference with retailers' ability to make their own choices would be bad for competition, especially because many private-label retailers have decided that they can compete most effectively with national brands by matching their size and other features as closely as possible. *See* S. Chan Choi & Anne T. Coughlan, *Private label positioning: Quality versus feature differentiation from the national brand*, 82 J. Retailing, no.2, 2006 at 79, 80. Indeed, before the reduction in fill, the retailers also sold their private-label products in the same weights as McCormick's branded

products, but the private-label products were sold at a lower price than the branded ones. Thus, it was procompetitive, not anticompetitive, for McCormick to offer retailers a choice about whether they wanted to sell private-label products in the traditional quantities or match the new, reduced quantities in McCormick's branded products.

There is another way to understand why retailers' agreeing with McCormick on reduced quantities for private-label products did not violate the Sherman Act. Suppose a retailer stocked branded McCormick pepper but had its own manufacturing facility to produce private-label pepper products. McCormick would have needed to inform the retailer about the planned reduction in quantity in order to make a new supply contract to sell the branded products to the retailer. Then, the retailer would have decided what quantities to put in its private-label products. Section 1 of the Sherman Act would not have constrained that decision, since there was no conspiracy. The difference between this hypothetical and our case is that the private-label retailers must enter supply agreements with McCormick in order to implement their decisions about the quantity of pepper. The fact that a retailer must enter a supply agreement in order to obtain its product should not affect its right to compete with the brand by matching it in size.

In sum, plaintiffs still have not plausibly alleged that it was anticompetitive for McCormick and the retailers to enter supply agreements for private-label products with the same reduced quantities of pepper as McCormick's branded products.

### C. Agreement to Deceive

In plaintiffs' motion for reconsideration, they argue that "McCormick's specific aim for these agreements was to implement an effective retail price increase 'in disguise' while *destroying competition* about the form of that deceptive increase." (Pls.' Mot. at 18.). They

contend that "McCormick sought fill reduction agreements to prevent private label competitors from 'advertis[ing] '10% more vs [McCormick]'' and 'pointing this deception out to our loyal branded customer.'" (Pls.' Mot. at 18.)  These statements seem to suggest that plaintiffs view deception as a central feature that made defendants' conduct anticompetitive, although this theory is far from clear from the proposed complaint.  (*See* Prop. 2d Am. Compl. at ¶¶ 82-95, 105-12.)

Deception is not normally an antitrust issue.  As this Court explained in its prior opinion, when deception affects individual consumers' choices about which products to purchase but does not impact the market, it does not violate antitrust laws.  *McCormick*, 2016 WL 6678340, at *9.  That said, the D.C. Circuit has recognized that deception can present antitrust problems in somewhat different circumstances.  In *United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001), the Court held that Microsoft had violated Section 2 of the Sherman Act because it "deceived Java developers regarding the Windows-specific nature of [its] tools" and that conduct "served to protect its monopoly of the operating system."  In a later case, where the Court rejected a Section 2 claim founded on deception, it explained that "[d]eceptive conduct—like any other kind—must have an anticompetitive effect in order to form the basis of a monopolization claim."  *Rambus Inc. v. FTC*, 522 F.3d 456, 464-67 (D.C. Cir. 2008) ("Even if deception raises the price secured by a seller, but does so without harming competition, it is beyond the antitrust laws' reach.").  This Court has not, however, been able to determine how, if at all, the logic of these cases applies to this Section 1 case.

Given plaintiffs' rather cursory mention of deception in their motion for reconsideration and the lack of explicit allegations in the antitrust count of their proposed complaint, defendants have not had a fair opportunity to address whether there was an agreement to deceive consumers

15

that had an anticompetitive effect. Therefore, although the Court will grant plaintiffs leave to amend their complaint, it will also permit defendants to renew their motions to dismiss. In their new filings, the parties must address whether: (1) plaintiffs have plausibly alleged an agreement to deceive consumers; (2) such an agreement has an anticompetitive effect (i.e., it causes harm of the type recognized by the antitrust laws by interfering with competition in the market, rather than merely injuring some consumers)[2]; and (3) such an agreement is cognizable under Section 1 of the Sherman Act.

## CONCLUSION

For the reasons discussed above, plaintiffs' motion for reconsideration is granted. The Court's Order of November 11, 2016, will be amended to state that Count I is dismissed without prejudice. The Court will grant plaintiffs leave to amend their complaint. Defendants may move to dismiss the amended complaint. In the Order accompanying this Memorandum Opinion, the Court provides deadlines and additional instructions for further proceedings.

/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: March 21, 2017

---

[2] The parties have also obscured the issue of anticompetitive effect by referring to supracompetitive prices without specifying whether they mean (1) only retail prices or also wholesale prices and (2) branded prices, private-label prices, or both. In addition, the parties have failed to explain why it is or is not plausible that defendants' conduct caused (or was likely to cause) prices to rise above competitive levels.