**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**IN RE: MCCORMICK & COMPANY, INC.,**
**PEPPER PRODUCTS MARKETING AND**
**SALES PRACTICES LITIGATION**

*This Document Relates To:*
**ALL CLASS ACTIONS**

**MDL Docket No. 2665**
**Misc. No. 15-1825 (ESH)**

---

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE ANTITRUST CLAIM (COUNT I)**
**OF PLAINTIFFS' SECOND AMENDED COMPLAINT**

**[REDACTED VERSION]**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: MCCORMICK & COMPANY, INC., PEPPER PRODUCTS MARKETING AND SALES PRACTICES LITIGATION<br><br>*This Document Relates To:*<br>ALL CLASS ACTIONS | MDL Docket No. 2665<br>Misc. No. 15-1825 (ESH) |

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE ANTITRUST CLAIM (COUNT I)**
<u>**OF PLAINTIFFS' SECOND AMENDED COMPLAINT**</u>

<u>**[FILED UNDER SEAL – CONTAINS INFORMATION DESIGNATED AS**</u>
<u>**CONFIDENTIAL UNDER THE PROTECTIVE ORDER]**</u>

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ...............................................................................3

      A.   McCormick Initially Made a Unilateral Decision to Reduce Fill in Its
           Pepper Products In Order to Maintain Retail Prices.................................................3

      B.   McCormick and its Private Label Competitors Agreed To Reduce Fill
           While Preserving the Shelf Price and Thus Eliminate Price Competition
           Between McCormick Pepper and Private-Label Pepper .........................................3

III.  ARGUMENT ........................................................................................................7

      A.   Plaintiffs Have Stated a Plausible Claim under Section 1 of the Sherman
           Act................................................................................................................8

           1.   As competitors in the retail market for black pepper, McCormick
                 and the Private Label customers engaged in a horizontal
                 agreement to restrain price competition.......................................................8

           2.   The Complaint alleges a cognizable and traditional antitrust
                 injury—a price increase on consumers as the result of collusion..............12

      B.   Plaintiffs Have Standing, Having Alleged A Wholesale-Level
           Agreement for the Purpose of Fixing Retail Prices ...............................................13

      C.   Harm to Competition Is Not a Required Showing When Horizontal
           Competitors Enter a Price Fixing Agreement; Nonetheless Plaintiffs
           Allege It Here.......................................................................................................17

      D.   Wal-Mart's Argument Regarding "Economic Sense" is a Red Herring...............18

           1.   The Supreme Court has rejected judicial consideration of motive
                 or independent business justifications when horizontal
                 competitors agree to fix prices...................................................................18

            2.   Even if this Court considers the agreement to be one between a
                 vertical supplier and retailers, Plaintiffs have alleged both motive
                 and that the decision was against the Private Label customers'
                 self-interest to enter the agreement...........................................................21

IV.   CONCLUSION...................................................................................................22

010546-12 956294 V1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Inc. v. Blue Cross Blue Shield of Mich.*,
2012 WL 2184568 (E.D. Mich. June 14, 2012)...................................................17

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)..............................................................................8

*Arizona. v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982)................................................................................17, 20

*Arizona v. Shamrock Foods Co.*,
729 F.2d 1208 (9th Cir. 1984) ...............................................................15, 16

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)................................................................................13, 18

*Bailey v. Allgas, Inc.*,
284 F.3d 1237 (11th Cir. 2002) ...............................................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................1, 7, 8

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982)................................................................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)................................................................................12

*California Dental Ass'n v. FTC*,
526 U.S. 756 (1999)................................................................................15

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*,
996 F.2d 537 (2d Cir. 1993)....................................................................15

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) ..................................................................17

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
148 F.3d 1080 (D.C. Cir. 1998)..............................................................13

*Cayman Exp. Corp. v. United Gas Pipe Line Co.*,
873 F.2d 1357 (10th Cir. 1989) ........................................................20, 21

- ii -

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ...................................................................................8, 18

*Doron Precision Sys. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006) .................................................17

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986).....................................................................14, 15

*Gen. Leaseways, Inc. v. Nat'l Truck Leading Ass'n*,
    744 F.2d 588 (7th Cir. 1984) ...............................................................13

*Gregory v. Fort Bridger Rendezvous Ass'n*,
    448 F.3d 1195 (10th Cir. 2006) ...........................................................20

*Interface Grp., Inc. v. Mass. Port. Auth.*,
    816 F.2d 9 (1st Cir. 1987) ....................................................................18

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)...................................................................15

*N. Tex. Specialty Physicians v. FTC*,
    528 F.3d 346 (5th Cir. 2008) ...............................................................17

*In re Nifedipine Antitrust Litig.*,
    335 F. Supp. 2d 6 (D.D.C. 2004) .........................................................16

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990)..................................................................................8

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) ...............................................................16

*Queen City Pizza v. Domino's Pizza*,
    124 F.3d 430 (3d Cir. 1997)..................................................................17

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)...............................................................................13

*Rossi v. Standard Roofing*,
    156 F.3d 452 (3d Cir. 1998)....................................................................2

*Stearns v. Select Comfort Retail Corp.*,
    2009 WL 1635931 (N.D. Cal. June 5, 2009) ..................................13, 16

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ...................................................17

*Tidewater Oil Co. v. U.S.*,
   409 U.S. 151 (1972)..................................................................................................17

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998)......................................................................................15

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ..................................................................................14

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
   986 F.2d 589 (1st Cir. 1993)....................................................................................17

*U.S. v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1376 (2016)........................20

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ..................................................................................21

*U.S. v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)............................................................................................19, 20

*U.S. v. Trenton Potteries Co.*,
   273 U.S. 392 (1927).................................................................................................19

*Wolff v. Beauty Basics, Inc.*,
   887 F. Supp. 2d 74 (D.D.C. 2012) ............................................................................7

## Statutes

15 U.S.C. § 1.....................................................................................................................8

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 2022a (3d ed. 2012) .......................9

# I.    INTRODUCTION

In its March 21, 2017 Opinion, the Court queried whether the antitrust claim alleges "an agreement to deceive consumers that had an anticompetitive effect."[1]  It does not.  Deception is not an element of, nor is an agreement to deceive cognizable as, a Section 1 price-fixing claim.[2]

Plaintiffs' antitrust claim is based on an agreement between McCormick, Wal-Mart, and 18 other retailers to reduce the amount of black pepper in their competing products, while agreeing to ███████████████████████  McCormick confirmed this agreement in an October 6, 2014 letter to its Private Label customers, which are also its retail competitors:[3]



---

[1] Dkt. #127 at 12-14.

[2] For that reason, Sections I and III of McCormick's Motion To Dismiss and Section 2 of Wal-Mart's Motion To Dismiss are moot and Plaintiffs do not respond to them herein.

[3] Second Amended Consolidated Class Action Complaint ("SACC"), ¶ 66 n.17 (citing MCC00005777, attached as Ex. N to Dkt. #106) (emphasis added). On motions to dismiss, courts may consider documents referenced in the complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568, n.13 (2007). *See also* Memorandum of Wal-Mart In Support Of the Motion to Dismiss the Antitrust Count (Count I) of Plaintiffs' SACC ("Wal-Mart Br."), at 5 n.2 (same).

While this Court denied Plaintiffs' motion to compel discovery of the communications between McCormick's account managers and the Private Label customers,[4] the fact that McCormick documented the agreement ███████████ in a letter to those customers, and each of those customers thereafter sold the reduced-fill products, is sufficient to state a Section 1 price-fixing claim.  Courts recognize that a document in which both parties say "I agree to fix prices," *i.e.* the proverbial "smoking-gun," is "frequently difficult for antitrust plaintiffs to come by.  Thus, plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy."[5]

In a nearly identical case, the Federal Trade Commission found that an agreement between competitors to reduce the fill in their propane tanks, even absent an explicit agreement on price, entails "a restriction on price competition and does not present any new or novel theory of liability."[6]  Rather, "[t]he agreement…amounts to a *per se* unlawful naked restraint on price competition" under the federal antitrust laws.[7]

Accordingly, allegations that McCormick intended that ███████████████████ ███████████████████████████████████████████ that McCormick sought the retailers agreement to the fill reduction and did not unilaterally act, and that McCormick documented the agreements in a letter to its Private Label customers, noting both that ████████████████████

---

[4] *See also* January 23, 2017 letter from Elizabeth Fegan to Hon. Ellen Segal Huvelle ("First, Plaintiffs seek McCormick's communications with retailers regarding the proposed reduction in fill, including through its "Customer Business Managers" and the "Directors" to whom they report. *** Second, Plaintiffs seek relevant documents stored on McCormick's SalesForce cloud, which is a customer relationship management software program used by McCormick for communications with its customers."); Dkt. #118 (denying requests in letter brief).

[5] *Rossi v. Standard Roofing*, 156 F.3d 452, 465 (3d Cir. 1998).

[6] Statement of Chairwoman Edith Ramiez and Commissioner Julie Brill, Ferrellgas Partners, L.P.; Ferrellgas, L.P., Also Doing Business as Blue Rhino; AmeriGas Partners, L.P., Also Doing Business as AmeriGas Cylinder Exchange; and UGI Corporation; Analysis To Aid Public Comment, FTC Docket No. 9360, Vol. 79, No. 216 (Nov. 2, 2014) ("FTC Docket"), at 66374, a copy of which is attached as Ex. A.

[7] *Id.* (citations omitted).

███████████████████████████ plausibly allege a price-fixing agreement in

violation of Section 1.  For this reason and those set forth below, Defendants' motions should be

denied.

## II.      FACTUAL BACKGROUND[8]

### A.      McCormick Initially Made a Unilateral Decision to Reduce Fill in Its Pepper Products In Order to Maintain Retail Prices

In January 2014, McCormick began to investigate an '██████████████████

████████████████████████████████████████████

████████ ,''  ███████████████████████████████████ '██████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████  ███████████████████████  ██████████████████

████████████████████████  █████████████████████

█████████████████████████████████████████████████

█████████████████████  '█████████████████ ''  █████████████

█████████████████████████████████████████████████

█████████████[9]

### B.      McCormick and its Private Label Competitors Agreed To Reduce Fill While ██████████████████ and Thus Eliminate Price Competition Between McCormick Pepper and Private-Label Pepper

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

---

[8] Plaintiffs do not repeat all of the allegations of the SACC as it pertains to the consumer fraud claims, but focus for purposes of this Motion on the allegations relevant to the Section 1 antitrust claim.

[9] SACC, ¶¶ 56-59.

---

[10] SACC, ¶¶ 60-61.

[11] SACC, ¶¶ 62, 64, 65.



---

[12] SACC, ¶¶ 66-70.

[13] SACC, ¶¶ 63, 68.

[14] SACC, ¶ 69.



---

[15] SACC, ¶¶ 67-80.

[16] SACC, ¶¶ 77-80.

[17] SACC, ¶¶ 63, 81.

010546-12 956294 V1



### III.    ARGUMENT

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[18] "The notice pleading rules are 'not meant to impose a great burden on a plaintiff.'"[19]

A motion to dismiss must be denied if the complaint alleges "enough facts to state a claim [for] relief that is plausible on its face."[20]  As the Supreme Court held in *Twombly*, pleading antitrust violations with sufficient plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[21]  At the pleading stage the

---

[18] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[19] *Wolff v. Beauty Basics, Inc.*, 887 F. Supp. 2d 74, 75 (D.D.C. 2012) (Huvelle, J.) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

[20] *Twombly*, 550 U.S. at 570.

[21] *Id.* at 556.

Court should not weigh competing theories and dismiss an antitrust complaint by choosing "among plausible alternatives."[22]

A.      **Plaintiffs Have Stated a Plausible Claim under Section 1 of the Sherman Act**

The Sherman Act prohibits any "contract, combination, … or conspiracy, in restraint of trade or commerce ...."[23]  "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."[24]

1.      **As competitors in the retail market for black pepper, McCormick and the Private Label customers engaged in a horizontal agreement to restrain price competition.**

Plaintiffs allege a horizontal agreement to fix or maintain the retail price of black pepper in the United States, which is unlawful *per se*.[25]  The Supreme Court has counseled that the "crucial question" for a Section 1 claim is whether "the challenged anticompetitive conduct," in this case the reduction in fill while maintaining shelf prices, "'stem[s] from independent decision or from an agreement, tacit or express."[26]  Here, Plaintiffs allege the agreement was not unilateral, but was in fact the subject of both written correspondence and telephone calls reflecting agreement.[27]  Moreover, as set forth in McCormick's October 6, 2014 letter to the retailers, the agreement expressly included an agreement ███████████████

---

[22] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) (internal quotation omitted).

[23] 15 U.S.C. § 1.

[24] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

[25] *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("[U]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity … is illegal per se.") (quotations omitted).

[26] *Twombly*, 550 U.S. at 553.

[27] SACC, ¶¶ 62, 65-81.

This Court's concern appears to stem not from whether the Private Label retailers agreed to the reduction in fill, but whether this agreement was on price. ████████████████████ ███████████████████████████████████████████████, the agreement to reduce fill affects retail prices and thus falls within Section 1.  A leading antitrust treatise explains:  "the per se rule generally governs not only explicit price fixing but agreements to fix a 'price element,' which broadly includes 'any term of sale that can be regarded as affecting the price that the customer must pay or any mechanism such as a formula by which the price maybe computed."[28] Here, the amount of fill is clearly a term of sale "that can be regarded as affecting the price that the customer must pay."[29]

Instructive is the antitrust enforcement action brought by the Federal Trade Commission ("FTC" or "Commission") against AmeriGas and Blue Rhino, *In re Ferrellgas Partners, L.P.*[30] Defendants previously argued that the FTC does not bring enforcement actions under the federal antitrust laws—and Section 5(a) of the FTC Act is not analogous to Section 1 of the Sherman Act. On the contrary, the FTC explains on its website:  "The Commission enforces various antitrust laws through its Bureau of Competition. The two most significant statutory provisions are Section 5(a) of the FTC Act and the Clayton Act. Section 5(a) of the FTC Act, 15 U.S.C. Sec. 45(a), prohibits, inter alia, 'unfair methods of competition.' ***Unfair methods of competition include any conduct that would violate the Sherman Antitrust Act.***"[31]

---

[28] Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 2022a, at 174 (3d ed. 2012).

[29] *Id.*

[30] *See* FTC Docket No. 9360, Complaint (Mar. 27, 2014), available at http://www.ftc.gov/system/files/documents/cases/140401amerigascomplaint.pdf.

[31] A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority, § II.B (bold in original; italics added), available at https://www.ftc.gov/about-ftc/what-we-do/enforcement-authority (last accessed May 4, 2017).

Suppliers of propane exchange tanks used for backyard barbecues, AmeriGas and Blue Rhino both filled each other's propane tanks through copacking agreements (i.e. vertical suppliers to the other) and also competed for consumers' propane tank business at retail (i.e. horizontal competitors). Initially, to offset rising costs, Blue Rhino unilaterally announced it was reducing the fill level in its propane exchange tanks from 17 to 15 pounds—without a corresponding price decrease.  Two weeks later, AmeriGas followed suit.  "This effectively increased the per unit price of the propane by 13 percent."  However, these decisions were *not* violative of the antitrust laws because they were parallel and not concerted action.[32]

After the announcements, Wal-Mart initially refused to accept the planned fill reduction from either Blue Rhino or AmeriGas.  Both Blue Rhino and AmeriGas understood they could not sustain the fill reduction unless it was accepted by Wal-Mart.  Moreover, Lowe's, another Blue Rhino customer, accepted the fill reduction only on the condition that all of Blue Rhino's other customers also accept the fill reduction. Thus, Blue Rhino and AmeriGas—horizontal competitors—discussed and agreed that they would not back down from their fill reduction plans but instead cause Wal-Mart to accept the reduction in fill (which it did).[33] Blue Rhino and AmeriGas thus turned what was unilateral action into a collusive agreement on maintaining reduction in fill.  The Commission found that the "collusive agreement, as alleged, was facially anticompetitive, and had the effect of raising the price per pound of propane exchange tanks to Walmart and likely ultimate consumers…."[34]

The Commission found that the agreement between AmeriGas and Blue Rhino need not have mentioned price to be a price restriction violative of the antitrust laws, stating:

---

[32] FTC Docket, at 66372.

[33] FTC Docket, at 66372.

[34] FTC Docket, at 66373.

> Reducing the volume of propane gas in a tank while
> keeping the price constant is equivalent to a per unit price increase.
> Indeed, that is how Walmart understood the fill reduction. The
> joint strategy therefore entails a restriction on price competition
> and does not present any new or novel theory of liability. It does
> not matter that the Complaint does not allege that AmeriGas and
> Blue Rhino agreed to keep their respective prices to Walmart
> constant, or that Walmart may have been free to negotiate prices
> with the parties…. The law is clear that price fixing agreements
> 'may or may not be aimed at complete elimination of price
> competition' and are unlawful in either instance because of the
> enormous threat they pose to the free market. *** The agreement
> thus amounts to a per se unlawful naked restraint on price
> competition. As Judge Posner explained in *In re Sulfuric Acid
> Antitrust Litigation*, '[t]he per se rule is designed for cases in
> which experience has convinced the judiciary that a particular type
> of business practice has no (or trivial) redeeming benefits ever.'[35]

Concurring with the majority statement, FTC Commissioner Joshua D. Wright stated:

> It is well understood that collusion among suppliers
> regarding price, quantity, and other competitive terms negotiated
> with purchasers can harm consumers by impeding the competitive
> process. Here, it is self-evident that AmeriGas and Blue Rhino's
> agreement to reduce the amount of propane in tanks sold to
> Walmart has the economic effect of increasing the per unit price if
> prices are held constant. The mere fact that AmeriGas and Blue
> Rhino's agreement did not preclude the possibility that they would
> continue to compete on price or other terms is of little consequence
> for antitrust analysis.[36]

The reasoning of the majority and concurrence is directly applicable here. McCormick

and Wal-Mart, among other retailers, agreed on a plan to reduce fill in their competing products.

That agreement resulted in Class Members "effectively paying higher prices for their purchases"

---

[35] FTC Docket, at 66374 (citing in n.8: *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012) (rejecting *per se* treatment of agreements on the ground there were reasonable procompetitive justifications for the alleged agreement); *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 65 F.T.C. 583, 612 (1964), enforced, 345 F.2d 421 (7th Cir. 1965) (agreement between competitors to reduce the percentage of more expensive and higher quality durum wheat and increase the percentage of less expensive and lower quality farina wheat for pasta held *per se* illegal)) (footnotes 4-7 omitted).

[36] FTC Docket, at 66376-77.

than they would have absent the agreement.[37]  While the October 6th letter confirms the parties'

intent was ████████████ the fact that future price competition was not prohibited does

not remove the agreement from the ambit of the antitrust laws.  "The law is clear that price fixing

agreements 'may or may not be aimed at complete elimination of price competition' and are

unlawful in either instance because of the enormous threat they pose to the free market."[38]

Moreover, the FTC did not find persuasive the fact that the initial decisions to reduce fill

were unilateral.[39]  The Commission explained:  "Whether the initial decision to reduce fill levels

was the result of independent decision-making has no bearing on the unlawfulness of the parties'

subsequent agreement to maintain a united front with respect to Walmart."[40]  Thus, here, even if

McCormick's initial decision to reduce fill and maintain price was unilateral, its subsequent

actions to obtain agreement to that strategy from its Private Label competitors was unlawful.

Accordingly, Plaintiffs have alleged a plausible agreement among horizontal competitors to fix

shelf prices and/or to reduce fill which is a term of sale affecting price—both *per se* violations of

Section 1 of the Sherman Act.

> **2.**     **The Complaint alleges a cognizable and traditional antitrust injury—a price increase on consumers as the result of collusion.**

A plaintiff must allege an "antitrust injury," that is, an "injury of the type the antitrust

laws were intended to prevent and that flows from that which makes defendants' acts

unlawful."[41]  This requirement "ensures that a plaintiff can recover only if the loss stems from a

---

[37] SACC, ¶ 109.  *See also id.* ¶ 7 ("By implementing a scheme to short-change customers, McCormick and the retailers were able to effectuate a de facto price increase while maintaining wholesale and thus retail prices….").

[38] FTC Docket, at 66374 (citations and footnotes omitted).

[39] *Id.*

[40] *Id.*

[41] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

competition-reducing aspect or effect of the defendant's behavior."[42]  Plaintiffs easily satisfy this

requirement, having alleged they purchased products at artificially high prices as the result of

collusion between Defendants.[43]

"The essence of the antitrust laws is to ensure fair price competition in an open market."[44]

For example, in the FTC action, "it [wa]s self-evident that AmeriGas and Blue Rhino's

agreement to reduce the amount of propane in tanks sold to Walmart has the economic effect of

increasing the per unit price if prices are held constant.  The mere fact that AmeriGas and Blue

Rhino's agreement did not preclude the possibility that they would continue to compete on price

or other terms is of little consequence for antitrust analysis."[45]  It is also self-evident here that the

agreement to reduce the amount of pepper in the tins and grinders had the economic effect of

increasing the per unit price to Plaintiffs and the Class.  This is precisely the type of harm that

the antitrust laws are designed to prevent.[46]

**B.      Plaintiffs Have Standing, Having Alleged A Wholesale-Level Agreement for the Purpose of Fixing Retail Prices**

Wal-Mart disputes Plaintiffs' standing and McCormick disputes the relevant market.

Defendants argue Class Plaintiffs lack antitrust standing since they seek to recover damages for a

retail-level injury owing to Defendants' wholesale-level conduct.  Defendants are mistaken—

---

[42] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

[43] *See, e.g.*, *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482-83 (1982) ("[A]n increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which [the antitrust laws] potentially offer[] redress."); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (finding antitrust injury where customers paid higher prices based on anticompetitive conduct of defendants).

[44] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979).

[45] FTC Docket, at 66376.

[46] *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *13 (N.D. Cal. June 5, 2009) ("The antitrust laws are intended to prevent harm to competition *manifested as higher prices, lower output, or decreased quality in the products* within a defined market.") (emphasis added); *see also Gen. Leaseways, Inc. v. Nat'l Truck Leading Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984).

first, about the role of and need for relevant market analysis, and second, about Class Plaintiffs'

antitrust standing.

The definition of the relevant market is likely unnecessary here given the evidence of

direct harm.  The Supreme Court has held that evidence of direct harm is sufficient in lieu of

defining relevant markets to assess the lawfulness of collaboration among competitors.  For

instance, in *FTC v. Indiana Federation of Dentists*, the Supreme Court reviewed a Seventh

Circuit judgment of an FTC decision that a dental association violated Section 1 of the Sherman

Act by enforcing a rule requiring withholding x-rays requested by dental insurers to evaluate

claims.[47]  The association claimed that the decision was wrong as a matter of law because the

FTC had not specifically defined the relevant market.[48]  The Supreme Court disagreed, holding

that product market analysis "is but a surrogate for detrimental effects."[49]

Similarly, in *Toys "R" Us, Inc. v. FTC*, the Seventh Circuit reviewed an FTC decision

that invalidated unlawful agreements between a major toy retailer and a group of toy

manufacturers in which each manufacturer promised to restrict distribution of its products to

low-priced warehouse stores.[50] The court found that the FTC need not establish that the company

had a large share of any particular relevant market, and was entitled to rely on direct evidence of

anticompetitive effects to establish an antitrust violation.[51]

---

[47] 476 U.S. 447 (1986).

[48] *Id.* at 460.

[49] *Id.* at 461.

[50] 221 F.3d 928 (7th Cir. 2000).

[51] *Id.* at 937 ("[Toys "R" Us] seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share.  This, however, has things backwards.  As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.  The Supreme Court has made it clear that there are two ways of proving market power.  One is through direct evidence of anticompetitive effects. . . .  The other, more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is

Thus, the Supreme Court has held that the definition of relevant market is unnecessary where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."[52] "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."[53]

Here, Plaintiffs allege, and the evidence shows, that the wholesale agreements between McCormick and the retail co-conspirators were designed to fix prices at the retail level.  The use of their wholesale-level relationship to effectuate a retail-level agreement on price is direct proof of actual detrimental effects.  Under those circumstances, the need for a review of the relevant market is not necessary.

For both the issue of standing and relevant market (and their interplay), the Ninth Circuit's analysis in *Shamrock Foods* is instructive.[54]  There, plaintiffs alleged that "dairy producers conspired among themselves and with the grocery stores to raise and stabilize the retail price of dairy products to maintain more profits for all concerned."[55]  Similar to this case,

---

important for the practice in the case.") (citations omitted).  *See also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (finding that market power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market"); *K.M.B. Warehouse Distribs. v. Walker Mfg. Co*., 61 F.3d 123, 129 (2d Cir. 1995) ("If a plaintiff can show an actual adverse effect on competition, such as reduced output[,] . . . we do not require a further showing of market power.") (citation omitted); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir. 1993) (explaining that plaintiff may avoid a "'detailed market analysis' by offering 'proof of actual detrimental effects, such as a reduction of output'") (citations omitted).

[52] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[53] *Indiana Fed'n of Dentists*, 476 U.S. at 460-61 (internal quotations omitted).

[54] *Arizona v. Shamrock Foods Co*., 729 F.2d 1208 (9th Cir. 1984).

[55] *Id.* at 1210-1211.

the defendant dairy producer was also a competitor in the market for retail sales of dairy

products.  Defendants in *Shamrock Foods* argued that plaintiffs' antitrust claim should fail either

(1) because plaintiffs were barred as indirect purchasers under *Illinois Brick*, or (2) because

plaintiffs were estopped from changing their alleged market definition mid-litigation from the

*wholesale* market to the *retail* market for dairy products.

The court rejected both arguments. First, the court acknowledged that plaintiffs were

alleging that the retail grocery stores were co-conspirators with the dairy producers to fix the

price of dairy products at the retail level, agreeing that, because the theory of recovery does not

depend on pass-on of damages, *Illinois Brick* does not apply.[56]  Instead, the conspiracy was

"among horizontal competitors at the retail level to fix retail prices.  Illinois Brick does not

prevent this garden variety price-fixing claim."[57]  As a result, the claim presents no standing

defects.

Second, the conspiracy may be both at the wholesale and retail levels of the market. As

the Ninth Circuit stated:  "The theories advanced by the consumers do not necessarily conflict in

that the existence of a conspiracy at the wholesale level does not preclude the existence of an

independent conspiracy at the retail level."[58]  Ultimately, whether the appropriate relevant

market is at the retail or wholesale level will be the subject of complex expert analysis, reports,

---

[56] *Id.* at 1211.

[57] *Id.  See also Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002).
Although the D.C. Circuit has not yet spoken on the *Illinois Brick* exception, this Court should follow *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 15 n.15 (D.D.C. 2004), which reasoned that "to the extent that [the court] might have to rule on the viability of the 'co-conspirator' exception, it is in the interest of justice to have as complete a factual record as possible on the existence of a conspiracy prior to any such ruling."

[58] *Arizona v. Shamrock Foods Co.*, 729 F.2d at 1215.

and testimony.[59]  For that reason, "[c]ourts hesitate to grant motions to dismiss for failure to

plead a relevant product market because market definition is a fact-intensive inquiry . . . ."[60]

Where the definition is plausible, as here given the agreements not to compete on price, the claim

should proceed.[61]  Because "[c]onstruction of the relevant market and a showing of monopoly

power must be based on expert testimony,"[62]  Defendants' motions should be denied.

## C.     Harm to Competition Is Not a Required Showing When Horizontal Competitors Enter a Price Fixing Agreement; Nonetheless Plaintiffs Allege It Here.

*Per se* violations of the Sherman Act are presumed to be unlawful, "regardless of the

motives driving an unlawful conspiracy."[63]  "The anticompetitive potential inherent in all price-

fixing agreements justifies their facial invalidation even if procompetitive justifications are

offered for some."[64]  In this horizontal price-fixing conspiracy, the only thing that Plaintiffs need

to allege to sustain their Sherman Act claims is that Defendants acted collectively in raising,

fixing, or stabilizing the retail price of pepper.[65]  Horizontal price-fixing agreements "are thought

---

[59] *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993) ("In practice, the frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify.").

[60] *Aetna Inc. v. Blue Cross Blue Shield of Mich.*, 2012 WL 2184568, at *5 (E.D. Mich. June 14, 2012); *see also Tidewater Oil Co. v. U.S.*, 409 U.S. 151, 172 (1972) (what constitutes a "relevant market" for antitrust purposes "can be properly decided only after full development of the evidence"); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997) ("in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers").

[61] *Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 180 (S.D.N.Y. 2006).

[62] *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002).

[63] *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 871 (N.D. Ill. 2010).

[64] *Arizona. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).

[65] *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 360 (5th Cir. 2008) ("Procompetitive justifications will not be considered if a practice, such as price-fixing, is a *per se* violation."); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003) (holding that where a *per se* approach applies, "no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition").

so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."[66]

Nonetheless, Plaintiffs have alleged harm to competition.  Proscribed anticompetitive conduct includes "actions that harm the competitive process, a process that aims to bring consumers the benefits of lower prices, better products, and more efficient production methods."[67]  No differently, the Supreme Court has explained that antitrust liability flows from those "competition-reducing aspect[s] or effect[s] of the defendant's behavior."[68] ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████[69] and ████████████████ while increasing price on a per-ounce basis.  That is the very essence of harm to competition for which the antitrust laws were enacted.

**D.**     **Wal-Mart's Argument Regarding "Economic Sense" is a Red Herring.**

**1.**     **The Supreme Court has rejected judicial consideration of motive or independent business justifications when horizontal competitors agree to fix prices.**

Wal-Mart argues that this Court imported elements of motive and lack of independent business justification into a horizontal price-fixing claim,[71] and that Plaintiffs have alleged neither.  Wal-Mart's argument is a dangerous trap because years of Supreme Court jurisprudence have been steadfast in rejecting these very same arguments.

---

[66] *Copperweld Corp.*, 467 U.S. at 768.

[67] *Interface Grp., Inc. v. Mass. Port. Auth.*, 816 F.2d 9, 10 (1st Cir. 1987) (citation omitted).

[68] *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. at 344; *see also* McCormick Motion at 7 (citing the same).

[69] SACC, ¶ 58.

[70] *See* n.3, *supra.*

[71] Wal-Mart Br. at 3-4.

Horizontal price-fixing agreements are pernicious on their face—under *per se* treatment, no judicial assessment of motive or weighing of claimed independent justification are appropriate.  In 1927, the Supreme Court explained:

> The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions.[72]

In 1940, the Supreme Court again reiterated in *United States v. Socony-Vacuum Oil Co.*: "for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense."[73]  The Court's reasoning was simple:

> Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and

---

[72] *U.S. v. Trenton Potteries Co.*, 273 U.S. 392, 397-399 (1927)

[73] 310 U.S. 150, 218 (1940).

competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.[74]

More recently, the Supreme Court stated: "We have not wavered in our enforcement of the per se rule against price fixing. Indeed, in our most recent price-fixing case we summarily reversed the decision of another Ninth Circuit panel that a horizontal agreement among competitors to fix credit terms does not necessarily contravene the antitrust laws."[75]

Thus, this Court's inquiry into whether the agreement between McCormick and its retail competitors is horizontal, and thus deserving of *per se* treatment, should "not include an inquiry into the specific motive of the alleged conspirators."[76] Wal-Mart's invitation to do so should be summarily rejected.

It is only in the absence of an explicit agreement that independent business justifications come into play.[77] In other words, if Plaintiffs were alleging that circumstantial evidence (such as

---

[74] *Socony-Vacuum Oil Co.*, 310 U.S. at 221-22.

[75] *Maricopa Cnty.*, 457 U.S. at 347-348 (citing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)).

[76] *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 n.10 (10th Cir. 2006). *See also U.S. v. Apple, Inc.*, 791 F.3d 290, 347 (2d Cir. 2015) ("'[H]orizontal agreements as a class deserve stricter scrutiny than . . . vertical agreements,' because horizontal agreements 'pose the most significant dangers of competitive harm.' 11 Areeda & Hovenkamp, supra, ¶ 1902a, at 232. Horizontal price conspiracies are illegal per se because motives of horizontal players are aligned and dominant and create irresistible temptations. *See, e.g.*, Adam Smith, The Wealth of Nations 207 (Collier 1902) (1776) ('People of the same trade seldom meet together . . . , but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.')"), *cert. denied*, 136 S. Ct. 1376 (2016).

[77] *Cayman Exp. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("The antitrust plaintiff who relies on a theory of 'conscious parallelism' must establish that 'defendants engaged in consciously parallel action . . . which was contrary to their economic self-interest so as not to

parallel action) reflected an agreement likely occurred, then the Court would consider whether independent business justifications made agreement unlikely.[78] Here, there is an explicit agreement—no conscious parallelism is in play.  Accordingly, even if this Court determines that the agreement is one which should be judged under the rule of reason, rather than *per se* rules, the trier of fact still will not consider whether independent business justifications played a role but instead will consider (on rebuttal at trial) whether *procompetitive* justifications outweighed the anticompetitive effects.[79]  Wal-Mart's motion should be denied.

> **2.     Even if this Court considers the agreement to be one between a vertical supplier and retailers, Plaintiffs have alleged both motive and that the decision was against the Private Label customers' self-interest to enter the agreement.**

The motive here was simple—an agreement not to compete on the amount of fill in each other's products (and thus the price per ounce) protected the retail price of McCormick's and the Private Label products.  First, no large competitor could undercut the other.  Second, each of them could protect their profit margin.[80]

While that motive protected short-term profit, the action was actually against the Private Labels' long-term interests in gaining market share.  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  The choice of Wal-Mart and other Private Label customers to

---

amount to good faith business judgment.' (quoting *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir. 1980), *cert. denied*, 454 U.S. 927, 70 L. Ed. 2d 236, 102 S. Ct. 427 (1981).").

[78] *Id.*

[79] *U.S. v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001) (for antitrust claim judged under the rule of reason, "plaintiffs must show that [defendant's] conduct was, on balance, anticompetitive. [Defendant] may of course offer procompetitive justifications, and it is plaintiffs' burden to show that the anticompetitive effect of the conduct outweighs its benefit.").

[80] *See, e.g.,* SACC, ¶¶ 6, 57, 58, 60.

agree to the fill reduction ███████████████ thus foreclosed their opportunity to

obtain increased market share in contravention of their own economic self-interest.[81]

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny McCormick's and Wal-Mart's motions

to dismiss the antitrust count (Count I) of Plaintiffs' Second Amended Consolidated Class

Action Complaint.


DATED: May 5, 2017                       Respectfully submitted,

                                         By: */s/ Elizabeth A. Fegan*

                                         Elizabeth A. Fegan
                                         Daniel J. Kurowski
                                         Mark T. Vazquez
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         455 N. Cityfront Plaza Drive, Suite 2410
                                         Chicago, IL 60611
                                         Telephone: (708) 628-4949
                                         Facsimile: (708) 628-4950
                                         beth@hbsslaw.com
                                         dank@hbsslaw.com
                                         markv@hbsslaw.com

---

[81] *See, e.g.,* SACC, ¶¶ 3, 4, 57, 60, 61.

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jennifer Fountain Connolly
HAGENS BERMAN SOBOL SHAPIRO LLP
1701 Pennsylvania Ave. NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 248-5403
Facsimilie: (202) 580-6559
jenniferc@hbsslaw.com

*Co- Lead Counsel*

Scott A. Kamber
KAMBERLAW LLC
100 Wall Street, 23rd floor
New York, NY 10005
(212) 920-3072
(212) 202-6364 (fax)
skamber@kamberlaw.com

Deborah Kravitz
KAMBERLAW LLP
401 Center Street, Suite 111
Healdsburg, CA 95448
(707) 820-4247
dkravitz@kamberlaw.com

*Co-Lead Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed electronically via the Court's ECF system, on May 5, 2017.  Notice of electronic filing will be sent to all parties by operation of the Court's electronic filing system.  Copies of unredacted documents were served on Counsel of Record for the parties by electronic mail at the following addresses:

| Counsel for McCormick & Company, Inc. | Counsel for Wal-Mart Stores, Inc. |
|---|---|
| David H. Bamberger<br>Edward S. Scheideman<br>Paul D. Schmitt<br>DLA Piper LLP (US)<br>500 Eighth Street, N.W.<br>Washington, D.C. 20004<br>David.bamberger@dlapiper.com<br>Edward.scheideman@dlapiper.com<br>Paul.schmitt@dlapiper.com | Andrew G. Klevorn<br>Yoni Rosenzweig<br>Kristin L. Coveney<br>Patricia Warren<br>Katten Muchin Rosenman LLP<br>525 W. Monroe Street<br>Chicago, IL 60661-3693<br>andrew.klevorn@kattenlaw.com<br>yoni.rosenzweig@kattenlaw.com<br>kristin.coveney@kattenlaw.com<br>patricia.warren@kattenlaw.com |
| **Counsel for Watkins Inc.**<br><br>Geoffrey P. Jarpe<br>Maslon LLP<br>90 South Seventh St.<br>3300 Wells Fargo Center<br>Minneapolis, MN 55402<br>geoffrey.jarpe@maslon.com | |

By: _____*Elizabeth A. Fegan*_____
    Elizabeth A. Fegan

010546-12 956294 V1

# Exhibit A


Consequently, notice is given that the receivership shall be terminated, to be effective no sooner than thirty days after the date of this Notice. If any person wishes to comment concerning the termination of the receivership, such comment must be made in writing and sent within thirty days of the date of this Notice to: Federal Deposit Insurance Corporation, Division of Resolutions and Receiverships, Attention: Receivership Oversight Department 34, 1601 Bryan Street, Dallas, TX 75201.

No comments concerning the termination of this receivership will be considered which are not sent within this time frame.

Dated: November 3, 2014.

Federal Deposit Insurance Corporation.

**Robert E. Feldman,**

*Executive Secretary.*

[FR Doc. 2014–26435 Filed 11–6–14; 8:45 am]

**BILLING CODE 6714–01–P**

---

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies; Correction

This notice corrects a notice (FR Doc. 2014–26081) published on pages 65213 and 65214 of the issue for Monday, November 3, 2014.

Under the Federal Reserve Bank of Kansas City heading, the entry for *Otten Holdings, LLC and FEO Investments, Inc.,* is revised to read as follows:

A. **Federal Reserve Bank of Kansas City** (Dennis Denney, Assistant Vice President) 1 Memorial Drive, Kansas City, Missouri 64198–0001:

1. *Otten Holdings, LLC and FEO Investments, Inc.,* both in Norfolk, Nebraska; to acquire 100 percent of the voting shares of First National Agency, Inc., and thereby indirectly acquire First Nebraska Bank of Wayne, both in Wayne, Nebraska.

Comments on this application must be received by November 28, 2014.

Board of Governors of the Federal Reserve System, November 4, 2014.

**Michael J. Lewandowski,**

*Associate Secretary of the Board.*

[FR Doc. 2014–26485 Filed 11–6–14; 8:45 am]

**BILLING CODE 6210–01–P**

---

## FEDERAL TRADE COMMISSION

**[Docket No. 9360]**

### Ferrellgas Partners, L.P.; Ferrellgas, L.P., Also Doing Business as Blue Rhino; AmeriGas Partners, L.P., Also Doing Business as AmeriGas Cylinder Exchange; and UGI Corporation; Analysis To Aid Public Comment

**AGENCY:** Federal Trade Commission.

**ACTION:** Proposed consent agreements.

**SUMMARY:** The consent agreements in this matter settle alleged violations of federal law prohibiting unfair methods of competition. The attached Analysis to Aid Public Comment describes both the allegations in the administrative complaint issued by the Commission and the terms of the consent orders— embodied in the consent agreements— that would settle these allegations.

**DATES:** Comments must be received on or before December 2, 2014.

**ADDRESSES:** Interested parties may file a comment at *https:// ftcpublic.commentworks.com/ftc/ amerigasbluerhinoconsent* online or on paper, by following the instructions in the Request for Comment part of the **SUPPLEMENTARY INFORMATION** section below. Write "In the Matter of AmeriGas and Blue Rhino—Consent Agreement; Docket No. 9360" on your comment and file your comment online at *https:// ftcpublic.commentworks.com/ftc/ amerigasbluerhinoconsent* by following the instructions on the web-based form. If you prefer to file your comment on paper, write "In the Matter of AmeriGas and Blue Rhino—Consent Agreement; Docket No. 9360" on your comment and on the envelope, and mail it to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW., Suite CC–5610 (Annex D), Washington, DC 20580, or deliver your comment to the following address: Federal Trade Commission, Office of the Secretary, Constitution Center, 400 7th Street SW., 5th Floor, Suite 5610 (Annex D), Washington, DC 20024.

**FOR FURTHER INFORMATION CONTACT:** Eric Edmondson, FTC Western Region, San Francisco, (415–848–5179), 901 Market Street, Suite 570, San Francisco, CA 94103.

**SUPPLEMENTARY INFORMATION:** Pursuant to Section 6(f) of the Federal Trade Commission Act, 15 U.S.C. 46(f), and FTC Rule 3.25(f), 16 CFR 3.25(f), notice is hereby given that the above-captioned consent agreements containing consent orders to cease and desist, having been filed with and accepted, subject to final approval, by the Commission, have been

placed on the public record for a period of thirty (30) days. The following Analysis to Aid Public Comment describes the terms of the consent agreements, and the allegations in the complaint. An electronic copy of the full text of each consent agreement package can be obtained from the FTC Home Page (for October 31, 2014), on the World Wide Web, at *http:// www.ftc.gov/os/actions.shtm.*

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before December 2, 2014. Write "In the Matter of AmeriGas and Blue Rhino— Consent Agreement; Docket No. 9360" on your comment. Your comment— including your name and your state— will be placed on the public record of this proceeding, including, to the extent practicable, on the public Commission Web site, at *http://www.ftc.gov/os/ publiccomments.shtm.* As a matter of discretion, the Commission tries to remove individuals' home contact information from comments before placing them on the Commission Web site.

Because your comment will be made public, you are solely responsible for making sure that your comment does not include any sensitive personal information, like anyone's Social Security number, date of birth, driver's license number or other state identification number or foreign country equivalent, passport number, financial account number, or credit or debit card number. You are also solely responsible for making sure that your comment does not include any sensitive health information, like medical records or other individually identifiable health information. In addition, do not include any "[t]rade secret or any commercial or financial information which . . . is privileged or confidential," as discussed in Section 6(f) of the FTC Act, 15 U.S.C. 46(f), and FTC Rule 4.10(a)(2), 16 CFR 4.10(a)(2). In particular, do not include competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

If you want the Commission to give your comment confidential treatment, you must file it in paper form, with a request for confidential treatment, and you have to follow the procedure explained in FTC Rule 4.9(c), 16 CFR 4.9(c).[1] Your comment will be kept

---

[1] In particular, the written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request, and must identify the specific portions of the Continued

confidential only if the FTC General Counsel, in his or her sole discretion, grants your request in accordance with the law and the public interest.

Postal mail addressed to the Commission is subject to delay due to heightened security screening. As a result, we encourage you to submit your comments online. To make sure that the Commission considers your online comment, you must file it at *https://ftcpublic.commentworks.com/ftc/amerigasbluerhinoconsent* by following the instructions on the web-based form. If this Notice appears at *http://www.regulations.gov/#!home,* you also may file a comment through that Web site.

If you file your comment on paper, write "In the Matter of AmeriGas and Blue Rhino—Consent Agreement; Docket No. 9360" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW., Suite CC–5610 (Annex D), Washington, DC 20580, or deliver your comment to the following address: Federal Trade Commission, Office of the Secretary, Constitution Center, 400 7th Street SW., 5th Floor, Suite 5610 (Annex D), Washington, DC 20024. If possible, submit your paper comment to the Commission by courier or overnight service.

Visit the Commission Web site at *http://www.ftc.gov* to read this Notice and the news release describing it. The FTC Act and other laws that the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. The Commission will consider all timely and responsive public comments that it receives on or before December 2, 2014. You can find more information, including routine uses permitted by the Privacy Act, in the Commission's privacy policy, at *http://www.ftc.gov/ftc/privacy.htm.*

**Analysis of Agreement Containing Consent Orders To Aid Public Comment**

**I. Introduction**

The Federal Trade Commission ("Commission" or "FTC") has accepted, subject to final approval, agreements containing proposed consent orders ("Consent Agreements") resolving an administrative complaint issued by the Commission on March 27, 2014. The FTC accepted a consent agreement from Respondents AmeriGas Partners, L.P., also doing business as AmeriGas Cylinder Exchange, and UGI

Corporation (collectively "AmeriGas") and a separate consent agreement from "Blue Rhino" Respondents Ferrellgas Partners, L.P. and Ferrellgas, L.P., also doing business as Blue Rhino (collectively "Blue Rhino"). AmeriGas and Blue Rhino are referred to collectively herein as "Respondents." The complaint charges that AmeriGas and Blue Rhino violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45, by colluding to push Walmart, a key customer, to accept a reduction in the amount of propane in the propane exchange tanks each sold to Walmart.

Under the terms of the Consent Agreements, AmeriGas and Blue Rhino are prohibited from agreeing with any competitor in the propane tank exchange business to modify fill levels or otherwise fix the prices of exchange tanks, or to coordinate communications with customers. Each is also required to maintain an antitrust compliance program.

The Commission believes that the terms of the proposed orders contained in the Consent Agreements will resolve the competitive issues described in the complaint. The Consent Agreements have been placed on the public record for 30 days for receipt of comments from interested members of the public. Comments received during this period will become part of the public record. After 30 days, the Commission will review the Consent Agreements and any comments received, and will decide whether it should withdraw from the Consent Agreements or make final the proposed orders contained in the Consent Agreements.

The purpose of this Analysis to Aid Public Comment is to invite and facilitate public comment concerning the proposed orders. It is not intended to constitute an official interpretation of the proposed Consent Agreements and the accompanying proposed orders or in any way to modify their terms.

The Consent Agreements are for settlement purposes only and do not constitute an admission by either Respondent that it has violated the law, or that the facts alleged in the complaint, other than the jurisdictional facts, are true.

**II. The Complaint**

The following allegations are taken from the complaint and publicly available information.

*A. Background*

Blue Rhino and AmeriGas control approximately 80 percent of the market for propane exchange tanks. These tanks are portable, steel tanks, prefilled with

propane, primarily used for propane barbeque grills and patio heaters. There are no widely used substitutes for exchange tanks that provide a similar ease of use. Consumers typically purchase these prefilled tanks at home improvement stores, hardware stores, mass merchandisers, supermarkets, convenience stores, and gas stations.

To compete effectively to serve national retailers, including mass merchandisers such as Walmart, The Home Depot, and Lowe's, propane exchange tank manufacturers must have access to refurbishing and refilling facilities located throughout the United States.[2] AmeriGas and Blue Rhino are the only manufacturers who can supply exchange tanks to large national retailers, except on a limited basis.

*B. Challenged Conduct*

In 2008, Blue Rhino and AmeriGas each decided to implement a price increase by reducing the amount of propane in their exchange tanks from 17 pounds to 15 pounds, without a corresponding decrease in the wholesale price. Blue Rhino publicly announced its fill reduction plan on June 25, 2008. AmeriGas publicly announced its fill reduction plan on July 10, 2008. The FTC's complaint does not allege that Respondents' initial decision to reduce fill levels to 15 pounds was the result of an agreement between the parties.

Walmart purchases tanks from both Blue Rhino and AmeriGas and initially refused to accept the planned fill reduction. Blue Rhino and AmeriGas understood they could not sustain the fill reduction unless it was accepted by Walmart. Blue Rhino's customer Lowe's accepted the fill reduction only on the condition that all of Blue Rhino's other customers, including Walmart, also accept the fill reduction within a short period of time. Faced with resistance from Walmart, Blue Rhino and AmeriGas colluded by secretly agreeing that neither would deviate from their proposal to reduce the fill level to Walmart.

On or about July 10, 2008, and continuing for three months thereafter, Blue Rhino and AmeriGas sales executives communicated repeatedly with each other regarding the status of their respective efforts to persuade Walmart to accept the fill reduction. The secret agreement between Blue Rhino and AmeriGas that neither would deviate from their proposal to Walmart

---

comment to be withheld from the public record. *See* FTC Rule 4.9(c), 16 CFR 4.9(c).

---

[2] As described in the complaint, Respondents have entered into a number of "co-packing" agreements, pursuant to which one of the Respondents processes and refills propane exchange tanks for the other Respondent at certain of their processing plants.

when faced with resistance from Walmart, and their combined efforts to push Walmart to promptly accept the fill reduction had the effect of raising the price per pound of propane to Walmart and likely to the ultimate consumers.

The Complaint alleges that this agreement violated Section 5 of the FTC Act by unreasonably restraining trade and constituting an unfair method of competition. The agreement alleged in the Complaint is *per se* unlawful.[3]

### III. The Proposed Orders

The proposed orders are designed to remedy the unlawful conduct charged against the Respondents in the complaint and to prevent future unlawful conduct. The proposed orders, although entered into separately with AmeriGas and Blue Rhino, are identical in all material respects. Paragraph II of the proposed orders contains two key prohibitions. The first, contained in Paragraph II.A., bars Respondents from soliciting, offering, participating in, or entering into any type of agreement with any competitor in the propane exchange business to modify the fill level, or maintain, stabilize, or otherwise fix the price of propane exchange tanks. In addition, it prohibits Respondents from coordinating communications to customers or competitors.

The second, contained in Paragraph II.B., prevents Respondents from sharing competitively sensitive non-public information with competitors except in identified circumstances. Respondents may exchange limited information needed to negotiate and fulfill the terms of refilling agreements. The proposed orders allow this information sharing because transporting exchange tanks is a significant expense and co-packing agreements may lower the cost of serving customers located farther away from filling facilities.

The proposed orders also allow Respondents to share information with

competitors as part of legally supervised due diligence or to participate in a joint venture. However, Respondents are prohibited from sharing highly sensitive information, such as future pricing and marketing plans, with employees whose duties include pricing, sales and marketing of exchange tanks. Further, Respondents are permitted to share confidential information with competitors to respond to health, safety, emergency or regulatory matters. Finally, Respondents can participate in industry-wide data exchange or market research so long as a third party collects the data and only disseminates data that are at least three months old and aggregated from a significant portion of the propane exchange industry.

Paragraph III of the proposed orders requires that Respondents establish and maintain antitrust compliance programs for their propane tank exchange business in the United States and identifies the requirements for that program. The remaining provisions of the proposed orders contain reporting and compliance requirements commonly found in FTC competition orders.

Pursuant to FTC policy regarding the term for competition orders, the proposed orders will expire in 20 years.

By direction of the Commission, Commissioner Ohlhausen dissenting, and Commissioner McSweeny not participating.

**Donald S. Clark,**
*Secretary.*

### Statement of Chairwoman Edith Ramiez and Commissioner Julie Brill

The Commission is issuing for public comment two identical proposed Orders that would resolve allegations that AmeriGas and Blue Rhino entered into an unlawful agreement that neither would deviate from its plan to reduce the amount of propane in prefilled propane exchange tanks sold to Walmart. The Commission commenced administrative litigation in this matter on March 27, 2014; AmeriGas and Blue Rhino have now agreed to settle the case. The proposed Orders will prevent the parties from engaging in collusive conduct with rivals in the future. Each respondent is prohibited from agreeing with any competitor in the propane tank exchange business to modify fill levels or otherwise to fix the price of exchange tanks, or to exchange competitively sensitive information. In addition, each respondent is required to maintain an antitrust compliance program.

Propane exchange tanks are a staple in the backyards of American consumers. The collusive agreement, as alleged, was facially anticompetitive

and had the effect of raising the price per pound of propane exchange tanks to Walmart and likely ultimate consumers in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Our action today thus provides important relief to American consumers and sends a clear signal to the marketplace that anticompetitive collusion will not be tolerated.

AmeriGas and Blue Rhino are the two largest suppliers of propane exchange tanks in the United States, together controlling approximately 80 percent of the market. No other competitor serves more than nine percent of the market or is capable of serving large national retailers, such as Walmart and Lowe's. As detailed in the Commission's Complaint, in 2008, AmeriGas and Blue Rhino faced rapidly increasing input costs. To offset these rising costs, AmeriGas and Blue Rhino each decided to reduce the fill level in their propane exchange tanks from 17 to 15 pounds—without a corresponding price decrease. This effectively increased the per unit price of the propane by 13 percent.

Walmart rejected proposals from both AmeriGas and Blue Rhino to reduce the propane fill levels; Walmart's buyer viewed each proposal as a price increase to which Walmart was not willing to agree. Although Blue Rhino's largest customer, Lowe's, accepted the fill reduction, it did so on the express condition that all of Blue Rhino's customers (including Walmart) also accept the fill reduction promptly. Blue Rhino and AmeriGas understood that they could not sustain the fill reduction across the industry unless it was accepted by Walmart.

The Commission's Complaint does not allege that the Respondents' initial decisions to reduce fill levels to 15 pounds were the result of an agreement. However, the Complaint alleges that thereafter, in light of Walmart's continued resistance to the reduction, and the risk that other customers would also demand to return to 17-pound tanks, AmeriGas and Blue Rhino agreed that neither would accede to pressure from Walmart. Faced with this united front, Walmart capitulated to the sellers' demand. This subsequent agreement to act in concert in negotiations with Walmart is the basis for the Commission's challenge.

The investigation revealed ample evidence to provide us with a reason to believe that AmeriGas and Blue Rhino entered into an unlawful agreement.[1]

---

[3] *See, e.g., United States* v. *Socony-Vacuum Oil Co.,* 310 U.S. 150, 223–24, n.59 (1940) (agreements among horizontal competitors to buy surplus gasoline on spot market to prevent prices from falling sharply held *per se* illegal, even though there was no agreement on price to be maintained; agreements to raise, lower, stabilize, or otherwise restrain price competition are summarily condemned as *per se* illegal under Section 1 of the Sherman Act.); *Catalano, Inc.* v. *Target Sales, Inc.,* 446 U.S. 643 (1980) (*per curiam*) (agreement among horizontal competitors to eliminate a form of short-term credit was tantamount to an agreement to eliminate discounts and held *per se* as illegal as price fixing); *Nat'l Macaroni Mfrs. Ass'n* v. *FTC,* 65 F.T.C. 583, 612 (1964), *enforced,* 345 F.2d 421 (7th Cir. 1965) (agreement between competitors to reduce the percentage of more expensive and higher quality durum wheat and increase the percentage of less expensive and lower quality farina wheat for pasta held *per se* illegal).

[1] In the Matter of Ferrellgas Partners, L.P., et al., FTC Docket No. 9360, Complaint (Mar. 27, 2014), *available at www.ftc.gov/system/files/documents/cases/140401amerigascomplaint.pdf.*

For example, AmeriGas and Blue Rhino executives spoke frequently in the days leading up to Walmart's decision to accept the fill reductions, and at one point a frustrated AmeriGas Director of National Accounts suggested to Blue Rhino that it was time for them to issue an ultimatum to Walmart.[2] Blue Rhino's Vice President of Sales responded by urging AmeriGas to "hang in there" as Blue Rhino continued to negotiate with Walmart.[3]

Reducing the volume of propane gas in a tank while keeping the price constant is equivalent to a per unit price increase. Indeed, that is how Walmart understood the fill reduction. The joint strategy therefore entails a restriction on price competition and does not present any new or novel theory of liability.[4] It does not matter that the Complaint does not allege that AmeriGas and Blue Rhino agreed to keep their respective prices to Walmart constant, or that Walmart may have been free to negotiate prices with the parties, as noted in Commissioner Ohlhausen's dissent. The law is clear that price fixing agreements "may or may not be aimed at complete elimination of price competition"[5] and are unlawful in either instance because of the enormous threat they pose to the free market.[6] There is also no reasonable procompetitive justification for the alleged agreement, particularly since it was directed to a significant customer whose refusal to accept the proposal had the potential to cause the firms' fill reduction plans to unravel. The agreement thus amounts to a per se unlawful naked restraint on price competition.[7] As Judge Posner explained in In re Sulfuric Acid Antitrust Litigation, "[t]he per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever." [8]

Whether the initial decision to reduce fill levels was the result of independent decision-making has no bearing on the unlawfulness of the parties' subsequent agreement to maintain a united front with respect to Walmart.[9] In addition, Walmart's position as the "largest propane exchange tank retailer in the United States" [10] does not protect it from coercion. Even a power buyer like Walmart is vulnerable when its only two suppliers for a product have secretly agreed not to deviate from a proposed price increase.

We continue to believe that pursuing this case was in the public interest. Contrary to Commissioner Ohlhausen's dissent, the private settlements that Blue Rhino and AmeriGas entered into resulted in very little benefit to consumers. While the settlement amounts in the private litigation noted by Commissioner Ohlhausen may superficially sound impressive, the vast majority of the actual funds distributed covered Plaintiffs' attorneys' fees, cy pres payments and administrative fees and expenses, with only a trivial amount disbursed to consumers. The proposed Orders will benefit consumers by prohibiting conduct that could lead to future agreements on price or other competitive terms.

## Dissenting Statement of Commissioner Maureen K. Ohlhausen

I voted against the issuance of the Part III complaint against AmeriGas and Blue Rhino last March, and I now dissent from the consent agreement proposed by the Commission. I write briefly to explain my opposition to the majority's pursuit and now settlement of this novel, unwarranted enforcement action.

Neither the theory advanced by the staff and ultimately adopted by the Commission nor the evidence offered in support thereof convinced me that there was reason to believe the parties had restrained competition in violation of Section 5 of the FTC Act. In my view, the allegations in this case—that the parties "colluded by secretly agreeing to maintain a united front to push their joint customer, Walmart, to accept the [propane tank] fill reduction" [1]—fit poorly, at best, in the Section 1 case law. I am not aware of any Section 1 case that involved an alleged agreement among competitors to coerce a single customer to accept a decrease in product size that the competitors had pursued independently and that in no way precluded independent negotiation of the product's price between each competitor and the customer. I simply "have never seen or heard of an antitrust case quite like this." [2]

One of my several concerns at the time the complaint issued was that the Walmart-as-lynchpin theory would effectively collapse into one in which the Commission was challenging the independently decided fill reduction.[3] The Commission, however, obviously did not have sufficient evidence to pursue that more direct case.

Even more troubling, the majority's treatment of the alleged conduct as per

---

[2] Complaint ¶ 50.

[3] Id.

[4] Cf. Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 648 (1980) (per curiam) (agreement among horizontal competitors to eliminate a form of short-term credit was tantamount to an agreement to eliminate discounts and held per se illegal as price fixing even though there was no agreement on actual price); U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 223–24, n.59 (1940) (agreements among horizontal competitors to buy surplus gasoline on spot market to prevent prices from falling sharply held per se illegal, even though there was no agreement on price to be maintained).

[5] Socony-Vacuum, 310 U.S. at 224 n.59. See also F.T.C. v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 423 (1980) (noting that constriction of supply is the essence of price-fixing, whether it be accomplished by agreement upon a price, which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered).

[6] As noted in Socony-Vacuum, 310 U.S. at 224 n. 59: "[w]hatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." See also NCAA v. Board Of Regents, 468 U.S. 85, 100 (1983) ("Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high; a per se rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" citing Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 19–20 (1979)).

[7] See Fed. Trade Comm'n & Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors (2000), available at http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf ("Certain types of agreements are so likely to harm competition and to have no significant procompetitive benefit that they do not warrant the time and expense required for particularized inquiry into their effects. Once identified, such agreements are challenged as per se unlawful.").

[8] 703 F.3d 1004, 1011–12 (7th Cir. 2012) (rejecting per se treatment of agreements on the ground there were reasonable procompetitive justifications for the alleged agreement; see also National Macaroni Mfrs. Ass'n v. FTC, 65 F.T.C. 583, 612 (1964), enforced, 345 F.2d 421 (7th Cir. 1965) (agreement between competitors to reduce the percentage of more expensive and higher quality durum wheat and increase the percentage of less expensive and lower quality farina wheat for pasta held per se illegal).

[9] Cf. Sugar Institute v. United States, 297 U.S. 553, 601 (1936) (agreement to adhere to previously announced prices and terms of sale held per se illegal, even though the previously announced prices and terms were unilaterally decided).

[10] Complaint ¶ 35.

[1] In re Ferrellgas Partners, L.P., FTC Dkt. No. 9360, Complaint, at 2 (Mar. 27, 2014), available at http://www.ftc.gov/system/files/documents/cases/140401amerigascomplaint.pdf.

[2] In re Sulfuric Acid Antitrust Litig., 703 F.3d 1004, 1011 (7th Cir. 2012) (Posner, J.) (rejecting per se treatment for agreements among competitors to shut down certain of their plants and abide by exclusive territorial restrictions).

[3] See, e.g., In re Ferrellgas Partners, L.P., FTC Dkt. No. 9360, Concurring Statement of Commissioner Joshua D. Wright, at 3 (Oct. 31, 2014) (referring to "the collusion between AmeriGas and Blue Rhino to reduce the amount of propane in tanks sold to Walmart"); Roundtable Conference with Enforcement Officials, Antitrust Source, June 2014, at 4 ("Just yesterday, we announced that the Commission voted to issue an administrative complaint against AmeriGas and Blue Rhino. . . . We have alleged that the two rivals illegally coordinated on reducing the amount of propane in the tanks that were sold to a key customer.") (Chairwoman Ramirez).

se unlawful depends on an unfounded assertion that the parties agreed to keep their prices fixed. Chairwoman Ramirez and Commissioner Brill are certainly correct that "[r]educing the volume of propane gas in a tank while keeping the price constant is equivalent to a per unit price increase." [4] The problem for the majority's position is that the complaint in this matter did not allege an agreement between AmeriGas and Blue Rhino to keep their respective prices to Walmart constant. There was no allegation in the complaint that the parties agreed in any way on the pricing of the lesser-filled propane tanks. Walmart was free to negotiate prices or any other price element with the parties. Yet, there is no allegation that Walmart tried but was unable to re-negotiate the price of the tanks with each of the parties. Thus, neither the majority's assertion that the parties "secretly agreed not to deviate from a proposed *price increase*" [5] nor their characterization of the alleged agreement as "a *per se* unlawful naked restraint on *price competition*" [6] find any support in the complaint or the evidence presented to the Commission.

Try as the majority may to fit this case into the per se category of price and output restrictions among competitors, it simply does not belong in that category. As a result, the cases and other support cited by the majority—including *Catalano, Sugar Institute,* and commentary addressing agreements on various elements of price—are inapposite. [7] In fact, none of the cases cited by Commissioners Ramirez, Brill, and Wright even remotely resembles the alleged facts in this case. The lack of judicial experience with the unique conduct alleged in this case further counsels against application of the per

se rule, as well as any abbreviated rule of reason treatment, for that matter. [8]

The majority's attempt to fit the alleged conduct into the per se category—done in large part through a mischaracterization of the allegations actually levied in the complaint—runs contrary to the now decades-long evolution in antitrust doctrine away from per se treatment of benign or even procompetitive business conduct, as well as the more sophisticated economic analysis that animates modern antitrust law. [9] The majority did not allege that the parties agreed on either their propane output levels [10] or the prices that they would charge Walmart (or any other customer). In my view, that takes the alleged agreement outside the scope of classic per se prohibitions of price and output restrictions, including joint conduct aimed at a single customer, such as bid rigging. At this point in the development of the antitrust laws, if anything, we should be continuing to move categories of conduct out of the per se category—not trying to squeeze conduct that we rarely encounter into the otherwise shrinking per se box. [11]

Even assuming a valid theory under Section 1, the evidence presented to the Commission failed to convince me that the parties had reached an agreement to do anything. In my view, notwithstanding the alleged communications between the parties relating to Walmart, [12] the evidence did not provide reason to believe the parties had reached an agreement on how they would "push" Walmart, which, as the complaint notes, is "the largest propane exchange tank retailer in the United States." [13] The evidence simply did not support the allegations that Walmart (the quintessential power buyer) was susceptible to pressure, that the parties were actually coercing Walmart, that the fill reductions pursued (separately) by the parties were going to unravel, or that the parties would have returned to the higher fill levels—as opposed to, for example, Walmart accepting the lower fill levels in exchange for a lower price.

Further, even assuming a valid theory and sufficient evidence to support a Section 1 violation (both of which were lacking), I was not convinced that bringing this case was in the public interest. The alleged conduct had occurred nearly six years before the complaint was issued. More importantly, the respondents had settled private litigation that included antitrust claims (as well as other, consumer protection claims), with AmeriGas and Blue Rhino agreeing to pay up to $10 million and $25 million, respectively, to settle the private claims. [14] As part of

---

[4] *In re Ferrellgas Partners, L.P.,* FTC Dkt. No. 9360, Statement of Chairwoman Edith Ramirez and Commissioner Julie Brill, at 2 (Oct. 31, 2014). *See also* Concurring Statement of Commissioner Joshua D. Wright, at 3 ("Here, it is self-evident that AmeriGas and Blue Rhino's agreement to reduce the amount of propane in tanks sold to Walmart has the economic effect of increasing the per unit price *if prices are held constant.*") (emphasis added).

[5] *Id.* at 3 (emphasis added).

[6] *Id.* at 2 (emphasis added).

[7] *See* Statement of Chairwoman Edith Ramirez and Commissioner Julie Brill, at 2 & 3 nn.4 & 9 (citing, among other cases, *Catalano, Inc.* v. *Target Sales, Inc.,* 446 U.S. 643 (1980); *Sugar Institute* v. *United States,* 297 U.S. 553 (1936)); Concurring Statement of Commissioner Joshua D. Wright, at 3 n.14 (citing, *inter alia,* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶2022a, at 174 (3d ed. 2012), for the proposition that agreements to fix various "price elements" are per se unlawful); *id.* at 2–3 n.13 (discussing "bid-rigging or auction collusion").

[8] *See, e.g.,* Timothy J. Muris & Brady P.P. Cummins, *Tools of Reason: Truncation through Judicial Experience and Economic Learning,* Antitrust, Summer 2014, at 46 (arguing that the antitrust agencies should apply a truncated rule of reason analysis only "to restraints whose effect on competition is clear based on 'judicial experience and current economic learning'") (quoting *In re* Polygram Holding Inc., 136 F.T.C. 310, 344–45 (2003), *aff'd sub nom. Polygram Holding, Inc.* v. *FTC,* 416 F.3d 29 (D.C. Cir. 2005)).

[9] *See, e.g.,* Bruce H. Kobayashi & Timothy J. Muris, *Chicago, Post-Chicago, and Beyond: Time to Let Go of the 20th Century,* 78 Antitrust L.J. 147, 152–53 (2012) ("One result of the incorporation of economics into antitrust law has been the widespread rejection of broad rules of per se illegality. Over three decades, the Supreme Court abandoned most per se rules, leaving only naked horizontal price fixing and market division, plus a modified per se rule for tie-ins, under per se treatment.") (footnotes omitted); Leah Brannon & Douglas H. Ginsburg, *Antitrust Decisions of the U.S. Supreme Court, 1967 to 2007,* 3 Competition Pol'y Int'l 1, 3 (2007) (arguing "that the U.S. Supreme Court . . . is methodically re-working antitrust doctrine to bring it into alignment with modern economic understanding").

[10] The majority alleged neither an agreement as to each party's output level nor an agreement on reducing the amount of the propane in each firm's tanks. While the former agreement, if reached, would clearly be per se unlawful, the latter would not necessarily be per se unlawful, in my view. The parties had contracted to fill each other's propane tanks in certain areas of the country where one of the firms did not have refilling and refurbishing facilities. *See* Compl. ¶ 29. As a result, there would have been an efficiency justification—the need for uniform fill levels across the two suppliers—for any agreement on the fill level, and such agreement, had one been reached, would have been appropriately evaluated under the rule of reason. I take no position here on the legality of that hypothetical agreement. Again, there was no allegation in the complaint that the parties agreed on the fill levels in their tanks.

[11] I would have voted against this case, even if it had been pursued under the rule of reason because the evidence did not provide a reason to believe that the alleged conduct had an adverse impact on competition in the market for propane exchange tanks.

[12] Commissioner Wright fairly notes that no antitrust practitioner would counsel a client to engage in the direct competitor communications that were alleged to have happened here. *See* Concurring Statement of Commissioner Joshua D. Wright, at 2. One might even consider bringing a standalone Section 5 case against competitors that have engaged in the sharing of nonpublic, competitively sensitive information. *See, e.g., In re* Bosley, Inc., FTC Dkt. No. C–4404, Complaint (June 5, 2013), *available at http://www.ftc.gov/sites/default/files/documents/cases/2013/06/130605aderansregiscmpt.pdf.* However, the (largely one-way) communications at issue here are a far cry from the categories of conduct that are properly deemed per se unlawful.

[13] Compl. ¶ 35.

[14] *See* Plaintiffs' Motion for Preliminary Approval of Amended Class Settlement, *In re* Pre-Filled Propane Tank Marketing and Sales Practices Litig., MDL No. 2086, No. 4:09–cv–00465 (W.D. Mo. Apr. 29, 2010) (settlement with AmeriGas granted final approval on Oct. 4, 2010); Plaintiffs' Motion for Preliminary Approval of Class Settlement, *In re* Pre-Filled Propane Tank Marketing and Sales Practices Litig., MDL No. 2086, No. 4:09–md–2086 (W.D. Mo. Continued

that settlement, one of the parties, Blue Rhino, also agreed to provide additional antitrust compliance training to relevant company personnel. One can only assume that AmeriGas took comparable steps following the settlement. In light of these considerations and others, scarce Commission resources would have been better spent pursuing other, more worthwhile matters.

Although the Commission may have discovered some smoke, there clearly was no fire in this case—whether fueled by propane or otherwise. In short, there was very weak evidence supporting what I saw as, at best, a novel Section 1 case. I therefore did not have reason to believe that the parties had committed a Section 1 violation. Nor did I think that it was in the public interest to pursue this enforcement action. For these reasons, I cannot vote for a consent agreement grounded on the same theory and evidence that was presented to me when the complaint originally issued.

**Concurring Statement of Commissioner Joshua D. Wright**

The Commission has voted to accept proposed Consent Agreements to remedy allegations that AmeriGas and Blue Rhino restrained competition by colluding to reduce the amount of propane in tanks sold to Walmart. I voted in favor of issuing the Complaint and accepting the proposed Consent Agreements because the evidence is sufficient to provide reason to believe that AmeriGas and Blue Rhino engaged in conduct that is unlawful under the antitrust laws and the proposed settlements will improve consumer welfare by preventing the parties from engaging in anticompetitive conduct in the future.[1] I write separately to explain my support for this enforcement action and the proposed settlements.

The alleged conspiracy would establish a relatively straightforward violation of the antitrust laws. In 2008, AmeriGas and Blue Rhino each independently reduced the amount of propane contained in their tanks from 17 pounds to 15 pounds.[2] The fill reductions had the effect of a 13 percent increase in the price of propane because neither AmeriGas nor Blue Rhino implemented a corresponding decrease

in price.[3] If the story had ended there, with merely unilateral action and no agreement between AmeriGas and Blue Rhino, there would be no violation of the antitrust laws and the Commission would not have pursued an enforcement action.

However, the story did not end there. Walmart, the largest propane exchange tank retailer in the United States, resisted the fill reductions.[4] Other retailers agreed to the fill reductions, but only on the condition that Walmart also would accept the fill reductions within a short period of time.[5] Faced with resistance from Walmart, Blue Rhino and AmeriGas encountered the very real prospect that their fill reductions could unravel and the market would return to costlier and thus less profitable 17-pound tanks.[6] To avoid this result, AmeriGas and Blue Rhino colluded in their negotiations with Walmart to ensure it quickly accepted the fill reductions.[7] That collusion provides the basis for the Commission's complaint and proposed Consent Agreements.

More specifically, AmeriGas and Blue Rhino executives spoke frequently in the days and weeks leading up to Walmart's decision to accept the fill reductions in order to coordinate their negotiations and encourage one another not to give in to Walmart's opposition.[8] For instance, AmeriGas and Blue Rhino executives worked together to ensure that retailers near Walmart's headquarters in Bentonville, Arkansas, only carried 15-pound tanks in hopes of convincing Walmart to accept the fill reductions as the new industry standard.[8] AmeriGas and Blue Rhino executives also discussed the status of their negotiations and coordinated emails using similar language to urge Walmart to accept the fill reductions.[9] Indeed, a frustrated AmeriGas's Director of National Accounts at one point suggested to Blue Rhino that it was time for them to issue an ultimatum to Walmart.[10] Blue Rhino's Vice President of Sales responded by urging AmeriGas to "hang in there" as Blue Rhino continued to negotiate with Walmart.[11] Faced with unyielding demands from its two primary propane suppliers and no viable outside option, Walmart finally

conceded and agreed to accept propane tanks filled to 15 pounds.[12]

No antitrust practitioner would counsel his or her client to engage in the direct competitor communications and concerted actions that are alleged to have occurred between Blue Rhino and AmeriGas. This is with good reason: Such conduct is plainly anticompetitive and unlawful under Section 1 of the Sherman Act.[13] It is well understood that collusion among suppliers regarding price, quantity, and other competitive terms negotiated with purchasers can harm consumers by impeding the competitive process.[14] Here, it is self-evident that AmeriGas and Blue Rhino's agreement to reduce the amount of propane in tanks sold to Walmart has the economic effect of increasing the per unit price if prices are held constant. The mere fact that AmeriGas and Blue Rhino's agreement did not preclude the possibility that they would continue to compete on price or other terms is of little consequence for antitrust analysis. Indeed, if such competition were enough to absolve otherwise anticompetitive concerted action, even a conspiracy to fix nominal prices would be lawful so long as the colluding rivals

---

Oct. 6, 2011) (settlement with Blue Rhino granted final approval on May 31, 2012).

[1] 15 U.S.C. 45(b) (2012) (authorizing the Commission to initiate an enforcement action when it has "reason to believe" a party has engaged in an unfair method of competition).

[2] In re Ferrellgas Partners, L.P., FTC Docket No. 9360, Complaint at ¶¶ 1, 5, 32, 43 (Mar. 27, 2014), *available at* http://www.ftc.gov/system/files/documents/cases/140401amerigascomplaint.pdf.

[3] *Id.* at ¶¶ 1, 33.
[4] *Id.* at ¶¶ 1, 6, 38.
[5] *Id.* at ¶¶ 6, 41, 47.
[6] *Id.* at ¶¶ 1, 7, 48.
[7] *Id.* at ¶¶ 42, 50.
[8] *Id.* at ¶ 50.
[9] *Id.* at ¶¶ 50, 54, 55.
[10] *Id.* at ¶ 50.
[11] *Id.*

[12] *Id.* at ¶¶ 56.
[13] Collusion by suppliers in negotiations with a single purchaser has long been accepted as a valid theory of harm under the antitrust laws. Over a century ago, collusion in negotiations by employees (i.e., suppliers of labor) with employers was challenged successfully under the Sherman Act. *See, e.g., Loewe v. Lawlor,* 208 U.S. 274 (1908). The theory was so viable that Congress created a new labor exemption by passing Sections 6 and 20 of the Clayton Act. *See* 29 U.S.C. 52, 101–115 (2012). In its most egregious form, collusion by suppliers in negotiations with a single purchaser can be challenged as bid-rigging or auction collusion, the harms of which are well documented in the economic literature and which represent one of the most common violations prosecuted by the Department of Justice's Antitrust Division. *See, e.g.,* Robert C. Marshall & Michael J. Meurer, *The Economics of Auctions and Bidder Collusion, in* Game Theory and Business Applications 339 (Kalyan Chatterjee & William F. Samuelson eds., 2001); Paul Klemperer, *What Really Matters in Auction Design,* 16 J. Econ. Persp. 169, 169 (Winter 2002); Luke Froeb, Robert Koyak, & Gregory Werden, *What is the Effect of Bid-rigging on Prices?,* 42 Economics Letters 419 (1993). It is therefore unclear why, if one concedes it would be unlawful for AmeriGas and Blue Rhino to collude to reduce the amount of propane in tanks sold to all purchasers, it also would not be unlawful for the parties to collude in imposing such a fill reduction on a single, unwilling purchaser.

[14] *See, e.g., Catalano, Inc. v. Target Sales,* Inc., 446 U.S. 643 (1980) (per curiam) (agreement by competitors to terminate certain credit terms held unlawful); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2022a, at 174 (3d ed. 2012) (explaining "the per se rule generally governs not only explicit price fixing but agreements to fix a 'price element,' which broadly includes "any term of sale that can be regarded as affecting the price that the customer must pay or any mechanism such as a formula by which the price maybe computed").

continued to compete on quality or quantity. Fortunately, antitrust law requires a different and more economically sensible result.[15]

It also is worth noting that no one—including but not limited to the parties—has presented a plausible efficiency justification that might suggest the collusion between AmeriGas and Blue Rhino to reduce the amount of propane in tanks sold to Walmart was somehow procompetitive.[16] This enforcement action therefore simply does not implicate traditional concerns over false positives and the fear that the Commission might inadvertently chill procompetitive behavior.[17] In addition, while much has been written about the important shift away from per se rules in favor of a more effects-based rule of reason analysis under modern antitrust doctrine, the benefits of this shift unsurprisingly accrue only where the challenged conduct potentially offers some procompetitive benefits.[18] Again, that is not the case here. The record is devoid of evidence supporting a plausible efficiency justification for the challenged agreement.

Moreover, the Supreme Court's shift toward the rule of reason has always left room for an appropriately truncated review for conduct that is likely to harm competition and without efficiency justification. The Court has made clear that attempting to place antitrust analysis into fixed categories is overly simplistic.[19] The Court has recognized that "there is often no bright line separating per se from Rule of Reason analysis" [20] and that determining whether a "challenged restraint enhances competition" requires "an enquiry meet for the case." [21]

The alleged coordination between AmeriGas and Blue Rhino bears a "close family resemblance" to conduct long since "convicted in the court of consumer welfare" based upon "economic learning and market experience" that demonstrates such restraints are likely to harm consumers.[22] Where, as here, the two principal suppliers in an industry have colluded in their negotiations with a major distributor to impose contractual terms the distributor initially resisted, and there are no plausible efficiency justifications suggesting the conduct may have been procompetitive, that enquiry is appropriately brief. Enforcement actions to prevent anticompetitive conduct with no plausible efficiency are a wise use of agency resources and should be a focus of the Commission's competition mission because they bring immediate benefits for consumers with little risk of chilling procompetitive conduct.

For all of these reasons, I voted in favor of issuing the Complaint and accepting the proposed Consent Agreements in this matter.

[FR Doc. 2014–26551 Filed 11–6–14; 8:45 am]

**BILLING CODE 6750–01–P**

---

[15] See, e.g., Areeda & Hovenkamp, supra note 14, ¶ 2022a, at 175 ("For example, firms could presumably agree to insist on cash at the time of delivery but nevertheless compete vigorously on the price they charge. But to make much of this fact distorts the relative importance of the various terms of any transaction. The explicit 'price' of any good or service is a function not only of the nominal price but also for the credit terms, applicable discounts, rebates, terms of delivery, and the like. Firms might also agree about the nominal price but continue to compete by offering increasingly longer time periods before payment is due. The fact that such competition continues to exist does not serve to make the price-fixing agreement reasonable.").

[16] Although the argument that AmeriGas and Blue Rhino's co-filling arrangement offers an efficiency justification for the parties' concerted action against Walmart has some superficial appeal, it can be dispensed with relatively easily. First, if we are to take seriously the claim that identical propane fill levels are necessary for the efficient operation of AmeriGas's and Blue Rhino's businesses, we would expect the parties to have agreed on the initial move from 17-pound to 15-pound tanks. They did not. In fact, after a lengthy investigation, the Commission concluded the parties independently reduced the amount of propane contained in their tanks and only colluded in subsequent negotiations with Walmart. Second, it would be a curious thing for two companies attempting to achieve an efficiency benefit—one that would reduce the costs passed on to purchasers—to seek to achieve that benefit by coordinating secretly rather than explaining to purchasers the costs of maintaining divergent fill-levels for their propane tanks.

[17] See Frank H. Easterbrook, The Limits of Antitrust, 63 Tex. L. Rev. 1, 15–17 (1984).

[18] See, e.g., Joshua D. Wright, Comm'r, Fed. Trade Comm'n, The Economics of Resale Price Maintenance & Implications for Competition Law and Policy, Remarks before the British Institute of International and Comparative Law (Apr. 9, 2014), available at http://www.ftc.gov/system/files/documents/public_statements/302501/140409rpm.pdf.

[19] See, e.g., Polygram Holding, Inc. v. FTC, 416 F.3d 29, 34–35 (D.C. Cir. 2005) (explaining usefully how the "Supreme Court's approach to evaluating a section 1 claim has gone through a transition over the last twenty-five years, from a categorical approach to a more nuanced and case-specific inquiry").

[20] Cal. Dental Ass'n v. F.T.C., 526 U.S. 756, 779 (1999) (quoting NCAA v. Board of Regents, 468 U.S. 85, 104 n.26 (1983)).

[21] Id. at 779–81.

[22] Polygram, 416 F.3d 29 at 36–37.

---

# DEPARTMENT OF DEFENSE

# GENERAL SERVICES ADMINISTRATION

# NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[OMB Control No. 9000–0013; Docket 2014–0055; Sequence 21]**

## Submission for OMB Review; Federal Acquisition Regulation; Cost or Pricing Data Requirements and Information Other Than Cost or Pricing Data

**AGENCY:** Department of Defense (DOD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of request for public comments regarding an extension to an existing OMB information collection.

**SUMMARY:** Under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 35) the Regulatory Secretariat Division will be submitting to the Office of Management and Budget (OMB) a request to review and approve an extension of a previously approved information collection requirement concerning Cost or Pricing Data Requirements and Information Other Than Cost or Pricing Data. A notice was published in the **Federal Register** at 79 FR 51168 on August 27, 2014. No comments were received.

**DATES:** Submit comments on or before December 8, 2014.

**ADDRESSES:** Submit comments identified by Information Collection 9000–0013, Cost or Pricing Data Requirements and Information Other Than Cost or Pricing Data, by any of the following methods:

• *Regulations.gov: http://www.regulations.gov.* Submit comments via the Federal eRulemaking portal by searching the OMB control number 9000–0013. Select the link that corresponds with "Information Collection 9000–0013, Cost or Pricing Data Requirements and Information Other Than Cost or Pricing Data". Follow the instructions provided on the screen. Please include your name, company name (if any), and "Information Collection 9000–0013, Cost or Pricing Data Requirements and Information Other Than Cost or Pricing Data", on your attached document.

• *Fax:* 202–501–4067.

• *Mail:* General Services Administration, Regulatory Secretariat Division (MVCB), 1800 F Street NW., Washington, DC 20405. ATTN: Ms. Flowers/IC 9000–0013, Cost or Pricing Data Requirements and Information Other Than Cost or Pricing Data.