# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MCCORMICK & COMPANY, INC., PEPPER PRODUCTS MARKETING AND SALES PRACTICES LITIGATION | MDL Docket No. 2665<br>Misc. No. 15-1825 (ESH)<br>Sealed |
| This Document Relates To:<br><br>**ALL CONSUMER CASES** | |

## MEMORANDUM OPINION

Plaintiffs, who are retail purchasers of black pepper supplied by defendant McCormick & Co., allege that McCormick and its retailers deceived plaintiffs about the amount of pepper in containers and conspired to inflate the prices that plaintiffs paid. This Court previously dismissed plaintiffs' claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, but permitted the suit to proceed on the basis of the consumer protection and unjust enrichment claims. *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124 (D.D.C. 2016). The Court subsequently gave plaintiffs leave to re-plead their antitrust claim. (*See* Mem. Op., March 21, 2017, ECF No. 127.) Defendants have now renewed their motions to dismiss that claim. Because the Court concludes that plaintiffs have not and cannot cure the deficiencies in their complaint, the Court will dismiss the antitrust claim in Count One with prejudice.

**BACKGROUND**

After the Judicial Panel on Multi-District Litigation consolidated fourteen separate class actions before this Court, plaintiffs filed their Consolidated Amended Class Action Complaint, ECF No. 34 ("Compl."), asserting antitrust, consumer protection, and unjust enrichment claims. As alleged in the antitrust claim, McCormick and its retailers agreed, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to implement a price increase by decreasing the quantity of pepper in both the branded McCormick containers and the retailers' private-label containers, which were also supplied by McCormick. (*Id.* at ¶¶ 48-63, 73-80.) Plaintiffs alleged that "[s]ince 2010 the cost of raw black pepper has increased by approximately 500%." (*Id.* at ¶ 31.) In response, in 2015 "McCormick began shipping millions of [its branded] pepper tins and grinders to retail stores containing 25% and 19% less black pepper, respectively" than they had previously. (*Id.* at ¶ 34.) Although the containers noted the new weight, they were the "exact same size" as before. (*Id.* at ¶¶ 38-40, 45.) In addition, "McCormick and the Retailers agreed that McCormick would reduce the amount of ground black pepper contained in the McCormick-supplied, store-branded tins, even though the actual size of the store-branded tins has, at all relevant times, remained the same." (*Id.* at ¶ 50.) Plaintiffs further alleged that "McCormick and the Retailers agreed to, and did, maintain the same retail prices (as if the black pepper tins and grinders were full) for the now slack-filled black pepper containers." (*Id.* at ¶ 62.) According to plaintiffs, defendants' conduct led to "supra-competitive, artificially inflated prices for pepper," in violation of Section 1 of the Sherman Act. (*Id.* at ¶¶ 74, 76.)[1]

---

[1] Because the Court has previously described plaintiffs' allegations in detail, it refers the reader to those descriptions. *See McCormick*, 217 F. Supp. 3d at 130-31; March 21 Mem. Op. at 2-3.

The Court dismissed plaintiffs' Sherman Act claim for failure to state a claim. *McCormick*, 217 F. Supp. 3d at 146. First, plaintiffs had conceded at the motion hearing on October 25, 2016, that McCormick and its retailers did not explicitly agree on retail prices, and the Court also found that the complaint did not plausibly suggest such an agreement. *Id.* at 131-34. Second, although the Court accepted that plaintiffs had alleged agreements between McCormick and its retailers about the quantity of pepper in containers, the Court held that plaintiffs had not plausibly alleged that such agreements were anticompetitive. *Id.* at 134-39.

After the Court dismissed the antitrust claim, plaintiffs moved for leave to amend their complaint to re-plead that claim. Their proposed complaint, which is now the Second Amended Consolidated Class Action Complaint, ECF No. 128 (redacted version at ECF No. 129) ("2d Compl."), adds allegations based on documents obtained from defendants during discovery. Again, the Court will provide only a brief summary of the allegations, because readers may refer to the Court's previous description. (*See* March 21 Mem. Op. at 5-7.) Plaintiffs now allege that McCormick wanted to avoid a price increase, because it was concerned that increases in the price gap between the branded products and less expensive private-label products had hurt the branded products' market share over the past few years. (*Id.* at ¶¶ 57-58.) However, McCormick also "feared that a unilateral reduction [in quantity of pepper in a tin] might be 'deceptive and could very well back fire on us[,]' since the private label competitors would likely 'advertise '10% more vs [McCormick]'' and thus 'point[] this deception out to our loyal branded customer.'" (*Id.* at ¶ 60.) McCormick informed retailers that it would be reducing the weights in its branded products and explained that they could choose to accept the reduced weights in their private-label products or pay a higher price to keep the old weights. (*Id.* at ¶¶ 66, 68, 69.) Nineteen retailers agreed to accept the reduced weights in the private-label products, while eight smaller retailers

3

took a wholesale price increase either because they were not offered a choice to reduce weights or because they elected not to do so. (*Id.* at ¶ 81.) According to plaintiffs, McCormick's agreements with the nineteen retailers to reduce weight in private-label products were anticompetitive because "competing on fill levels" would have "creat[ed] downward pressure on prices." (*Id.* at ¶¶ 55, 81, 106.)

In their argument for leave to amend, plaintiffs contended that the new complaint would address the Court's concerns with the original complaint, because it showed that "McCormick and its private label competitors expressly agreed to reduce fill" and that "the agreements had an anticompetitive effect, namely the elimination of competition around fill levels between McCormick and its private label competitors." (Pls. Mot. Reconsideration at 11-12, ECF No. 107 (redacted version at ECF No. 105).) The Court concluded that plaintiffs had again failed to make plausible allegations that the agreements on fill levels were anticompetitive. (March 21 Mem. Op. at 9-14.) Still, the Court granted leave to amend because plaintiffs "seem[ed] to be intimating that their antitrust claim can be based on an alternative theory that defendants agreed to deceive consumers about the reduction in fill," and the Court required further briefing to assess the plausibility of that theory. (*Id.* at 9-10, 14-16.)

In response to plaintiffs' attempt to re-plead their Sherman Act claim, defendants have renewed their motions to dismiss that claim. (McCormick Mot., ECF No. 132; Wal-Mart Mot., ECF No. 134.)[2] Defendants argue that plaintiffs have not alleged an agreement to deceive

---

[2] McCormick's motion is entitled "Motion to Dismiss Consumer Plaintiffs' Second Amended Consolidated Class Action Complaint," and it states that McCormick "renews by reference the arguments set forth as to Plaintiffs' state law claims in McCormick's initial Motion to Dismiss." (McCormick Mot. at 1-2.) The Court has previously held that those counts state a claim, *see McCormick*, 217 F. Supp. 3d 124, so it will deny the portion of McCormick's motion that seeks dismissal of plaintiffs' state law claims.

consumers, such an agreement would not be cognizable under Section 1 of the Sherman Act, plaintiffs have failed to allege an anticompetitive effect or antitrust injury, the relevant market allegations are inadequate, and plaintiffs do not have standing to pursue a claim about the wholesale market. (McCormick Mem., ECF No. 132-1; Wal-Mart Mem., ECF No. 142 (redacted version at ECF No. 134-1).) In their opposition, plaintiffs state that they have not alleged an agreement to deceive, but they argue that they have "alleged a plausible agreement among horizontal competitors to fix shelf prices and/or to reduce fill which is a term of sale affecting price—both *per se* violations of Section 1 of the Sherman Act." (Pls.' Opp. at 12, ECF No. 143 (redacted version at ECF No. 139).) In reply, defendants argue that plaintiffs admit they are not pursuing the theory which was the sole basis for granting leave to amend, and plaintiffs have not plausibly alleged an agreement on retail prices. (McCormick Reply, ECF No. 140; Wal-Mart Reply, ECF No. 141.)

**ANALYSIS**

In the Court's two previous opinions addressing whether plaintiffs have stated an antitrust claim, the Court has identified three types of agreement that plaintiffs may be attempting to allege: (1) an agreement on retail prices; (2) an agreement on quantity (fill level); and (3) an agreement to deceive consumers about reduced fill levels. A review of the Court's previous conclusions and an analysis of plaintiffs' current arguments about each of these types of agreement demonstrate that plaintiffs have still failed to make plausible allegations that defendants violated the Sherman Act. Plaintiffs concede that they have not alleged an agreement to deceive consumers. Despite plaintiffs' attempts to bolster their complaint with documents from discovery, they have still failed to make plausible allegations that defendants agreed on

5

retail prices. Finally, plaintiffs remain unable to articulate, either in their complaint or in their briefing, any plausible anticompetitive effect of the alleged agreements on fill level.

I.  **LEGAL STANDARD**

To state a claim for violation of Section 1 of the Sherman Act, plaintiffs' allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely . . . conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The Supreme Court has explained that there is a "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 557-59. Following *Twombly*, courts dismiss Section 1 complaints when there is an independent business justification for the observed conduct and no basis for rejecting it as the explanation for the conduct. *McCormick*, 217 F. Supp. 3d at 132-34.

In addition, plaintiffs cannot survive a motion to dismiss without plausibly alleging that the agreement unreasonably restrains trade. *See Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). The Supreme Court labels categories of restraints as illegal *per se* when they would always or almost always tend to restrict competition, and therefore, it is not worthwhile to analyze the effects in a particular instance. I ABA Section of Antitrust Law, *Antitrust Law Developments* 54-55 (7th ed. 2012). Horizontal agreements — agreements among competitors — to fix prices or allocate markets are deemed illegal *per se*. *Id.* at 54-61. In contrast, some other horizontal agreements and almost all vertical agreements — agreements between firms at different levels in the chain of distribution — must be analyzed under the rule of reason. *Id.* at 136-37. To state a claim under the rule of reason, plaintiffs must plausibly allege an actual or potential anticompetitive effect. *McCormick*, 217 F. Supp. 3d at

6

137-39; March 21 Mem. Op. at 11-12. Conclusory allegations of supracompetitive prices are not sufficient. *McCormick*, 217 F. Supp. 3d at 137.

Private plaintiffs claiming damages for an antitrust violation must also allege "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

## II. AGREEMENT TO DECEIVE

This Court granted plaintiffs leave to amend their complaint because there was a suggestion that plaintiffs might be alleging an agreement to deceive consumers about reduced fill levels. (March 21 Mem. Op. at 9-10, 14-16.) In granting leave to amend, the Court explained that the proposed complaint did not plausibly allege that defendants' agreements on fill level were anticompetitive. (*Id.* at 12-14.) Plaintiffs had not even argued that their proposed complaint demonstrated an agreement on retail prices. Thus, although the Court granted leave to amend, it also gave defendants permission to renew their motions to dismiss and directed the parties to focus their briefing on whether plaintiffs had plausibly alleged an anticompetitive agreement to deceive consumers. (*Id.* at 15-16.) Now, plaintiffs concede that they have not alleged any agreement to deceive: "In its March 21, 2017 Opinion, the Court queried whether the antitrust claim alleges 'an agreement to deceive consumers that had an anticompetitive effect.' It does not. Deception is not an element of, nor is an agreement to deceive cognizable as, a Section 1 price-fixing claim." (Pls.' Opp. at 1.) Plaintiffs have thus rejected the only basis upon which the Court granted leave to amend. But since plaintiffs argue that their complaint makes sufficient allegations about agreements on price and fill level, the Court will address those types

of agreements as well, even though most of plaintiffs' arguments have been rejected in the Court's prior opinions.

## III. AGREEMENT ON PRICE

At the hearing on the motion to dismiss plaintiffs' first complaint, plaintiffs conceded that they were not alleging an explicit agreement on retail prices. (Mot. Hr'g Tr. at 69, 93, Oct. 25, 2016.) Because plaintiffs' complaint alleged that defendants "agreed to, and did, maintain the same retail prices (as if the black pepper tins and grinders were full)" (Compl. at ¶ 62), the Court nonetheless considered whether plaintiffs had plausibly alleged an agreement on retail prices. The Court concluded that plaintiffs had not. *McCormick*, 217 F. Supp. 3d at 132-34. When plaintiffs moved for leave to amend, they argued that their proposed complaint would cure deficiencies in the alleged agreements on fill level but did not argue that it would demonstrate an agreement on price. (*See* Pls.' Mot. Reconsideration at 11). In fact, while arguing that the agreements on fill level harmed competition, plaintiffs even said that "it matters not in this instance that '[r]etailers [were] free to choose their prices.'" (*Id.* at 20.) As a result, the Court's opinion granting leave to amend did not address whether the proposed complaint plausibly alleged an agreement on price. Plaintiffs now claim that defendants "agree[d] to maintain the shelf price" and "documented the agreement *to maintain price* in a letter." (Pls.' Opp. at 1-2.) Despite plaintiffs' previous concessions to the contrary, the Court will consider the sufficiency of plaintiffs' allegations about an agreement on price.

To begin, the Court reviews its reasons for concluding that the first complaint did not plausibly allege an agreement on price. Plaintiffs had not alleged any specific communications between McCormick and its retailers from which the Court could reasonably infer an agreement on retail prices. *McCormick*, 217 F. Supp. 3d at 133. On the contrary, there was an obvious

8

alternative explanation for the continuity in retail prices — "that McCormick maintained its wholesale prices when it reduced the fill level of pepper to offset the increased cost of raw pepper, and retailers in turn maintained their retail prices to preserve their usual allowance for operating costs and their traditional profit margin." *Id.* Plaintiffs had alleged no facts suggesting that retailers would have been acting against their independent economic self-interest if they had chosen to maintain the same prices that they had charged before. *Id.* Furthermore, plaintiffs failed to allege any motivations for McCormick and the retailers to make an agreement on retail prices. *Id.* at 133-34. Thus, the Court concluded that the complaint did not plausibly suggest an agreement on retail prices. *Id.*

Plaintiffs now argue that a letter from McCormick to its retailers demonstrates an express agreement to maintain shelf prices. (Pls.' Opp. at 1-2, 8.) In that letter, McCormick states that "[a] net weight reduction will allow McCormick and its Private Label customers to mitigate the commodity increase while also preserving the most competitive price on shelf for our consumers. All straight fill black pepper items will be discontinued and replaced with new ones, but prices will remain the same." (*Id.* at 1.) It is surprising that plaintiffs now characterize this passage as documenting an explicit agreement on retail price, because their complaint quoted a different passage from the letter without mentioning either this passage or an agreement on price. (*See* 2d Compl. at ¶ 66.) In any case, the Court cannot reasonably infer an agreement about retail prices on the basis of this letter. Given that McCormick sets its wholesale prices, and plaintiffs have presented *no* evidence that it (as opposed to the retailers) sets retail prices, the only reasonable inference from McCormick's statement that "prices will remain the same" is that McCormick is maintaining its *wholesale* prices despite the reduction in fill. Based on McCormick's statement that the fill reduction will "preserv[e] the most competitive price on shelf," the Court can

9

reasonably infer that McCormick expected the retail price for a tin of pepper to be lower if McCormick reduced the fill and maintained the wholesale price than if it maintained the old fill and increased the wholesale price. That is a logical expectation in the absence of any agreement on retail price, so the Court cannot infer any agreement on retail price from McCormick's statement. In sum, plaintiffs have still failed to make plausible allegations that defendants agreed on retail prices.

## IV. AGREEMENT ON QUANTITY (FILL LEVEL)

When the Court dismissed the antitrust claim from plaintiffs' first complaint, it explained that plaintiffs had failed to make plausible allegations or arguments that defendants' agreements on fill level were anticompetitive. *McCormick*, 217 F. Supp. 3d at 134-39. Although the Court granted plaintiffs leave to file their current complaint, it explained that the complaint still failed to state a viable antitrust claim on the basis of the alleged agreements on fill level. (March 21 Mem. Op. at 12-14.) Nonetheless, plaintiffs continue to press their claim based on the alleged agreements on fill level. For the sake of completeness, the Court will explain why plaintiffs' latest arguments do not alter the Court's conclusion.

Again, the Court must begin by reviewing its previous opinions. When the Court dismissed plaintiffs' original antitrust claim, it gave two independent reasons for holding that the alleged agreements on fill level were not illegal *per se*. First, the agreements were not horizontal, because plaintiffs had not alleged an agreement among retailers, and the relationship between McCormick and its retailers involved both horizontal and vertical aspects. *McCormick*, 217 F. Supp. 3d at 135-36. The Court explained that analysis under the rule of reason was required for a novel factual situation that appeared to have some characteristics of both horizontal and vertical restraints. *Id.* Second, the agreements were not about price but about

standardizing a product. *Id.* at 136-37. Having concluded that analysis under the rule of reason was necessary, the Court then explained that plaintiffs had failed to plausibly allege the anticompetitive effect required for that analysis. *Id.* at 137-39. There were "no allegations about how an agreement on the quantity of pepper in containers that McCormick supplies to Wal-Mart would lead to artificially high prices for those containers." *Id.* at 137. In fact, McCormick could not supply pepper to retailers without an agreement on the quantity of pepper that it would put in the containers. *Id.* at 134. In response to plaintiffs' claim that the agreement was an output restriction, the Court explained that "McCormick's agreement with retailers to fill individual containers with less pepper did not restrict the total supply of pepper." *Id.* Plaintiffs also argued that the agreements to reduce the amount of pepper in containers were effectively agreements to increase the price per ounce, but the Court noted that "if there is no agreement on retail price, decreasing the amount of pepper in the can does not automatically increase the price per ounce. Retailers are free to choose their prices." *Id.* at 138. Plaintiffs also argued that the agreements prevented retailers from choosing whether to pass on their cost increases to consumers, but again "plaintiffs ignore[d] the fact that an agreement on quantity does not restrict what retailers can charge consumers." *Id.* Finally, the Court held that because plaintiffs had not plausibly alleged that the increase in price per ounce that accompanied the quantity reductions was the result of anticompetitive conduct, as opposed to the increased cost of raw pepper, they had not adequately alleged an antitrust injury. *Id.* at 139.

In plaintiffs' current complaint, they allege that McCormick's agreements with retailers to reduce weight in private label products were anticompetitive because "competing on fill levels" would have "creat[ed] downward pressure on prices." (2d Compl. at ¶¶ 55, 81, 106.) "[R]etailers would have been free to compete [with McCormick's branded products] based on

11

price and volume comparisons to their 'full' private label products." (*Id.* at ¶ 94.) In the Court's opinion granting leave to amend, it explained that plaintiffs' alleged anticompetitive effect did not satisfy *Twombly* because plaintiffs seemed to assume that competing on more dimensions of a product would always lower prices, but they provided no support for that assumption. (March 21 Mem. Op. at 12.) The Court also explained that even if selling different quantities of pepper would drive down prices, antitrust law would not require retailers to sell different quantities. (*Id.* at 13.) "[I]t was procompetitive, not anticompetitive, for McCormick to offer retailers a choice about whether they wanted to sell private-label products in the traditional quantities or match the new, reduced quantities in McCormick's branded products." (*Id.* at 14.)

Now, plaintiffs argue that they are not required to allege an anticompetitive effect because a horizontal agreement on a price element is illegal *per se*. (Pls.' Opp. at 8-12.) The Court has already held that plaintiffs' underlying premise is incorrect — the alleged agreements are not horizontal agreements, *McCormick*, 217 F. Supp. 3d at 135-36 — and plaintiffs offer no argument on that point. Although an agreement among retailers would be horizontal, the current complaint does not add any allegations that retailers communicated with each other or that their choice to purchase reduced-fill products was conditioned on other retailers' making the same choice. (*See* 2d Compl. at ¶¶ 67-70, 81.)

As for plaintiffs' contention that fill level is a price element, plaintiffs have misread the treatise upon which they rely. (*See* Pls.' Opp. at 9.) As plaintiffs state, that treatise defines a price element as "any term of sale that can be regarded as affecting the price that the customer must pay or any mechanism such as a formula by which the price may be computed." XII Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2022a (3d ed. 2012). The examples that the treatise gives are terms of

financing, discounts, rebates, formulas to be used for determining the price, and willingness to entertain competitive bids. *Id.* Furthermore, the treatise specifically distinguishes agreements on price elements from standardization of products, which "can enable a consumer to make more meaningful comparisons" and often qualifies for treatment under the rule of reason. *Id.* at ¶ 2022b. The amount of pepper in a container is a characteristic of the product, not a term of sale. As the Court has already held, the alleged agreements on fill level were product standardization agreements rather than agreements on price or a price element. *McCormick*, 217 F. Supp. 3d at 136-37. Plaintiffs' position is senseless, because if the relationship between McCormick and a private-label retailer were treated as horizontal, and the amount of fill in the private-label products were treated as a price element, every supply contract for McCormick to manufacture private-label products would be illegal *per se*. *See id.* at 134. Since the alleged agreements were not horizontal agreements on a price element, they are subject to the rule of reason, and as such, plaintiffs cannot survive a motion to dismiss without alleging an anticompetitive effect.

In their attempt to avoid having to articulate what could be anticompetitive about the agreements alleged in this case, plaintiffs also rely on the assertion that defendants' conduct is "nearly identical" to the conduct in *In re Ferrellgas Partners, L.P.*, 159 F.T.C. 1 (2015). (Pls. Opp. at 2, 9-12.) This Court has already explained that "*Ferrellgas* does not demonstrate the unreasonableness of the agreement alleged in this case." *McCormick*, 217 F. Supp. 3d at 138. Whereas McCormick is a wholesaler that supplies the defendant retailers, the defendants in *Ferrellgas* were both wholesalers, so the agreement clearly qualified as a horizontal agreement. *Id.* at 138-39. Furthermore, the FTC filed its complaint under Section 5 of the Federal Trade Commission Act rather than Section 1 of the Sherman Act, the FTC commissioners approved the consent orders without making any legal findings, and the commissioners disagreed about

13

whether and why the challenged conduct was anticompetitive. *Id.* Thus, plaintiffs cannot rely on *Ferrellgas*.

Plaintiffs' conclusory arguments about anticompetitive effect and antitrust injury fare no better than their previous attempts. Plaintiffs' opposition includes only a single sentence describing the supposed anticompetitive effect: "Here, rather than face competition over unilateral fill reduction (and the resulting effective price increase), McCormick obtained agreement from its retail competitors on fill levels to 'maintain a retail price point' and to preserve shelf prices while increasing price on a per-ounce basis." (Pls.' Opp. at 18.) Much of this sentence claims an agreement on price rather than describing an anticompetitive effect of the agreement on fill. The Court has already explained that McCormick's references to preserving or maintaining retail prices do not permit an inference of an agreement on price, but rather indicate an effort to prevent the increasing raw material costs from driving up the prices of individual tins — hence, the interest in reducing fill instead of raising wholesale prices. As for the claimed increase in price per ounce, not every increase in price qualifies as an anticompetitive effect. Plaintiffs have not provided any plausible explanation for why an increase in retail price per ounce would not also have occurred if McCormick had simply raised its wholesale prices, instead of reducing fill. Indeed, the complaint acknowledges that raising wholesale prices would presumably have resulted in an increase in retail prices. (2d Compl. at ¶ 58.) Thus, plaintiffs have not plausibly alleged that the increase in price per ounce was an artificial increase caused by the agreements on fill levels, rather than a natural response to the increasing cost of raw pepper. *McCormick*, 217 F. Supp. 3d at 133, 137-39.

To support their argument that they should not be required to define a relevant market, plaintiffs also assert that "[t]he use of their wholesale-level relationship to effectuate a retail-

14

level agreement on price is direct proof of actual detrimental effects." (Pls.' Opp. at 15.) But the Court has already rejected the claimed agreement on price, and an increase in price does not constitute an actual detrimental effect unless the price is supracompetitive, which plaintiffs have not plausibly alleged. Plaintiffs' claim of antitrust injury — that they "purchased products at artificially high prices" (Pls.' Opp. at 12-13) — fails for the same reason. Because plaintiffs have not plausibly alleged anticompetitive effect or antitrust injury from the agreements on fill level, the current complaint again fails to state a claim under Section 1 of the Sherman Act.[3]

## V. DISMISSAL WITH PREJUDICE

"A dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations omitted). Two or more unsuccessful attempts to plead a claim may demonstrate that a plaintiff cannot cure the deficiency in his complaint and, therefore, dismissal with prejudice is appropriate. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Belizan v. Hershon*, 495 F.3d 686, 688 (D.C. Cir. 2007); *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 169-70 (D.D.C. 2016); *Plumbers Local #200 Pension Fund v. Wash. Post Co.*, 930 F. Supp. 2d 222, 233 n.5 (D.D.C. 2013). Not only is this plaintiffs' second unsuccessful attempt to survive a motion to dismiss, but they also have had access to extensive discovery for purposes of filing their current complaint. Between the two motions to dismiss and the intervening motion for leave to amend, the Court has also seen three rounds of briefing about the adequacy of plaintiffs' claim. Rather than responding to the Court's concerns about their failure to explain

---

[3] The Court need not reach defendants' alternative challenges to plaintiffs' relevant market allegations and standing.

any anticompetitive effect from the agreements to reduce fill, plaintiffs have provided only conclusory statements of anticompetitive effect and attempted to rehash legal issues that the Court has already resolved.  Given plaintiffs' failure to state a plausible antitrust claim, despite an opportunity to amend their complaint, access to discovery, and guidance from the Court as to the gaps in their allegations, the Court concludes that plaintiffs cannot cure the deficiencies in their claim.  Therefore, the Court will dismiss the Sherman Act claim with prejudice.

## CONCLUSION

For the reasons discussed above, McCormick's motion to dismiss plaintiffs' Second Amended Consolidated Class Action Complaint is granted as to Count One.  Wal-Mart's motion to dismiss Count One from the Second Amended Consolidated Class Action Complaint is granted.  Count One is dismissed with prejudice.  A separate Order accompanies this Memorandum Opinion.

/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   June 13, 2017