**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE: MCCORMICK & COMPANY, INC.,
PEPPER PRODUCTS MARKETING AND
SALES PRACTICES LITIGATION

This Document Relates to:

ALL CONSUMER CASES

**MDL Docket No. 2665**
**Misc. No. 15-1825 (ESH)**

**REDACTED**

**MEMORANDUM OPINION**

**TABLE OF CONTENTS**

BACKGROUND ....................................................................................................................... 4

I.   WHAT IS "NONFUNCTIONAL SLACK-FILL"?................................................................ 4

   A.   Federal Law ..................................................................................................................... 4

   B.   State Laws ........................................................................................................................ 5

   C.   Slack-Fill Litigation ........................................................................................................ 6

II.  THE PRESENT LITIGATION............................................................................................. 9

   A.   Factual Background ......................................................................................................... 9

   B.   Procedural History of the Multi-District Litigation ...................................................... 17

   C.   Current Plaintiffs and Remaining Claims ...................................................................... 21

III. MOTION FOR CLASS CERTIFICATION ....................................................................... 23

   A.   Proposed Classes........................................................................................................... 23

      1.   Consumer Protection Claims ................................................................................... 24

         a.   Multi-State Consumer Protection Class................................................................ 24

         b.   Single-State Consumer Protection Classes .......................................................... 25

      2.   Unjust Enrichment Claims....................................................................................... 25

         a.   Multi-State Unjust Enrichment Classes ............................................................... 25

         b.   Single-State Unjust Enrichment Classes.............................................................. 27

B.   Class Certification Record ............................................................................... 27

ANALYSIS ........................................................................................................................ 29

I.    LEGAL STANDARD FOR CLASS CERTIFICATION ....................................... 29

II.   MULTI-STATE CLASSES ................................................................................... 33

   A.   Multi-State Consumer Protection Class of Twenty Jurisdictions ................... 36

   B.   Multi-State Unjust Enrichment Classes .......................................................... 43

      1.   Element of Unjustness ................................................................................ 45

      2.   No Adequate Remedy at Law Requirement ............................................... 48

III.  SINGLE-STATE CLASSES .................................................................................. 51

   A.   Numerosity (Rule 23(a)(1)) ............................................................................. 51

   B.   Commonality (Rule 23(a)(2)) .......................................................................... 52

   C.   Typicality (Rule 23(a)(3)) ................................................................................ 55

   D.   Adequacy (Rule 23(a)(4)) ................................................................................ 60

   E.   Ascertainability ................................................................................................ 61

   F.   Predominance (Rule 23(b)(3)) ......................................................................... 65

      1.   Single-State Consumer Protection Classes ................................................ 67

         a.   Deception ............................................................................................. 67

         b.   Existence of Nonfunctional Slack-Fill ................................................ 70

         c.   Damages ............................................................................................... 72

         d.   Extrinsic Evidence of Consumer Perceptions and Behavior ............... 73

         e.   California Consumer Protection Class .................................................. 80

         f.   Illinois Consumer Protection Class ..................................................... 88

         g.   Florida Consumer Protection Class ..................................................... 95

         h.   Missouri Consumer Protection Class ................................................... 98

      2.   Single-State Unjust Enrichment Classes .................................................. 102

   G.   Superiority (Rule 23(b)(3)) ............................................................................ 106

   H.   Appointment of Class Counsel (Rule 23(g)) ................................................ 108

CONCLUSION ............................................................................................................... 109

This multidistrict consumer litigation against McCormick & Co. and Wal-Mart Stores, Inc., arises from the sales of black pepper in tins and grinders allegedly containing "nonfunctional slack-fill" not visible to purchasers (the "Slack-Filled Pepper Products"). The Slack-Filled Pepper Products were sold between March 2015 and mid-2016. They include both McCormick-branded products and McCormick-filled private-label brands, such as Wal-Mart's Great Value products. Named plaintiffs are purchasers who claim that the sale of these products violated various state consumer protection statutes and unjust enrichment laws.[1]

Before the Court is plaintiffs' motion pursuant to Federal Rule of Civil Procedure 23 for class certification and appointment of counsel. (Pls.' Mot. for Class Certification, ECF No. 156 ("Class Cert. Mot.").) With respect to their statutory consumer protection claims, plaintiffs seek certification of a multi-state class covering purchasers in 20 jurisdictions (the "Consumer Protection Multi-State Class") or, in the alternative, four single-state classes covering purchasers in California, Florida, Illinois, and Missouri. With respect to their unjust enrichment claims, plaintiffs seek certification of two multi-state classes, covering purchasers in a total of 29 jurisdictions (the "Unjust Enrichment (Restatement) Multi-State Class" and the "Unjust Enrichment (Appreciation) Multi-State Class") or, in the alternative, seven single-state unjust enrichment classes covering purchasers in California, Connecticut, the District of Columbia, Illinois, Maryland, Missouri, and Pennsylvania. In addition to opposing class certification, defendants have filed a joint motion to exclude the expert report and opinions of Dr. Armando Levy, plaintiffs' damages expert. (Defs.' Joint Mot. to Exclude the Report and Opinions of Dr. Armando Levy, Aug. 28, 2017, ECF No. 164 ("Defs.' Expert Mot.").)

---

[1] Plaintiffs also brought antitrust claims, but those claims have been dismissed. *See In re McCormick*, 217 F. Supp. 3d 124, 131 (D.D.C. 2016).

For the reasons stated herein, plaintiffs' motion for class certification is granted in part and denied in part. Defendants' motion to exclude plaintiffs' damages expert is denied.

## BACKGROUND

### I. WHAT IS "NONFUNCTIONAL SLACK-FILL"?

#### A. Federal Law

Although plaintiffs' legal claims arise under state law, they rely on the federal definition and prohibition of "nonfunctional slack-fill." "Slack-fill" is defined as "the difference between the actual capacity of a container and the volume of product contained therein." 21 C.F.R. § 100.100(a). "Nonfunctional slack-fill" is defined as "the empty space in a package that is filled to less than its capacity for reasons other than:"

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other nonmandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

21 C.F.R. § 100.100(a) (emphasis added); *see also Misleading Containers; Nonfunctional Slack-Fill*, 58 Fed. Reg. 64123-01, 64126 (Dec. 6, 1993) ("[T]he exceptions in §100.100(a) provide

only for that amount of slack-fill that is necessary to accomplish a specific function.").  Federal

law deems "non-functional slack-fill" in "[a] container that does not allow the consumer to fully

view its contents" "to be filled as to be misleading," 21 C.F.R. § 100.100(a), which is a violation

of the federal law prohibiting the "misbranding" of foods.  *See* 21 U.S.C. § 343(d) ("[a] food

shall be deemed to be misbranded– . . . [i]f its container is so made, formed, or filled as to be

misleading.").[2]

### B.   State Laws

Although only a few of the states at issue in this litigation have laws or regulations that

expressly prohibit or limit nonfunctional slack-fill,[3] the remaining states either incorporate or

mirror the definition of "misbranding" in 21 U.S.C. § 343(d),[4] or define "misbranding" to

---

[2] In 1993, the U.S. Food and Drug Administration ("FDA") concluded that the "filled as to be misleading" portion of § 343(d) had not been "adequately implemented."  *See Misleading Containers; Nonfunctional Slack-Fill*, 58 Fed. Reg. 2957-01, 2960 (Jan. 6, 1993).  It thus proposed, *see* 58 Fed. Reg. at 2960, and ultimately adopted a regulation, *see* 21 C.F.R. § 100.100(a), to define when "slack-fill" is "nonfunctional" and when "nonfunctional slack-fill" is "misleading."  *See* 58 Fed. Reg. 64123.  The FDA noted that it had "decided not to elaborate on ways in which a container may be "made" or "formed" as to be misleading," finding those terms to be "straightforward" and to "require little elaboration."  58 Fed. Reg. at 2960.

[3] California has adopted verbatim the federal definition of nonfunctional slack-fill, and it similarly provides that "[a] container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill."  *See* Cal. Bus. & Prof. Code § 12606.2(c).  New Jersey law provides that "nonfunctionally slack-filled" means "a container which is filled to substantially less than its capacity for reasons other than (a) protection of the contents of the container or (b) the requirements of machines used for enclosing the contents in the container" and that "[n]o container shall be so nonfunctionally slack-filled as to constitute deception."  N.J. Stat. Ann. § 51:1-29(c)(2).  Colorado has adopted the same definition and its Department of Public Health and Environment is charged with enacting regulations, as necessary, to prevent "deception of consumers" by "preventing the nonfunctional slack-fill of packages containing consumer commodities."  Colo. Rev. Stat. Ann. § 25-5-419(4).

[4] *See, e.g.*, Alaska Stat. Ann. § 17.20.040(a)(4) ("food is misbranded if . . . its container is made, formed, or *filled* so as to be misleading") (emphasis added); *see also* Ark. Code Ann. § 20-56-209(4); Cal. Bus. & Prof. Code § 12606.2(b); Colo. Rev. Stat. Ann. § 25-5-411(e); Conn. Gen. Stat. Ann. § 21a-102(4); D.C. Code Mun. Regs. tit. 25-B, § 3602.1(d); Fla. Stat.

include misleading or deceptive packaging.[5]  In addition, a number of states have consumer protection statutes that define unfair or deceptive acts or practices to include "[r]epresenting that goods . . . have . . . quantities that they do not have."  Cal. Civ. Code § 1770(a)(5).[6]

## C.    Slack-Fill Litigation

While there is no private right of action to enforce the federal regulations on nonfunctional slack-fill, consumers in recent years have filed numerous lawsuits seeking to hold manufacturers liable under state law for the sale of products allegedly containing nonfunctional slack-fill.  For example, cases have been brought alleging nonfunctional slack-fill in the

---

Ann.§ 500.11(1)(d); Haw. Rev. Stat. Ann. § 328-10(4); Idaho Code Ann. § 37-123(d); 410 Ill. Comp. Stat. Ann. 620/11(d); Iowa Admin. Code r. 481-31.2(6)(137F); Kan. Stat. Ann. § 65-665(d); Ky. Rev. Stat. Ann. § 217.035(4); Me. Rev. Stat. Ann. tit. 22, § 2157; Mass. Gen. Laws Ann. ch. 94, § 187; Mich. Comp. Laws Ann. §§ 289.1109(p)(iv), 289.5101(1)(a); Minn. Stat. Ann. § 34A.03(a)(4); Mo. Ann. Stat. § 196.075(4); Nev. Rev. Stat. Ann. § 585.350; N.H. Rev. Stat. Ann. § 146:5; N.M. Stat. Ann. § 25-2-11; N.Y. Agric. & Mkts. Law § 201; N.D. Cent. Code Ann. § 19-02.1-10; Okla. Stat. Ann. tit. 63, § 1-1110(d); 3 Pa. Stat. & Cons. Stat. Ann. § 5729(a)(4); 21 R.I. Gen. Laws Ann. § 21-31-11(4); S.C. Code Ann. § 39-25-110(d); Tenn. Code Ann. § 53-1-105(4); Utah Code Ann. § 4-5-201(2)(d) (formerly § 4-5-8); 18 Vt. Stat. Ann. § 4060(4); Wash. Rev. Code Ann. § 69.04.250 (repealed eff. June 7, 2018; replaced by § 15.130.210); W.Va. Code Ann. § 19-2-7(11); Wis. Stat. Ann. § 97.03.

[5] *See* Del. Code Ann. tit. 16, § 3309(4) ("food is deemed to be misbranded . . . [i]f the package containing it . . . bears . . . design . . . regarding . . . the substances contained therein, which . . . design . . . is false or misleading in any particular"); Md. Code Ann., Health-Gen. § 21-210(b) ("A food is misbranded if: (1) Its labeling or packaging is false or misleading in any way."); S.D. Codified Laws § 39-4-7 ("The term 'misbranded' as used in this chapter, shall apply to all substances used as food or which enter into the composition of food, the package, or label of which shall bear any statement, design, or device regarding such substance or the ingredients contained therein which shall be false, deceptive, or misleading in any particular. . . .").

[6] *See also* Colo. Rev. Stat. Ann. § 6-1-105; Del. Code Ann. tit. 6, § 2532(5); D.C. Code Ann. § 28-3904(a); Idaho Code § 48-603(5); 815 Ill. Comp. Stat. Ann. 510/2; Mich. Comp. Laws Ann. § 445.903(1)(c); Minn. Stat. Ann. § 325D.44; N.H. Rev. Stat. Ann. § 358-A:2; N.M. Stat. Ann. § 57-12-2.

packaging of candy in cardboard boxes,[7] chips,[8] cereal,[9] pretzels,[10] pasta,[11] risotto mix,[12] canned tuna,[13] gum,[14] protein powder,[15] ice cream,[16] cake mix,[17] dried fruit,[18] and a variety of other food[19] and non-food products.[20]  The present litigation is the first challenge to allegedly nonfunctional slack-fill in spice tins and grinders.

Despite the volume of slack-fill litigation, all of which has been filed as putative class actions, very few have reached the stage of class certification.  Many cases have been dismissed

---

[7] *See, e.g.*, *Escobar v. Just Born, Inc.*, No. 17-cv-01826, 2017 WL 5125740, at *1 (C.D. Cal. June 12, 2017).

[8] *See, e.g.*, *Alce v. Wise Foods, Inc.*, No. 17-cv-2402, 2018 WL 1737750, at *1 (S.D.N.Y. March 27, 2018) (21 varieties of potato chips).

[9] *See Leonhart v. Nature's Path Foods, Inc*, No. 13-cv-00492, 2014 WL 6657809, at *7 (N.D. Cal. Nov. 21, 2014).

[10] *See Cordes v. Boulder Brands USA, Inc.*, No. 18-cv-6534, 2019 WL 1002513, at *3-4 (C.D. Cal. Jan. 30, 2019).

[11] *See Stewart v. Riviana Foods, Inc.*, No. 16-cv-6157, 2017 WL 4045952, at *1-2 (S.D.N.Y. Sept. 11, 2017).

[12] *See Buso v. Vigo Importing Co.*, No. 18-cv-1328, 2018 WL 6191390, at *1 (S.D. Cal. Nov. 28, 2018).

[13] *See Hendricks v. StarKist Co.*, 30 F. Supp. 3d 917, 921-22 (N.D. Cal. 2014).

[14] *See Martin v. WM. Wrigley Jr. Co.*, No. 4:17-cv-541, 2017 WL 4797530, at *5 (W.D. Mo. Oct. 24, 2017).

[15] *See, e.g.*, *Miao Xin Hu v. Iovate Health Sciences U.S.A. Inc.*, No. 17-cv-09427, 2018 WL 4954105, at *1 (S.D.N.Y. Oct. 12, 2018).

[16] *See Kamal v. Eden Creamery*, LLC, No. 18-cv-01298, 2019 WL 2617041, at *1 (S.D. Cal. June 26, 2019).

[17] *Reider v. Immaculate Baking Co.*, No. 8:18-cv-01085, 2018 WL 6930890, at *3 (C.D. Cal. Nov. 8, 2018).

[18] *Barrere v. Trader Joe's Co.*, No. 2:19-cv-04297 (C.D. Cal. filed May 17, 2019.)

[19] *See, e.g.*, *Bush v. Mondelez Int'l*, No. 16-cv-02460, 2016 WL 7324990, at *1 (N.D. Cal. Dec. 16, 2016) (travel size snack products).

[20] *See, e.g.*, *Macaspac v. Henkel Corp.*, No. 3:17-cv-01755, 2018 WL 2539595, at *1 (S.D. Cal. June 4, 2018) (laundry fragrance booster).

for failing to plausibly allege nonfunctional slack-fill or failing to plausibly allege that reasonable consumers would have been misled by the packaging even if there was nonfunctional slack-fill.[21] Slack-fill claims have also been dismissed on other grounds,[22] remanded to state court,[23] stayed,[24] or resolved on summary judgment,[25] or plaintiffs have decided not to pursue

---

[21] *See Cordes*, 2019 WL 1002513, at *3-4 (pretzels); *Morrison v. Barcel USA, LLC*, No. 18-cv-531, 2019 WL 95477, at *2 (S.D.N.Y. Jan. 2, 2019) (tortilla chips), *appeal withdrawn*, No. 19-176 (2d Cir. Mar. 5, 2019); *Benson v. Fannie May Confections Brands, Inc.*, No. 17-cv-3519, 2018 WL 6446391, at *3-4 (N.D. Ill. Dec. 10, 2018) (candy boxes), *appeal pending*, No. 19-1032 (7th Cir. Jan. 4, 2019); *Buso*, 2018 WL 6191390, at *5-6 (risotto); *Daniel v. Tootsie Roll Indus.*, No. 17-cv-7541, 2018 WL 3650015, at *1, 14 (S.D.N.Y. Aug. 1, 2018) (boxed candy), *appeal voluntarily dismissed*, No. 18-2424 (2d Cir. Oct. 11, 2018); *Macaspac*, 2018 WL 2539595, at *5-6, *appeal voluntarily dismissed*, No. 18-55880 (9th Cir. Aug. 24, 2018); *Miao Xin Hu*, 2018 WL 4954105, at *2-3 (protein powder), *appeal voluntarily withdrawn*, No. 18-3217 (2d Cir. June 12, 2019); *Alce*, 2018 WL 1737750, at *7-8 (potato chips) (no appeal filed); *Wurtzburger v. Kentucky Fried Chicken*, No. 16-cv-08186, 2017 WL 6416296, at *4-5 (S.D.N.Y. Dec. 13, 2017) (fried chicken in a bucket) (no appeal filed); *Martin v. WM. Wrigley Jr. Co.*, 2017 WL 4797530, at *6 (W.D. Mo. Oct. 24, 2017) (chewing gum) (no appeal filed); *Stewart*, 2017 WL 4045952, at *9-10 (pasta) (no appeal filed); *Bautista v. CytoSport, Inc.*, 223 F. Supp. 3d 182, 189-90 (S.D.N.Y. 2016) (protein powder) (no appeal filed); *Bush*, 2016 WL 7324990, at *1, 2-4, *appeal voluntarily dismissed*, No. 17-15126 (9th Cir. Sept. 21, 2017); *Fermin v. Pfizer Inc.*, 215 F. Supp. 3d 209, 211-12 (E.D.N.Y. 2016) (pills) (no appeal filed).

[22] *See Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697, 2016 WL 6459832, at *1, 7-8 (S.D.N.Y. Oct. 26, 2016) (boxed candy) (dismissed for failure to adequately allege injury under New York's consumer protection law); *Bimont v. Unilever U.S., Inc.*, 14-cv-7749, 2015 WL 5256988, at *1 (S.D.N.Y. Sept. 9, 2015) (dismissed because deodorant packaging claim preempted by federal law); *O'Connor v. Henkel Corp.*, No. 14-cv-5547, 2015 WL 5922183, at *6 (E.D.N.Y. Sept. 22, 2015) (same); *Gordon v. Tootsie Roll Indus.*, No. 17-cv-2664, slip op. at 2 (C.D. Cal. Sept. 25, 2018) (dismissed for lack of prosecution).

[23] *See Waters v. Ferrara Candy Co.*, No. 4:17-cv-00197, 2017 WL 2618271, at *6 (E.D. Mo. June 16, 2017) (boxed candy); *Smith v. Abbott Labs., Inc.,* No. 16-cv-0501, 2017 WL 3670194, at *1 (D.D.C. Mar. 31, 2017) (protein powder); *Witte v. Gen. Nutrition Corp.*, 104 F. Supp. 3d 1, 2 (D.D.C. 2015) (dietary supplements).

[24] *Ivie v. Kraft Foods Glob., Inc.*, No. 12-cv-02554, 2013 WL 685372, at *11 (N.D. Cal. Feb. 25, 2013) (multiple food products).

[25] *See Bratton v. Hershey Co.*, No. 2:16-cv-4322, 2018 WL 934899, at *2-4 (W.D. Mo. Feb. 16, 2018) (boxed candy) (granting summary judgment for defendant).

them.[26]  In several cases, plaintiffs have voluntarily dismissed their claims (presumably due to a settlement), frequently with the plaintiff's individual claims dismissed with prejudice, while the class claims are dismissed without prejudice.[27]  Courts have reached the question of class certification in only six cases – one granted certification,[28] two granted certification of a settlement class,[29] and three denied certification.[30]

## II.    THE PRESENT LITIGATION

### A.    Factual Background

Black pepper is the most widely traded spice in the international market, both in terms of quantity and value, and McCormick is the largest manufacturer and leading seller of black pepper products in the United States.  (*See* Second Am. Cons. Class Action Compl. ¶ 3, ECF No.

---

[26] *See Trazo v. Nestle USA, Inc.*, No. 5:12-cv-2272, 2013 WL 4083218, at *13 (N.D. Cal. Aug. 9, 2013) (slack-fill claims dismissed and then not included in amended complaint); *Samet v. Procter & Gamble Co.*, No. 3:12-cv-01891, 2013 WL 6491143, at *1 (N.D. Cal. Dec. 10, 2013) (slack-fill claims survived motion to dismiss, but were not included in motion for class certification, *see* Order (Jan. 15, 2019)).

[27] *See, e.g.*, Notice of Voluntary Dismissal at 2, *Leonhart*, No. 13-cv-00492 (N.D. Cal. Jan. 3, 2019) (cereal); Order, *Thomas v. Costco Wholesale Corp.*, No. 5:12-cv-02908 (N.D. Cal. Dec. 14, 2018); Order, *Hawkins v. Nestle U.S.A. Inc.*, No. 17-cv-205. slip op. at 1 (E.D. Mo. Nov. 30, 2018); Stipulation of Voluntary Dismissal, *Yee Ting Lau v. Pret A Manger (USA) Ltd.*, No. 17-cv-5775 (S.D.N.Y. Feb. 25, 2019); Notice of Voluntary Dismissal, *Daniel v. Mondelez Int'l, Inc.*, No. 17-00174 (E.D.N.Y. Apr. 25, 2018); Order, *Martinez-Leander v. Wellnx Life Sciences, Inc.*, No. 2:16-cv-08220 (C.D. Cal. Mar. 17, 2017); Order, *Waldman v. New Chapter, Inc.*, No. 09-cv-3514 (E.D.N.Y. July 14, 2010).

[28] *See Escobar*, 2019 WL 2619636, at *2 (C.D. Cal. Mar. 25, 2019) (boxed candy).

[29] *See Berni v. Barilla G. e R. Fratelli, S.p.A.*, No. 16-cv-4196, 2019 WL 2341991, at *1 (E.D.N.Y. June 3, 2019) (pasta) (injunctive relief only); *Hendricks v. StarKist Co*, No. 13-cv-00729, 2016 WL 5462423, at *16 (N.D. Cal. Sept. 29, 2016) (canned tuna fish), *aff'd sub nom. Hendricks v. Ference*, No. 16-16992, 754 F. App'x 510 (9th Cir. Oct. 19, 2018).

[30] *See Spacone v. Sanford, L.P.*, No. 2:17-cv-02419, 2018 WL 4139057, at *1 (C.D. Cal. Aug. 9, 2018) (glue), *appeal voluntarily dismissed*, No. 18-56208 (9th Cir. Jan. 11, 2019); *White v. Just Born, Inc.*, No. 2:17-cv-04025, 2018 WL 3748405, at *1 (W.D. Mo. Aug. 7, 2018) ("*White II*") (boxed candy), *appeal voluntarily dismissed*, No. 18-8011 (8th Cir. Nov. 14, 2018); *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 641 (C.D. Cal. 2014), *voluntarily dismissed*, No. 2:12-cv-08487 (Feb. 7, 2014) (lip balm).

128 ("2d Am. Compl."); Declaration of Elizabeth Fegan ¶¶ 10, 12, ECF No. 188-1 ("Fegan Decl."); Expert Report of Dr. Armando Levy ¶¶ 19, 20, ECF No. 188-3 ("Levy Rep.").) It buys black pepper from all over the world and transports it to its processing plants in the United States. (2d Am. Compl. ¶ 28; Levy Rep. ¶ 19 (citing McCormick 2014 Annual Report).) McCormick's processing plants produce both McCormick-branded pepper products and private-label pepper products for major retail chains, including Wal-Mart's Great Value brand. (2d Am. Compl. ¶¶ 3, 46; McCormick's Am. Answer to 2d Am. Compl. ¶ 3, ECF No. 151; Wal-Mart's Am. Answer to 2d Am. Compl. ¶¶ 3, 46, ECF No. 155; Levy Rep. ¶ 20.) In 2015, McCormick-branded pepper products represented 47% of the U.S. black pepper market, while the private-label pepper products produced by McCormick represented another 18.8% of the market. (*See* Fegan Decl. ¶¶ 13, 16; Levy Rep. ¶ 20.)

Global consumption of black pepper has been growing rapidly since the 1990's. (2d Am. Compl. ¶ 29; Levy Rep. ¶ 17.) This rapid increase in demand, coupled with relatively stable world production, resulted in significant increases in the price of black pepper. (2d Am. Compl. ¶ 29; Levy Rep. ¶ 18; *see also* McCormick's Am. Answer ¶ 31.) For example, between 2005 and 2015, the spot price of black pepper in New York increased more than six-fold, from $0.75 per pound to more than $5.00 per pound. (Levy Rep. ¶ 18.) As the cost of pepper increased, McCormick repeatedly raised the retail prices for its black pepper products. At the same time, the gap between the retail price for McCormick-branded products and private-label brands grew,

while McCormick's overall market share declined. (*See* Pls.' Exs. 101, 102.[31])[32]

On May 30, 2014, McCormick embarked on a "Black Pepper Net Weight Reduction" Project. (*See* Fegan Decl. ¶ 22; Pls.' Ex. 103.) The project's "objective" was "to mitigate commodity cost increases expected on black pepper through a net weight reduction across branded and private label metal cans" and thus avoid any further price increases for its own products. (*See* Fegan Decl. ¶ 24; Pls.' Ex. 103; *see also* Pls.' Exs. 104-106, 118, 121.) McCormick recognized that reducing the net weight in a container without changing the "absolute price" was effectively a price increase because the cost per ounce would increase. (*See* Fegan Decl. ¶¶ 29, 39; Pls.' Exs. 107, 114.) McCormick sought to avoid an absolute price increase on products on the shelves, since it believed that such a price increase would lead to a decline in sales. (*See* Fegan Decl. ¶ 36; Pls.' Exs. 112-113.)

Over the next few months the final details of McCormick's net weight reduction project were decided. (*See* Fegan Decl. ¶¶ 25-34, 58-59, 77; Pls.' Ex. 104, 109.) Although McCormick had initially contemplated a 10% net weight reduction, due to the continued increase in the cost of black pepper, it ultimately decided on a larger reduction, reducing the weight of ground pepper in its tins by 25% and the weight of peppercorn in its grinders by 19%. (*See* 2d Am.

---

[31] Any citation to "Pls.' Ex." refers to the exhibits attached to the Declaration of Elizabeth Fegan, which was filed with plaintiffs' motion for class certification. (*See* ECF No. 158 (exhibits 1-34); ECF No. 157-5 to 157-48 (exhibits 100-144).) Exhibits 101-144 have been filed under seal, so the Court will cite where appropriate but will not disclose the substance of these documents unless revealed in an unsealed filing. "Pls.' Reply Ex." will be used to refer to exhibits attached to the Supplemental Declaration of Elizabeth Fegan. (*See* Supp. Fegan Decl., ECF No. 171.) "Pls.' Supp. Ex." will be used to refer to exhibits attached to plaintiffs' supplemental brief. (*See* Pls.' Supp. Br., ECF No. 203-1 to 203-6.)

[32] McCormick's retail prices increased by ▉% between 2010 and November 10, 2014. The price gap for a 4-ounce tin of black pepper grew from approximately ▉% to ▉% (McCormick's price increased from $▉ to $▉ while the private label price went from $▉ to $▉). McCormick's share of the market for the 4-ounce tin declined by ▉ percentage points. (*See* Pls.' Exs. 101, 102.)

Compl. ¶ 5; Fegan Decl. ¶¶ 24, 31, 33; Pls.' Exs. 103, 108-110.)  Plaintiffs claim that "McCormick contemplated it would receive a monetary benefit in the form of a cost savings increase from $4.6MM with 10% reduction to $11.1MM with a 25% reduction."  (Fegan Decl. ¶ 34 (citing Pls.' Ex. 110).)

During this time, McCormick employees discussed the impact of a net weight reduction on "visual fill" levels, specifically the need to make sure that the reduced-weight products would meet McCormick's internal visual fill requirement of 75%, a level it believed complied with the federal regulation prohibiting nonfunctional slack-fill.  (*See* Fegan Decl. ¶¶ 52, 70, 73, 74, 77, 79, 81, 82; Pls.' Exs. 100, 103, 109, 111, 119-121, 124, 125, 131, 133, 137-138, 142-143.) Several possibilities to avoid any "fill" problem were discussed, including using less dense (bulkier) pepper[33] or reducing McCormick's internal visual fill requirements.  (*See* Fegan Decl. ¶¶ 76, 77; Pls.' Exs. 101, 109, 111, 119-120, 124, 137.)

McCormick employees also discussed what to do about the McCormick-produced private-label brands, which were in identically-sized containers.  (*See* Fegan Decl. ¶¶ 24, 25, 35-59; Pls.' Ex. 116.)  McCormick documents indicate that employees were concerned that if the private-label brands did not also reduce the weights in their comparable products, they might advertise the difference in quantity and price and that McCormick would appear to be "deceptive" for reducing weights while maintaining the same size containers.  (*See* Fegan Decl. ¶ 37; Pls.' Ex. 113.)  Ultimately, the majority (59%) of the private-label brands supplied by McCormick, including Wal-Mart, agreed to follow McCormick and reduce weights by the same

---

[33] According to McCormick's Materials Manager, James Michael Hester, "[d]epending on the type of black pepper, the climate conditions, the age of the black pepper, the maturity of the plants and other factors, there can be wide variation in the density of the product, both before and after it is ground."  (Hester Decl. ¶ 2, ECF No. 188-2.)

amounts without changing container sizes.  (*See* Fegan Decl. ¶¶ 58-59; Pls.' Exs. 132, 134.)  But several private-label brands did not reduce weights, opting instead to take a wholesale price increase.  (*See* Fegan Decl. ¶ 59.)

In its final executed form, the Net Weight Reduction Project resulted in the following changes:  (1) for both McCormick and participating private-label brands, including Wal-Mart, the net weights of the 2-, 4-, and 8-ounce metal tins of ground black pepper were reduced by 25% to 1.5, 3, and 6 ounces, with no changes in container size or price; and (2) for McCormick, the net weights of the 1.24-ounce and 3.1-ounce black peppercorn grinders were reduced to 1.00 ounce and 2.5 ounces, again with no change in container size or price.  (*See* Fegan Decl. ¶¶ 62-68; Pls.' Ex. 122; McCormick's Am. Answer ¶ 34, 35, 40, 41; Wal-Mart's Am. Answer ¶ 5; 2d Am. Compl. ¶¶ 5, 36-38, 42-45.)  New Universal Product Codes ("UPC") were assigned to all new products.  (*See* Fegan Decl. ¶ 71.)  The "net weight decreases" were "effective with all shipments on February 23, 2015."  (*See* Fegan Decl. ¶ 69; Pls.' Ex. 135.)  As discussed in greater detail *infra*, McCormick claims that even though it reduced the label weights on these products, the fill levels did not decrease because it "overfill[ed]" when necessary to meet a new internal minimum fill level of 80%.  (*See* Hester Decl. ¶¶ 11-12, ECF 188-2.)

The reduced-weight products began to reach store shelves in March 2015.  Consumers looking at any of these products on store shelves saw the same containers they had always seen. The label on the container stated the new weight in the same size print and location as the prior weight had appeared.  Consumers could not see the fill levels in any of the products; the metal tins were opaque and the fill level of the grinders was obscured by an opaque label.  (*See* Fegan Decl. ¶¶ 62-68; 2d Am. Compl. ¶¶ 2, 33, 35-46.)  Nor were fill levels necessarily observable even after the products were opened.  (*See* Fegan Decl. ¶ 81 (internal McCormick email dated

8/7/2014 states "keep in mind consumers do not really know the fill level right now" (quoting Pls.' Ex. 110).)  Below are pictures (copied from the Second Amended Complaint ¶¶ 36, 43, 44) showing (1) the reduced-weight 1.5-ounce tin and the original-weight 2-ounce tin; and (2) the reduced-weight 1-ounce grinder with the label on; and (3) the reduced-weight 1-ounce grinder with the label removed next to the original-weight 1.24-ounce grinder with the label removed.

<u>**Picture 1**</u>



**Picture 2**



**Picture 3**



Until retailers sold out of the original weight products, both the original and the reduced-weight product could have been on store shelves at the same time. In addition, in some locations there would also have been pepper products from other pepper producers and/or private-label brands produced by McCormick where the weights had not been reduced.

In May 2015, Wal-Mart told McCormick that it was concerned that the new tins had "too much air space." (*See* Fegan Decl. ¶ 77 n.2; Pls.' Exs. 139-40.) On June 9, 2015, Watkins Inc., another pepper producer and a McCormick competitor, filed a lawsuit in Minnesota complaining that the new McCormick products were deceiving consumers and causing Watkins to lose sales. *See Watkins Inc. v. McCormick & Co.*, No. 15-cv-02688 (D. Minn. filed June 9, 2015). That same day, the *Minneapolis Star Tribune* newspaper published a story about the *Watkins* lawsuit. *See* Mike Hughlett, *Watkins sues spice giant McCormick & Co. over pepper tins*, Minneapolis Star Tribune, June 9, 2015 ("Watkins Inc., a small player in the pepper business, filed a lawsuit Tuesday claiming that the nation's largest spice company has 'deceived' consumers by stealthily slashing the amount of black pepper in its tins, without shrinking the container or lowering the price."). Several other news articles followed, including one in the *Wall Street Journal*. *See* Paul Ziobro, *Same Package, Same Price, Less Product–It's Called a 'Weight-Out' in the Business–a Less Direct Way to Raise Prices for Consumers*, Wall Street Journal, June 12, 2015, at B1; *see also* Mike Hughlett, *McCormick Says It Is Not Deceiving Customers with Product Labeling*, Minneapolis Star Tribune, June 10, 2015.

On June 15, 2015, a pepper consumer filed in federal court in New York the first putative class action against McCormick. *See Dupler v. McCormick & Co.*, No. 2:15-cv-6760 (S.D.N.Y.). Other consumer cases, filed in federal district courts throughout the country,

followed.[34]  Only one of the cases also named Wal-Mart as a defendant.  *See Vladimirsky v. McCormick & Co.*, No. 1:15-cv-08102 (N.D. Ill. filed Sept. 15, 2015).  These consumer cases alleged that, by reducing the weight of black pepper in a container without changing the container size or price, so that the products contained "nonfunctional slack-fill" that was not visible to consumers, McCormick had deceived consumers into believing that they were buying more pepper than they actually received.

In the spring of 2016, McCormick discontinued production of the reduced-weight, same container-sized products, replacing them with reduced-size containers.  The reduced-weight products remained on store shelves until they were sold out, which was no later than June 2016.  (*See* Hr'g Tr. at 81, July 10, 2018, ECF No. 196 ("7/10/18 Tr.").)

**B.    Procedural History of the Multi-District Litigation**

In December 2015, the United States Judicial Panel on Multidistrict Litigation transferred all pending black pepper "slack-fill" cases against McCormick to this Court for coordinated or consolidated pretrial proceedings.  *See In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices Litig.*, 148 F. Supp. 3d 1364, 1365 (J.P.M.L. 2015).  Ultimately, a total of 16

---

[34] *See Bunting v. McCormick & Co.*, No. 3:15-cv-01648 (S.D. Cal. filed July 23, 2015; *Esparza v. McCormick & Co.*, No. 2:15-cv-05823 (C.D. Cal. filed Aug. 1, 2015); *Ferreri v. McCormick & Co.*, No. 7:15-cv-06760 (S.D.N.Y. filed Aug. 26, 2015); *Linker v. McCormick & Co.*, No. 4:15-cv-01340 (E.D. Mo. filed Aug. 27, 2015); *Jung v. McCormick & Co.*, No. 15-cv-1448 (D.D.C. filed Sept. 4, 2015); *Bittle v. McCormick & Co.* No. 3:15-cv-00989 (S.D. Ill. filed Sept. 4, 2015); *Vladimirsky v. McCormick & Co.*, No. 1:15-cv-08102 (N.D. Ill. filed Sept. 15, 2015); *Marsh v. McCormick & Co.*, No. 2:15-cv-01625 (E.D. Cal. filed Sept. 29, 2015); *Pellitteri v. McCormick & Co.*, No. 9:15-cv-81521 (S.D. Fla. Nov. 3, 2015); *Barnes v. McCormick & Co.*, No. 3:15-cv-01224, (S.D. Ill. filed Nov. 4, 2015); *Theis v. McCormick & Co.*, No. 3:15-cv-01228 (S.D. Ill. filed Nov. 5, 2015); *Thornton v. McCormick & Co.*, No. 3:15-cv-00566 (D. Nev. filed Nov. 20, 2015); *Gerstnecker v. McCormick & Co.*, No. 2:15-cv-01671 (W.D. Pa. filed Dec. 17, 2015); *Marron v. McCormick & Co.*, No. 16-cv-0104 (D.D.C. filed Jan. 20, 2016); *Fernandez v. McCormick & Co.*, No. 16-cv-0117 (D.D.C. filed Jan. 22, 2016).

separate actions were transferred, 15 consumer cases (*see supra* note 34) and the *Watkins* competitor suit.[35]

After the cases were transferred, plaintiffs filed a consolidated and amended class action complaint against McCormick and Wal-Mart ("Amended Complaint").[36]  (*See* Cons. Am. Class Action Compl., Mar. 2, 2016, ECF No. 34.)  The Amended Complaint included fifteen named plaintiffs from eleven jurisdictions:  California, Connecticut, the District of Columbia, Florida, Illinois, Iowa, Maryland, Missouri, New York, New Jersey, and Pennsylvania.[37]  It alleged that each named plaintiff had purchased a black pepper product that was part of McCormick's reduced-weight program and that these products contained nonfunctional slack-fill in containers without a visible fill line.  It further alleged that by selling these products defendants had violated federal antitrust law (Count I), the consumer protection statutes of 24 states and the District of Columbia (Count II), and the unjust enrichment law of all 50 states and the District of Columbia (Count III).  Plaintiffs brought all three types of claims on their own behalf and on behalf of putative classes of consumers.

Defendants moved to dismiss the Amended Complaint.  The Court granted the motions as to the federal antitrust claim but denied them as to the consumer protection and unjust

---

[35] One of the California cases, *Esparza*, had been consolidated into another California case, *Bunting*, before the transfers occurred.

[36] The *Watkins* case has proceeded independently of the consumer cases, and it is not part of the pending motion for class certification.  *See In re McCormick*, 215 F. Supp. 3d 51, 62 (D.D.C. 2016) (granting in part and denying in part motion to dismiss in underlying case *Watkins, Inc. v. McCormick & Co.*, No. 15-cv-2188).

[37] The named plaintiffs in the amended complaint were Julia Vladimirskiy, Bernard Ortiz, Hubert L. Gerstnecker, Cynthia Fernandez, Anne Marron, Scott Allan Bittle, Debbie Esparza, Nicholas Hilla, Carmen Pellitteri, Brenda Theis, Holly Marsh, Lillian Ferreri, Catherine Grindel, Sandra Robinson, and Paula Cole Jones.  Several of the named plaintiffs from the transferred cases were not included and several new plaintiffs were added.

enrichment claims. *See In re McCormick*, 217 F. Supp. 3d 124, 129 (D.D.C. 2016).

Relevant to the pending motion for class certification, defendants argued in their motion to dismiss that legal variations among state laws and factual variations among individual purchasers precluded class treatment of the consumer protection and unjust enrichment claims. *See id.* at 139. The Court disagreed, concluding that dismissal on either ground would be premature given that plaintiffs had not yet moved for class certification. With respect to legal variations among state laws, the Court recognized that multi-state consumer protection and unjust enrichment classes were theoretically possible, so plaintiffs were entitled to try to demonstrate, through an extensive analysis of state laws, that there was a workable grouping. *Id*. at 140-42. As to defendant's argument that factual variations among individual purchasers would preclude a consumer protection class because "the alleged injury depends on individual consumers' state of mind at the time they purchased the pepper," the Court concluded that the argument was "not fairly presented" because defendants made the argument without "specify[ing] any particular state consumer protection statute." *Id*. at 146. The Court noted, however, that it "expect[ed] to confront this issue again at class certification." *Id*. As to defendants' argument that the factual variations among individual purchasers would preclude an unjust enrichment class because unjust enrichment requires evaluation of plaintiffs' individual circumstances, the Court declined to address that argument because the parties had "not yet provided analyses of all fifty states' unjust enrichment law," so it could not "be certain that every state requires an individualized showing of injustice." *Id*. at 145-46.[38] For those states that did,

---

[38] In the alternative, defendants argued that the Court should dismiss claims under the laws of states where no named plaintiffs resided because they had no standing to pursue those claims. *In re McCormick*, 217 F. Supp. 3d at 142. The Court rejected this argument, concluding that "[i]t is more logical to consider named plaintiffs' ability to raise other state-law claims as a question of

though, the Court noted that it was "likely that plaintiffs' unjust enrichment claims against McCormick and Wal-Mart will require individualized factual inquiries that bar class treatment" because

> [s]ome plaintiffs presumably bought McCormick pepper with full knowledge of the quantity of the pepper in the container, either because they understood that the listed weight had changed or because they had already purchased another container and seen the reduced quantity. Other plaintiffs might not have realized the quantity had been reduced but would have bought the pepper regardless. There would be no injustice in defendants' retaining what these plaintiffs paid for their pepper.

*Id*. at 145.

After the ruling on defendants' motion to dismiss, plaintiffs moved for leave to file a Second Amended Complaint in order to add new factual allegations aimed at addressing the deficiencies that had led to the dismissal of the antitrust claim. (*See* Pls.' Mot. for Recons., Dec. 9, 2016, ECF No. 105.) After the Court granted the motion, *see In re McCormick*, 275 F. Supp. 3d 218. 219 (D.D.C. 2017), defendants moved to dismiss the Second Amended Complaint. Defendants' motions focused on the revived antitrust count but also "renew[ed] by reference the arguments set forth as to [the] state law claims in McCormick's initial Motion to Dismiss." (*See* McCormick's Mot. to Dismiss 2d Am. Compl. at 2, Apr. 7, 2017, ECF No. 132; *see also* Wal-Mart's Mot. to Dismiss 2d Am. Compl. at 1, Apr. 7. 2017, ECF No. 134.) The Court again granted the motion as to the antitrust claim and denied it as to the state law consumer protection and unjust enrichment claims. (*See* Order, June 13, 2017, ECF No. 146; Mem. Op. at 4, June 13, 2017, ECF No. 148.)

---

commonality, typicality, and adequacy under Rule 23, rather than a question of standing." *Id*. at 144.

## C. Current Plaintiffs and Remaining Claims

The Second Amended Complaint is now the operative pleading. In addition to adding new factual allegations, it eliminated four named plaintiffs, who had voluntarily dismissed their claims since the filing of the Amended Complaint, and added one additional plaintiff. As a result, there are now twelve named plaintiffs (instead of fifteen) from eight jurisdictions (instead of eleven): Deborah Esparza and Holly Marsh (California), Cynthia Fernandez (Connecticut), Paula Cole Jones (District of Columbia), Carmen Pellitteri (Florida), Scott Allan Bittle, Alexander Liberov, Brenda Theis and Julia Vladimirskiy (Illinois), Sandra Robinson (Maryland), Catherine Grindel (Missouri), and Hubert Gerstnecker (Pennsylvania).[39] The Second Amended Complaint alleges that each named plaintiff purchased a reduced-weight pepper product for personal use, believing that it was "full" or "substantially filled to capacity," and "did not know that in fact the tin contained just 75% of the pepper that the tin was designed to hold[] and was actually deceived." (2d Am. Compl. ¶¶ 10-21.) The complaint further alleges, on behalf of the named plaintiffs and a putative class, that "[a]s a result of Defendants' actions, Plaintiffs and the Class were deceived when they paid for full tins of ground black pepper that in fact contained just 75% pepper and 25% air, or paid for full bottles of black peppercorns that in fact contained just 81% peppercorns and 19% air, and thus were overcharged, did not receive the benefit of the bargain and/or suffered out-of-pocket loss." (2d Am. Compl. ¶ 9; *see also id.* ¶ 52 ("[a]s a result of Defendants' blatantly misleading and deceptive use of traditional-sized, non-transparent metal tins and grinders with unlawful slack-fill, Plaintiffs and the Class have been deceived into

_____

[39] The named plaintiffs who voluntarily dismissed their claims without prejudice were Anne Marron, Nicholas Hilla, Bernard Ortiz, and Lillian Ferreri. Without these plaintiffs, the named plaintiffs no longer include anyone from Iowa, New Jersey, or New York. In addition, the case in which Marron was the sole plaintiff, No. 16-cv-00104 (D.D.C.), has been dismissed.

believing that the containers contain the amount of ground black pepper that the containers are designed to hold").)

The counts that have survived allege that defendants' actions violated twenty-five state consumer protection statutes (Count II) and constituted unjust enrichment under the common law of all fifty states plus the District of Columbia (Count III). Specifically, Count II alleges that by "selling black pepper in non-transparent containers containing nonfunctional slack-fill," defendants committed unfair, deceptive or fraudulent acts prohibited by state consumer protection statutes. (2d Am. Compl. ¶ 116.) Count II further alleges that plaintiffs and the proposed class members were "directly and proximately injured by Defendants' conduct and would not have paid for Defendants' black pepper had they known that the containers were under-filled," that "as a proximate result of Defendants' misrepresentations and omissions, Plaintiffs and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial," and that they "are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below." (2d Am. Compl. ¶¶ 115-22.) Count III alleges that by selling "black pepper to Plaintiffs and the Class, in containers that included nonfunctional slack-fill while maintaining price levels for full containers," defendants "have unjustly retained a benefit to the detriment of Plaintiffs and members of the Class," that "Defendants' retention of the benefit violates the fundamental principles of justice, equity and good conscience" because "Defendants did not disclose to Plaintiffs and the Class that the black pepper containers contained nonfunctional slack-fill," and that "[a]s a direct and proximate result of the Defendants' misrepresentations and/or omissions with respect to the nonfunctional slack-fill in the pepper tins

and grinders, Plaintiffs and the Class have suffered damages in an amount to be proven at trial."

(2d Am. Compl. ¶¶ 127-29.)

## III.    MOTION FOR CLASS CERTIFICATION

Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), plaintiffs now move for class certification of their consumer protection and unjust enrichment claims.

### A.    Proposed Classes

Each proposed class consists of individuals who purchased, for their personal or household use, a "Slack-Filled Pepper Product" – which plaintiffs have defined as the following 29 black pepper products:

| Description | Size (oz) | UPC |
|---|---|---|
| MCCORMICK BLACK PEPPER GROUND | 1.50 | 5210002992 |
| MCCORMICK BLACK PEPPER GROUND | 3.00 | 5210002996 |
| MCCORMICK BLACK PEPPER GROUND | 6.00 | 5210003010 |
| MCCORMICK BLACK PEPPER GRINDER | 1.00 | 5210003026 |
| MCCORMICK PEPPERCORN GRINDER MED | 2.50 | 5210003065 |
| WAL-MART GREAT VALUE PEPPER BLK GRD 3 OZ | 3.00 | 7874206710 |
| WAL-MART GREAT VAL PEPPER BLK GRD 6 OZ | 6.00 | 7874206711 |
| 5TH SEAS PEPPER BLK GRD 1.5 OZ | 1.50 | 5210003037 |
| ESSN EVDAY PEPPER BLK GRD 1.5 OZ | 1.50 | 4130305760 |
| ESSN EVDAY PEPPER BLK GRD 3 0Z | 3.00 | 4130305759 |
| HANNAFORD BROS PEPPER BLK GRD 1.5 OZ | 1.50 | 4126820212 |
| HANNAFORD BROS PEPPER BLK GRD 3 OZ | 3.00 | 4126820211 |
| FOOD LION PEPPER BLK GRD 1.5 OZ | 1.50 | 3582609860 |
| FOOD LION PEPPER BLK GRD 3 OZ | 3.00 | 3582609859 |
| PUBLIX PEPPER BLK GRD 1.5 OZ | 1.50 | 4141500731 |
| PUBLIX PEPPER BLK GRD 3 OZ | 3.00 | 4141500031 |
| PUBLIX PEPPER BLK GRD 6 OZ | 6.00 | 4141500631 |
| PUBLIX PEPPER BLK WHL 3.5 OZ | 3.50 | 4141505731 |
| SOUTHERN HOME PEPPER BLK GRD 3 OZ | 3.00 | 788003806 |
| FAMILY GOUR PEPPER BLK GRD 1.5 OZ | 1.50 | 3225115974 |
| FAMILY GOUR PEPPER BLK GRD 3 OZ | 3.00 | 3225115973 |
| CVS GE PEPPER BLK GRD 1.5 OZ | 1.50 | 5042852014 |
| AHOLD WEDGE PEPPER BLK GRD 1.5 OZ | 1.50 | 8826715510 |
| AHOLD WEDGE PEPPER BLK GRD 3 OZ | 3.00 | 8826715511 |

| Description | Size (oz) | UPC |
|---|---|---|
| AHOLD WEDGE PEPPER BLK GRD 6 OZ | 6.00 | 8826715512 |
| WINN DIXIE PEPPER BLK GRD 3 OZ | 3.00 | 2114002679 |
| WINN DIXIE PEPPER BLK GRD 6 OZ | 6.00 | 2114002680 |
| SPRINGFIELD PEPPER BLK GRD 1.5 OZ | 1.50 | 4138029502 |
| SPRINGFIELD PEPPER BLK GRD 3 OZ | 3.00 | 4138029503 |

(Pls.' Mem. at 4-5; Fegan Decl. ¶¶ 60-61.)  The list includes five McCormick brand pepper products and twenty-four McCormick-supplied, private-label brand pepper products.  Each product is identified by a unique UPC code.  As previously noted, these products were on retail store shelves starting in March 2015 until June 2016, but the specific time periods that the products were on store shelves varied by retailer.  (*See* 7/10/18 Tr. at 81-82.)

## 1.    Consumer Protection Claims

For their consumer protection claims, plaintiffs seek to certify a multi-state class, covering twenty jurisdictions[40] or, in the alternative, four single-state classes.

### a.    Multi-State Consumer Protection Class

The proposed Consumer Protection Multi-State Class would consist of:

> All persons residing in Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Dakota, or Washington who purchased Slack-Filled Black Pepper Products for their personal or household uses.

(Class Cert. Mot. at 1-2.)  This class would bring claims against both McCormick and Wal-Mart under the consumer protection statutes of the 20 jurisdictions where class members reside. The proposed class representatives are the nine named plaintiffs who are from the states included in this grouping:  Esparza and Marsh (California); Fernandez (Connecticut); Jones (District of

---

[40] Plaintiffs' motion is narrower than the complaint, which alleges violations of the consumer protection statutes in 24 states and the District of Columbia.

Columbia); Pellitteri (Florida); Bittle, Liberov, Theis, and Vladimirskiy (Illinois); and Grindel (Missouri). Because Liberov is the only proposed class representative who purchased Wal-Mart's private label brand pepper, he is the proposed class representative for the claims against Wal-Mart.

### b. Single-State Consumer Protection Classes

As an alternative to one multi-state class, plaintiffs initially sought certification of six single-state consumer protection classes – California, Connecticut, the District of Columbia, Florida, Illinois, and Missouri. The proposed class representatives were the named plaintiffs from each state. Because Liberov is from Illinois, only the Illinois consumer protection class includes claims against Wal-Mart. However, plaintiffs subsequently narrowed their request, withdrawing their request to certify single-state classes for Connecticut and the District of Columbia and no longer seeking to have two of the named plaintiffs from Illinois (Theis and Bittle) serve as class representatives. (*See* Pls.' Supp. Br. at 1, 10, Oct. 3, 2018, ECF No. 203.) Accordingly, plaintiffs' current request is to certify four single-state consumer protection classes with six proposed class representatives: Esparza and Marsh (California); Pellitteri (Florida); Liberov and Vladimirskiy (Illinois); and Grindel (Missouri).

### 2. Unjust Enrichment Claims

For their unjust enrichment claims, plaintiffs seek to certify two multi-state classes, covering 29 jurisdictions[41] or, in the alternative, seven single-state classes.

### a. Multi-State Unjust Enrichment Classes

Plaintiffs' two proposed multi-state unjust enrichment classes are designed to account for

---

[41] Plaintiffs' motion is narrower than the Amended Complaint, which alleges that defendants violated the unjust enrichment laws in all 50 states and the District of Columbia.

two different definitions of unjust enrichment.

The Unjust Enrichment (Restatement) Multi-State Class ("Restatement Class") would include jurisdictions that follow the Restatement (First) of Restitution's definition of unjust enrichment. This class would consist of:

> All persons residing in Arkansas, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, [], New York, Oklahoma, or West Virginia who purchased Slack-Filled Black Pepper Products for their personal or household use.

(Class Cert. Mot. at 2.) It would bring claims against McCormick and Wal-Mart under the unjust enrichment laws of the 10 jurisdictions where class members reside, with the proposed class representatives being the named plaintiffs from those jurisdictions: Fernandez (Connecticut); Jones (District of Columbia); and Bittle, Liberov, Theis, and Vladimirskiy (Illinois).

The Unjust Enrichment (Appreciation) Multi-State Class ("Appreciation Class") would include jurisdictions that follow the Restatement but require proof of one additional element – "appreciation." This class would consist of:

> All persons residing in Alaska, California, Kansas, Kentucky, Maine, Maryland, Massachusetts, [Missouri, New Mexico], Nevada, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, or Wisconsin who purchased Slack-Filled Black Pepper Products, for their personal or household use.

(Class Cert. Mot. at 2.)[42] This class would bring claims under the unjust enrichment laws of the 19 jurisdictions where class members reside with the proposed class representatives being the named plaintiffs from those jurisdictions: Esparza and Marsh (California); Robinson (Maryland); Grindel (Missouri); and Gerstnecker (Pennsylvania).

---

[42] Plaintiffs initially included Missouri and New Mexico in the Restatement Class, but they subsequently agreed with defendants that they belonged in the Appreciation Class. (*See* McCormick's Opp. at 41; Pls.' McCormick Reply at 22.)

### b. Single-State Unjust Enrichment Classes

As an alternative to two multi-state classes, plaintiffs seek certification of seven single-state unjust enrichment classes. The proposed class representatives for each class are the named plaintiffs from that jurisdiction: Esparza and Marsh (California); Fernandez (Connecticut); Jones (District of Columbia); Bittle, Liberov, Theis, and Vladimirskiy (Illinois); Robinson (Maryland), Grindel (Missouri); and Gerstnecker (Pennsylvania). Only the Illinois class has claims against Wal-Mart.

### B. Class Certification Record

In support of their motion for class certification, plaintiffs submitted tables comparing consumer protection and unjust enrichment law from the relevant jurisdictions, proposed jury instructions for the proposed multi-state classes, excerpts from the depositions of the twelve proposed class representatives, corporate documents that had been produced by McCormick during discovery, the Expert Report of Dr. Armando Levy, and declarations from the custodians of records of various retailers who sold Slack-Filled Pepper Products. (*See* Pls.' Mem. in Support of Class Cert. Mot., ECF No. 157-2 ("Pls.' Mem."); Pls.' Exs. 1-32, 100-144; Pls.' Reply to McCormick's Opp., ECF No. 172-1 ("Pls.' McCormick Reply"); Pls.' McCormick Reply Exs. 1-2; Pls.' Supp. Exs. A-H.)

Defendants each filed an opposition. (*See* McCormick's Opp. to Class Cert. Mot., Aug. 28, 2017, ECF No. 160 ("McCormick's Opp."); Wal-Mart's Resp. to Class Cert. Mot., Aug. 28, 2017, ECF No. 165 ("Wal-Mart's Opp.").) McCormick's opposition, which Wal-Mart joined in, was supported by its own analysis of the relevant consumer protection and unjust enrichment laws, additional deposition excerpts from proposed class representatives and three former named plaintiffs, a declaration from James Hester, the Materials Manager for McCormick, the Expert Report of Dr. John H. Johnson, IV, as a rebuttal to Dr. Levy's Report, and excerpts from Dr.

Levy's deposition. (*See* McCormick's Exs. 1-16, 19, 21-28.) Defendants also jointly moved to exclude the report and opinions of Dr. Levy.

At the Court's first hearing on plaintiffs' motion on July 10, 2018, plaintiffs informed the Court that all fact discovery had been completed and that all experts had been identified. (7/10/18 Tr. at 5.) Plaintiffs also presented the Court with additional materials in support of their request to certify multi-state classes – a PowerPoint presentation and a collection of examples of jury instructions – both of which were added to the record. (*See* Notice of Filing, Aug. 13, 2018, ECF No. 198.) Plaintiffs subsequently filed a statement on Maryland's law of unjust enrichment, and defendants filed a response to plaintiffs' PowerPoint. (*See* Pls.' Statement Concerning Md. Law, July 11, 2018, ECF No. 193; Defs.' Resp. to Certain Statements in Pls.' PowerPoint Presentation, July 17, 2018, ECF No. 195.)

On September 18, 2018, the Court held a telephone conference call with the parties to advise them that it intended to deny their motion to certify multi-state consumer protection and unjust enrichment classes, but that additional briefing would be necessary before any decision could be made on whether to certify any single-state classes, particularly the single-state consumer protection classes. The Court therefore asked the parties to address in their supplemental briefing: (1) whether there was "a typical/adequate plaintiff for each state?"; (2) whether "the requirements under each state's law regarding materiality/causation/injury (as distinct from deception)?"; and (3) whether "evidentiary proof [was] necessary for plaintiffs to sustain their burden under Rule 23(b)(3)?" and, if so, whether plaintiffs had "met their burden to show factual predominance based on the 'common proof' cited on page 23 of their PowerPoint presentation?" (*See* Order at 1, Sept. 18, 2018, ECF No. 200.) The parties filed supplemental memoranda on October 3, 2018, and responses on October 16, 2018. (*See* Defs.' Joint Supp. Br.,

Oct 3, 2018, ECF No. 202 ("Defs.' Supp. Br."); Pls.' Supp. Br., Oct. 3, 2018, ECF No. 203;

Defs.' Joint Resp. to Pls.' Supp. Br., Oct. 3, 2018, ECF No. 204 ("Defs.' Supp. Resp."); Pls.'

Resp. to Defs.' Supp. Br., Oct. 3, 2018, ECF No. 205 ("Pls.' Supp. Resp.").)  In their first filing,

plaintiffs withdrew their request to certify single-state consumer protection classes in

Connecticut and the District of Columbia, withdrew their request to have Bittle and Theis

appointed as class representatives for Illinois, and submitted additional deposition testimony

from the remaining proposed class representatives:  Esparza and Marsh (California), Pellitteri

(Florida), Liberov and Vladimirskiy (Illinois), and Grindel (Missouri).  (*See* Pls.' Supp. Br. at 1,

12 & Exs. A-F.)

On October 24, 2018, the Court held a second hearing, focusing exclusively on the four-

remaining single-state consumer protection classes.  The parties agreed during the September 18,

2018 conference call that the decision whether to certify any single-state classes should be

resolved by this Court.

## ANALYSIS

Plaintiffs have asked the Court to certify either three multi-state classes or four single

state classes to bring consumer protection claims and seven single-state classes to bring unjust

enrichment claims against defendants McCormick and Wal-Mart.  As explained herein, the Court

will not certify any of the proposed multi-state classes.  Nor will it certify the Illinois Consumer

Protection Class or any of the single-state unjust enrichment classes.  However, it will certify the

California, Florida, and Missouri Consumer Protection Classes.

## I.  LEGAL STANDARD FOR CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs the certification of class actions in federal

court.  Rule 23(a) sets out the four "prerequisites" for any class action:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four "threshold requirements" are referred to as "numerosity," "commonality," "typicality," and "adequacy of representation." *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 106 (D.C. Cir. 2002).

Rule 23(b) provides that "[a] class action may be maintained if Rule 23(a) is satisfied," and the action meets the requirements of either Rule23(b)(1), (b)(2), or (b)(3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, plaintiffs seek certification under Rule 23(b)(3), which permits a class action "if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(2). The first part of this criterion is known as "predominance"; the second part as "superiority." *Amchem.*, 521 U.S. at 615. Rule 23(b)(3) further provides that:

The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"A party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Rule 23 "'does not set forth a mere pleading standard.'" *Id*. (quoting *Wal-Mart*, 564 U.S. at 350). "Rather, a party must not only 'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id*. (quoting *Wal-Mart*, 564 U.S. at 350).

A court presented with a motion for class certification must engage in a "rigorous analysis" to be certain that the requirements of Rule 23(a) and (b) are satisfied, which will frequently necessitate looking behind the pleadings and giving some consideration to the merits of plaintiffs' underlying claims. *Comcast*, 569 U.S. at 33. While a court's "class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013). "Merits questions may be considered to the extent–but only to the extent–that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466. Ultimately, "[a] district court exercises broad discretion in deciding whether to permit a case to proceed as a class action." *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994).

In a multidistrict litigation, the MDL transferee court must apply the law of its own circuit when analyzing questions of federal law. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1174 (D.C. Cir. 1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490

U.S. 122 (1989); Multidistrict Litig. Man. § 9:18.  This principle extends to interpretations of Rule 23.  *See, e.g.*, *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-cv-20001, 2012 WL 865041, at *9 (S.D. Ill. Mar. 13, 2012) (applying Seventh Circuit precedent to class certification motion in MDL); *In re Toys "R" Us-Delaware, Inc.-Fair & Accurate Credit Transactions Act (FACTA) Litig.*, No. 06-cv-08163, 2010 WL 5071073, at *2-4 (C.D. Cal. Aug. 17, 2010) (applying Ninth Circuit precedent to class certification motion in MDL).  Also, the parties here agree that the D.C. Circuit's Rule 23 precedent applies to the class certification motion.  (*See* Hr'g Tr. at 6, 43, Oct. 24, 2018, ECF No. 211 ("10/24/18 Tr.").).

However, in the absence of controlling precedent, "the law of a transferor forum on a federal question . . . merits close consideration, but [it] does not have stare decisis effect in a transferee forum situated in another circuit."  *See In re Korean Air Lines Disaster*, 829 F.2d at 1176.  For, as held by the D.C. Circuit:

> [I]n the context of 28 U.S.C. § 1407, a statute authorizing transfers only for pretrial purposes, we are persuaded by thoughtful commentary that the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit.

*Id.* at 1174.[43]

---

[43] Then-Circuit Judge Ruth Bader Ginsburg explained:

> Applying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings. Indeed, because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory.  Our system contemplates differences between different states' laws; thus a multidistrict judge asked to apply divergent state positions on a point of law would face a coherent, if sometimes difficult, task.  But it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law.

*In re Korean Air Lines Disaster*, 829 F.2d at 1175-76.

## II.    MULTI-STATE CLASSES

Plaintiffs seek certification of three multi-state classes.  Defendants oppose certification on a number of grounds, but because the Court agrees that plaintiffs have not met their burden under Rule 23(b)(3) to show that common issues of law predominate, it will limit its discussion to that issue.

The predominance prong of Rule 23(b)(3) permits a class action "if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  To satisfy this requirement for a proposed multi-state class, movants must "creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (quoting *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986)).  Or, in other words, claims arising under different states' laws can be "grouped" into a single class only if they contain "*materially* identical legal standards."  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183 (3d Cir. 2014) ("grouping, in general, may be a permissible approach to nationwide class action litigation," but "plaintiffs face a significant burden to demonstrate that grouping is a workable solution"); 1 McLaughlin on Class Actions § 5:46 (15th ed.) ("If there is no true conflict between or among the substantive laws of the relevant states, the need to apply multiple state laws will not defeat a predominance finding.")

The burden of showing "groupability" "rests squarely with the plaintiffs."  *Klay*, 382 F.3d at 1262 (citing *Walsh*, 807 F.2d at 1017); *see also Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96-97 (2d Cir. 2018) ("the party seeking certification has the ultimate burden to demonstrate that any variations in relevant state laws do not predominate over the

similarities"). "[T]he crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013). Courts can allow subclassing on motion or *sua sponte*, but are under no obligation to do so, and the burden remains on the party seeking certification. 3 Newberg on Class Actions § 7:30 (5th ed.).

In considering whether to certify a multi-state class, it is the trial court's job to critically consider variations in state law. *See, e.g.*, *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010)). The inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Any variations in state courts' interpretations of facially similar elements will also be relevant. *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) ("Consumer protection laws are a creature of the state in which they are fashioned. They may impose or not impose liability depending on policy choices made by state legislatures or, if legislators left a gap or ambiguity, by state supreme courts."). The absence of any clear interpretation of an element may also be material because "each state must decide for itself how to resolve [] unanswered questions about the scope and evidentiary requirements needed to establish [that element]." *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271, 2016 WL 3440600, at *5 (N.D. Cal. June 20, 2016); *see also In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 276 F.R.D. 336, 342 (W.D. Mo. 2011) (providing a "sampling of the legal disputes that the Court is unable to resolve without delving into a legal inquiry more extensive than has been provided by the parties in order to ascertain (or predict) the holdings of the highest courts in these jurisdictions").

Whether variations in elements or interpretations are material will depend on the extent and nature of any variations, plaintiffs' theory of liability, and the factual record.[44] *See, e.g.*, *Grandalski*, 767 F.3d at 184 (plaintiffs failed to provide "analysis describing how the grouped state laws might apply to the facts of this case"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 99-100 (D. Mass. 2008) (considering whether variations in scienter requirements among states' unfair trade practice statutes were material "[i]n the context of plaintiffs' theory in this case"); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997) (court should "determine whether the variations are significant and whether they are material to the issues contested in the case").

A "'single difference' [among] the [s]tate laws governing plaintiffs' claims is not necessarily a substantial difference," but "[c]ourts must exercise care . . . in order to determine whether any conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation through class[-]wide proof." *Hughes v. Ester C Co.*, 317 F.R.D. 333, 352 (E.D.N.Y. 2016) (quoting *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 140 (S.D.N.Y. 2014) and then quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 141 (2d Cir. 2015). "Even differences in state laws that amount to 'nuances' [may] suffice to make multistate classes inappropriate." *Marshall v. H & R Block Tax Servs., Inc.*, 270 F.R.D. 400, 407 (S.D. Ill. 2010) (quoting *In re Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir.1995)).

Finally, plaintiffs seeking certification of a multi-state class "bear[] the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'" *Zinser v. Accufix*

---

[44] The Court does not agree, as defendants appear to suggest, that because so many courts have denied certification of multi-state consumer protection and unjust enrichment classes, the burden is essentially insurmountable. (*See* McCormick's Opp. at 26-27, 38-39 & Exs. 29-30 (Tables of Cases).)

*Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). "If more than a few of the [state] laws . . . differ, [a court] would face an impossible task of instructing jury on relevant law." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996). In the end, "certifying multistate or nationwide classes is not categorically prohibited," but "class certification analysis is necessarily contextual." *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 348 F. Supp. 3d 797, 812 (N.D. Ill. 2018). The ultimate test for multi-state class certification is whether the relevant states "establish a large number of different legal standards governing a particular claim." 1 McLaughlin on Class Actions § 5:46.[45]

### A.     Multi-State Consumer Protection Class of Twenty Jurisdictions

Plaintiffs seek certification of a single multi-state consumer protection class covering 20 jurisdictions: the Consumer Protection Multi-State Class. They argue that the consumer protection statutes in these 20 jurisdictions (Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Dakota, and Washington) can be grouped into one class because they contain the following "common

---

[45] An important caveat to this general principle is that courts tend to be "more receptive to certification of multistate settlement classes." 7AA Fed. Prac. & Proc. Civ. § 1780.1 (3d ed.); *see Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context."); *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556-57 (9th Cir. 2019) (en banc) ("The criteria for class certification are applied differently in litigation classes and settlement classes. In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial. However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial"); *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) ("Given the settlement, no one need draw fine lines among state-law theories of relief.").

elements of proof": (1) "[d]efendant(s) engaged in an act or practice prohibited by state statute"; (2) "[p]laintiffs suffered damage"; and (3) "the challenged act or practice caused that damage." (Pls.' Mem. at 28.) In addition, they contend that each law "provides a private right of action to consumers," "utilizes objective (rather than subjective) standards for deception," "implements the general legal requirement that the damage was proximately caused by the challenged conduct," and "does not require individual reliance." (*Id.* at 30; *see also* Pls.' Exs. 13, 15-17.) Thus, plaintiffs propose that classwide liability could be determined by asking a jury these four questions:

Do you find by a preponderance of the evidence the following:

(1) Did Defendant engage in a deceptive business act or practice?

(2) Did Defendant engage in an unfair business act or practice?

(3) Did Defendant make representations that a good has quantities that it does not have?

(4) Did Defendant's conduct cause Plaintiffs and the Class to lose money?

(Pls.' Ex. 21.)

Defendants counter that plaintiffs have grossly oversimplified matters by "ignoring numerous material state-by-state variations," including "varying descriptions of 'deceptive' or 'unfair' conduct," the differing requirements as to scienter, materiality, causation, injury, and reliance, the need in some states for showing a public impact or interest and for providing notice, and the differences among states in available remedies. (*See* McCormick's Opp. at 26-34.)

Although the Court does not adopt all of defendants' criticisms, it does agree that there are material variations among the 20 consumer protection statutes that preclude certification of the proposed multi-state class. The most significant of these variations involve differences in the burden of proof; scienter requirements; definitions of deception, in particular whether there is a

materiality component and, if so, how it is defined; and the requirements for proving causation and injury.

*Burden of proof*:  Plaintiffs' proposed jury instructions use a "preponderance of the evidence" standard, but at least the District of Columbia requires a higher burden of proof (clear and convincing evidence) to prove a consumer protection violation.  *See* D.C. Std. Civ. Jury Instr. No. 20-11 (2007 ed. rev.).  Accordingly, a single jury instruction on burden of proof could not be used for the proposed multi-state class.

*Scienter*:  Plaintiffs' proposed jury instructions do not include a scienter requirement, although scienter requirements vary among the 20 jurisdictions.  While there are states in the proposed class that have no scienter requirement, e.g., California, Connecticut, the District of Columbia, Florida, Massachusetts, New York, and Washington (*see* McCormick's Opp. at 31), there are also states, including Illinois, Iowa, Minnesota, and North Dakota, which require proof that a defendant intended consumers to rely on the allegedly deceptive conduct.  *See De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009); *McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532 (Iowa 2015) (citing Iowa Code Ann. § 714H.3); *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 694 (Minn. 2014) (citing Minn. Stat. Ann. § 325F.69); N.D. Cent. Code Ann. § 51-15-02.

Differences in scienter are generally material because "[i]n cases where a defendant acted without scienter, a scienter requirement will spell the difference between the success and failure of a claim."  *See, e.g.*, *Mazza*, 666 F.3d at 591.  Here, plaintiffs do not dispute that there are variations in scienter requirements, but they assert that the variations are "immaterial" because they plan to "use common evidence to prove that Defendants acted with complete knowledge." (Pls.' McCormick Reply at 17.)  Plaintiffs' response, though, does not fully address the problem

posed by variations in scienter requirements. First, they do not explain why proving that defendants acted "with complete knowledge" is the same as proving they acted with the intent that others would rely on the deception. Second, if liability is premised on a jury finding that defendants acted with a certain level of intent, but the jury fails to find that intent, recovery would be precluded for all class members, even those in the states that do not require any showing of scienter. Accordingly, a single jury instruction on scienter could not be used for the proposed multi-state class.

_Definition of Deception_: Although every state's consumer protection statute prohibits deceptive acts, they do not utilize a uniform definition of deception. The most obvious difference is that some states require that the deceptive act be "material," while others only require that the deceptive act have the capacity or tendency to deceive. For example, in Connecticut, "the misleading representation . . . or practice must be material – that is, likely to affect consumer decisions or conduct." Conn. Judicial Branch Civil Jury Instr. 5.2-7. But in New Hampshire, a "'deceptive' act or practice is simply one that has the capacity to deceive." _Fowler v. O'Hara_, No. 2182015-cv-01109, 2016 WL 9137116 (N.H. Super.) (jury instructions) (Dec. 22, 2016).

Plaintiffs did not initially acknowledge this difference, but they now suggest that this variation can be accommodated within a single multi-state class by asking the jury two questions: (1) "Was the size of the black pepper tin _material to a reasonable consumer's decision to purchase_ the pepper product?" and (2) "Did the size of the black pepper tin have the _capacity or tendency to deceive consumers_?" (Pls.' Powerpoint Presentation at 20, ECF No. 198-1 ("Powerpoint") (emphasis added).) According to plaintiffs, eight states would be covered by the first question and twelve states would be covered by the second. (_See id_.) But plaintiffs

have failed to establish that these two questions fully account for the all the potential differences in the states' definitions of deception. For example, among the "materiality" states: Connecticut law defines "materiality" as "likely to affect consumer decisions or conduct," Conn. Judicial Branch Civil Jury Instr. 5.2-7; in the District of Columbia a fact is considered to be material if "a reasonable man or woman would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question, *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013); and in Michigan "a material fact . . . [is] one that is important to the transaction or affects a consumer's decision to enter into a transaction," *Laura v. DaimlerChrysler Corp.*, 711 N.W.2d 792, 794 (Mich. Ct. App. 2006) (quoting *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 398 (Mich. Ct. App. 1999)). As for the "capacity or tendency to deceive" states: in Arkansas, a plaintiff "need only prove that the defendant engaged in a practice that has the capacity to deceive a reasonable consumer," *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 156 (5th Cir. 2010); in Massachusetts, an act is deceptive "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Lowell Gas Co. v. Attorney Gen.*, 385 N.E.2d 240, 249 (Mass. 1979); in New Mexico, an act is deceptive if it "would have induced a reasonable consumer in [p]laintiffs' shoes to enter into [the transaction in question]," *Azar v. Prudential Ins. Co.*, 68 P.3d 909, 930 (N.M. Ct. App. 2003); and in Washington, a plaintiff must prove "that the act or practice 'had the *capacity* to deceive a substantial portion of the public.'" *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 591 (Wash. 2015) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986) (en banc)).

Since plaintiffs have made no attempt to explain how the two questions they propose asking a jury would account for all of the above-described variations in the states' definitions of

deception, they have failed to establish materially identical legal standards for deception.

*Causation/Injury/Loss*:  Plaintiffs propose that proving causation and injury for each of the 20 jurisdictions can be handled by asking one question: "Did Defendant's conduct cause Plaintiffs and the Class to lose money?"  But causation, injury and loss must themselves be defined.  And, it is the variations in those elements that plaintiffs' proposed instruction fails to address.

First, the consumer protection statutes do not use identical language when describing what is required in terms of causation and injury to recover damages in a private suit.  For example, in Arkansas, a plaintiff must prove "actual damage or injury as a result of an offense or violation."  Ark. Code Ann. § 4-88-113(f) (repealed Aug. 1, 2017).  In California, a plaintiff can recover for "any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful."  Cal. Civ. Code. § 1780(a).  In Colorado, a plaintiff must been "injured as a result of [a] deceptive trade practice."  Colo. Rev. Stat. § 6-1-113(1)(a).  In Connecticut, Idaho, Iowa, Missouri, and New Jersey, the plaintiff must have "suffer[ed] an ascertainable loss of money or property, real or personal, as a result of the [deceptive act]."  Conn. Gen. Stat. § 42-110g(a); Idaho Code § 48-608(1); Iowa Code § 714H.5; Mo. Ann. Stat. § 407.025; N.J. Stat. § 56:8-19.  In Florida, the plaintiff must have "suffered a loss as a result of a violation of this part."  Fla. Stat. Ann. § 501.211.  In Illinois, the plaintiff must have "suffer[ed] actual damage as a result of a violation."  815 ILCS 505/10a(a).

The variations in statutory language would not matter if they had been interpreted to have the same meaning, but they have not.  Rather, judicial interpretations of these statutes have confirmed that there are clear differences in what a plaintiff must show to prove causation and injury.  Plaintiffs suggest that "proximate cause" is required in all jurisdictions, but that is not the

case. Washington, for example, requires "but for" causation. *See Patrick v. Wells Fargo Bank*, 385 P.3d 165, 171 (Wash. 2016) ("A claimant must show a causal link 'between the unfair or deceptive acts and the injury suffered.' That link must establish that the alleged injury would not have occurred 'but for' the defendant's unlawful acts." (quoting *Hangman Ridge*, 719 P.2d at 539)). In Illinois, a plaintiff can prove causation by showing actual deception. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 861 (Ill. 2005). In Florida, a plaintiff can prove causation by showing that "an objectively reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011). By contrast, in New Mexico, no direct causation is needed, at least to obtain the minimum damages set forth by statute. *See Jones v. Gen. Motors Corp.*, 953 P.2d 1104, 1109 (N.M. Ct. App. 1998) ("In the absence of actual losses, [a] [p]laintiff is still entitled under [the New Mexico consumer protection statute] to recover the statutory damages of one hundred dollars").

As for injury, several states have concluded that a legally cognizable "injury" must be distinct from the deception itself. In New York, for example, the applicable statute has been interpreted as having a "direct injury requirement," meaning that a plaintiff "cannot rely on the deceptive act itself as the alleged injury" but "must prove actual injury, although not necessarily pecuniary harm." Comm. on Pattern Jury Instr. Assoc. of Sup. Ct. Justices, N.Y. PJI-Civ. 3:20.4 (2017). Massachusetts also has held that "legally cognizable injuries . . . must involve objective, 'identifiable' harm that goes beyond the deception itself." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 10 (1st Cir. 2017) (quoting *Tyler v. Michaels Stores, Inc.*, 984 N.E.2d 737, 745 (Mass. 2013)). In other words, plaintiffs must suffer a "'separate, identifiable harm arising from the [regulatory] violation' that is distinct 'from the claimed unfair or deceptive conduct itself.'" *Id*. (quoting *Bellerman v. Fitchburg Gas & Elec. Light Co.*, 54 N.E.3d 1106, 1111 (Mass. 2016)).

Plaintiffs do not dispute that there are variations among state causation standards, but they argue that "any variations in state causation standards are not material" because they "can satisfy the strictest causation standard of any of the state laws at issue (i.e., states requiring direct, 'but for' causation)." (Pls.' McCormick Reply at 15.) But, as noted above, applying a stricter standard than is legally required in some jurisdictions creates a risk that some plaintiffs will be wrongly denied a recovery.

In light of the many material variations among the state consumer protection statutes, and plaintiffs' failure to show how these variations could be accounted for in a manageable way at a trial, the Court concludes that common issues of law do not predominate for the proposed multi-state consumer protection class.

**B.      Multi-State Unjust Enrichment Classes**

Plaintiffs seek certification of two multi-state unjust enrichment classes, covering a total of 29 jurisdictions: the Unjust Enrichment (Restatement) Multi-State Class ("Restatement Class") and the Unjust Enrichment (Appreciation) Multi-State Class ("Appreciation Class"). The Restatement Class would include Arkansas, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, New York, Oklahoma, and West Virginia; the Appreciation Class would include Alaska, California, Kansas, Kentucky, Maine, Maryland, Massachusetts, [Missouri, New Mexico], Nevada, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, and Wisconsin.

According to plaintiffs, two classes are appropriate because all 29 jurisdictions follow the Restatement (First) of Restitution's definition of unjust enrichment, which requires proof that "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant retained the benefit, and (3) the defendant's retention of the benefit would be unjust," but the jurisdictions in the Appreciation Class also require proof of one additional element – "the defendant's appreciation

43

or knowledge of the benefit." Thus, plaintiffs propose that a jury could be asked the following common questions to determine liability for both the Restatement and Appreciations Classes:

> Do you find by a preponderance of the evidence the following:
>
>> (1) Did Plaintiffs and the Class confer a benefit on Defendant?
>>
>> (2) Did Defendant accept a benefit from Plaintiffs and the Class?
>>
>> (3) Under the circumstances, would it be unfair for Defendant to retain the benefit?
>
> Then, for the Appreciation Class, there would be one additional question:
>
>> (4) Did Defendant appreciate the benefit it was receiving from Plaintiffs and the Class?

(Pls.' Ex. 21; *see also* Powerpoint at 32-33.)

As to each proposed unjust enrichment class, the Court must decide whether the covered jurisdictions have "materially identical" legal standards. Courts frequently refuse to certify multi-state unjust enrichment classes. (*See* McCormick's Opp. at 38-39 (citing cases).) However, plaintiffs have addressed a number of potential problems by not seeking a nationwide class,[46] by excluding certain clearly problematic states,[47] and by dividing the remaining states into two groups.[48] Nonetheless, plaintiffs have failed to show that the unjust enrichment law for

---

[46] *See, e.g.*, *Mazza*, 666 F.3d at 591 (affirming denial of certification to nationwide unjust enrichment class).

[47] For example, plaintiffs have excluded Florida, Idaho, and Ohio, which "preclude indirect purchasers from asserting claims for unjust enrichment unless they have conferred a benefit directly on the defendant," *In re ConAgra Peanut Butter Prod. Liab. Litig.*, 251 F.R.D. 689, 697 (N.D. Ga. 2008); Alabama, which requires a showing that "'the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship,'" *Thompson v. Bayer Corp.*, No. 4:07-cv-00017, 2009 WL 362982, at *5 (E.D. Ark. Feb. 12, 2009) (quoting *Mantiply v. Mantiply*, 951 So. 2d 638, 654-55 (Ala. 2006)); and Arizona, which includes "impoverishment" as an element of unjust enrichment, *see In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 148 (S.D.N.Y. 2008).

[48] *See, e.g.*, *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 WL 3623005, at

all the jurisdictions in each of the two proposed classes is materially identical. Nor are the cases they cite particularly helpful as they either do not involve the same proposed groupings,[49] had very different underlying facts,[50] or lack any analysis explaining their decision to certify.[51] In addition, although plaintiffs submitted tables purporting to establish that the unjust enrichment law for the jurisdictions within each proposed class is materially identical, those tables alone do not account for the material differences in how the element of unjustness is defined and whether there is a "no adequate remedy at law" requirement and, if so, how that requirement might apply to the current case.

### 1. Element of Unjustness

It is undisputed that to prevail on a claim for unjust enrichment in any of the jurisdictions at issue, plaintiffs must prove that defendants' retention of the benefit is "unjust." Plaintiffs do not dispute that the specific language used to define unjustness varies by jurisdiction, but they assert, without any further analysis, that "these differences are not material." (Pls.' McCormick Reply at 24.) Thus, they suggest that a jury could simply be asked, "Under the circumstances, would it be unfair for Defendant to retain the benefit?"

Plaintiffs appear to ignore the fact that the question they pose is a fact-intensive inquiry that focuses on the totality of the circumstances, not just defendant's conduct. Plaintiffs also fail

---

*29 (E.D. Pa. June 10, 2015) (denying certification to proposed class that grouped states with an "appreciation" requirement with states lacking such a requirement).

[49] See, e.g., In re TD Bank, N.A. Debit Card Overdraft Fee Litig., 325 F.R.D. 136, 174 (D.S.C. 2018).

[50] *See, e.g.*, *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. 04-cv-1511, 2007 WL 1689899, at *8-10 (N.D. Cal. June 11, 2007) (antitrust case); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697-98 (S.D. Fla. 2004) (same); *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-cv-6997, 2018 WL 6573118, at *16-17 (D.N.J. Oct. 30, 2018) (same).

[51] *See, e.g.*, *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 343 (N.D. Cal. 2010); *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 19-21 (D. Mass. 2010).

to provide an in-depth analysis of the critical question – whether the definition of unjustness is identical for every state within each proposed class. To that question, the Court will now turn.

Among the states in the Restatement Class, for example, unjustness is defined in a variety of ways: Arkansas defines unjustness to mean that "a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain," *El Paso Prod. Co. v. Blanchard*, 269 S.W.3d 362, 372 (Ark. 2007); in Colorado, "[w]hether retention of the benefit is unjust is a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties," *Melat, Pressman & Higbie, LLP v. Hannon Law Firm, LLC*, 287 P.3d 842, 847 (Colo. 2012); in Connecticut, unjust enrichment is defined as "a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff," *Gagne v. Vaccaro,* 766 A.2d 416, 427 (Conn. 2001), and plaintiffs must prove that "the failure of payment was to the plaintiffs' detriment," *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 970 A.2d 592, 609 (Conn. 2009); in Illinois, plaintiffs must prove that "defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience," *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); New York requires that it be "against equity and good conscience to permit the defendant to retain what is sought to be recovered," *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (quoting *Paramount Film Distrib. Corp. v. New York*, 285 N.E.2d 695, 698 (N.Y. 1972)); Oklahoma courts hold that "[u]njust enrichment arises from the failure of a party to make restitution in circumstances where it is inequitable, or one party holds property that, in equity and good conscience, it should not be allowed to retain," *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1035 (Okla. 2006);

and in West Virginia, unjustness means that "if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value," *Realmark Developments, Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W.Va. 2000); *see also* W. Va. Pattern Jury Instr. Civ. § 1124 ("Unjust enrichment means that one party has unfairly kept some benefit that actually belonged to another party, that this benefit was not freely given to the party keeping it, and that there was no legal justification for keeping it.").

Similarly, among the states in the Appreciation Class, unjustness is defined in a variety of ways: Alaska courts define unjustness to mean that "the defendant must receive a true windfall or something for nothing," *Alaska Sales & Serv., Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 1987); in California, "[t]here is no equitable reason for invoking restitution when the plaintiff gets the exchange which he expected," *Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 323-24 (Cal. Ct. App. 2008) (quoting *Comet Theatre Enters. v. Cartwright*, 195 F.2d 80, 83 (9th Cir. 1952)); in Maryland, "the right to restitution is . . . subject to any counter-equities that the recipient of benefits may assert," *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 352 (Md. 2007); in Massachusetts, unjustness is "a quality that turns on the reasonable expectations of the parties," *Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013) (quoting *Global Investors Agent Corp. v. National Fire Ins. Co.*, 927 N.E.2d 480, 494 (Mass. Ct. App. 2010); in Missouri, "[t]here can be no unjust enrichment if the parties receive what they intended to obtain," *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010) (quoting *Am. Std. Ins. Co. v. Bracht*, 103 S.W.3d 281, 293 (Mo. Ct. App. 2003)); in Vermont, "[u]njust enrichment applies if 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given," *Kellogg v. Shushereba*, 82 A.3d 1121, 1130 (Vt. 2013) (quoting

*Gallipo v. Rutland*, 882 A.2d 1177, 1191 (Vt. 2005)), and, in addition, "[w]hether there is unjust enrichment present 'may not be determined from a limited inquiry confined to an isolated transaction. It must be a realistic determination based on a broad view of the human setting involved,'" *Mueller v. Mueller*, 54 A.3d 168, 176 (Vt. 2012) (quoting *Legault v. Legault*, 459 A.2d 980, 984 (Vt. 1983)).

Given the varied definitions of unjustness within each proposed class, plaintiffs have failed to meet their burden to show that the element of unjustness has been given a materially identical definition by all of the jurisdictions within each proposed class.

### 2. No Adequate Remedy at Law Requirement

The unjust enrichment laws of the jurisdictions at issue also vary in terms of whether they have a "no adequate remedy at law" requirement and, if so, how that requirement is defined. Plaintiffs have failed to establish that these variations are not material.

First, there are states within each proposed class that have a no adequate remedy at law requirement and states that do not. In the Restatement Class, for example, Connecticut, Hawaii, Illinois, Iowa, New York, and West Virginia have the requirement,[52] but Arkansas does not.[53] In the Appreciation Class, Kansas, Massachusetts, South Carolina, Utah, and Washington have the

---

[52] *See In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 333 (S.D.N.Y. 2018) (Connecticut); *Porter v. Hu*, 169 P.3d 994, 1008 (Haw. Ct. App. 2007) (Hawaii); *Mosebach v. Blythe*, 282 N.W.2d 755, 761 (Iowa Ct. App. 1979) (Iowa); *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (New York); *Mountain State Coll. v. Holsinger*, 742 S.E.2d 94, 103 (W. Va. 2013) (West Virginia).

[53] See Thompson v. Bayer Corp., 2009 WL 362982, at *6.

requirement,[54] but Rhode Island does not.[55]

Second, in those states with a "no adequate remedy at law" requirement, its meaning varies. For example, in New York (Restatement Class) and Massachusetts (Appreciation Class), the requirement would almost certainly bar plaintiffs' unjust enrichment claims. Courts applying the law of those states consistently dismiss unjust enrichment claims (including slack-fill cases),[56] since the same underlying conduct would constitute a claim under the state's consumer protection statute.[57] A court applying Washington (Appreciation Class) law would probably reach the same result.[58] In other states, such as Connecticut and Illinois (both in the Restatement Class), the requirement appears to have been interpreted as not barring an unjust enrichment

---

[54] *See Batman v. Deutsch*, 423 P.3d 1062 (Table), 2018 WL 4038983, at *8 (Kan. Ct. App. 2018) (Kansas); *Reed v. Zipcar, Inc.*, 883 F. Supp. 2d 329, 334 (D. Mass. 2012) (Massachusetts); *EllisDon Constr., Inc. v. Clemson Univ.*, 707 S.E.2d 399, 401 (S.C. 2011)) (South Carolina); *VCS, Inc. v. Utah Cmty. Bank*, 293 P.3d 290, 299-300 (Utah 2012) (Utah); *Firey v. Orozco*, No. 33232-2-III, 2015 WL 5893664, at *8, 190 Wash. App. 1025 (Wash. Ct. App. 2015) (Washington).

[55] See S. Cty. Post & Beam, Inc. v. McMahon, 116 A.3d 204, 213 (R.I. 2015).

[56] *See Alce*, 2018 WL 1737750, at *11-12 (dismissing unjust enrichment claim based on alleged slack-fill even though consumer protection claim dismissed for failure to plausibly allege that packaging could be misleading); *Bautista*, 223 F. Supp. 3d at 193-94; *Izquierdo*, 2016 WL 6459832, at *9-10.

[57] *See, e.g.*, *Samiento v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008); *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 466 (D. Mass. 2018) ("claims for misrepresentation and violations of [the Massachusetts consumer protection statute] provide available remedies, even though some of them must be dismissed").

[58] *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1264 (D.N.M. 2017) ("The Court concludes that, if faced with this case, the Supreme Court of Washington would similarly decide that the [Washington Consumer Protection Act's] availability precludes unjust-enrichment relief . . . the Plaintiffs have a statutory remedy available that provides them identical legal and equitable relief."); *see also Firey*, 2015 WL 5893664, at *8 ("fact that [the plaintiff] cannot prove her breach of contract claim does not permit her to raise unjust enrichment").

claim for damages.[59]  Finally, in Hawaii, Iowa, and West Virginia (Restatement Class), and in

Kansas, South Carolina and Utah (Appreciation Class), it is difficult to predict if an unjust

enrichment claim would be barred in a case similar to this one.[60]

Given the variations among states as to whether there is a "no adequate remedy at law"

requirement, and if such a requirement exists, the variations as to its scope, the Court concludes

that plaintiffs have not met their burden to show that the "no adequate remedy at law"

requirement is not a material variation.

* * *

For the above reasons, the Court concludes that plaintiffs have failed to establish that

there are no material variations in unjust enrichment law in the jurisdictions within each

proposed class and, accordingly, it will not certify the proposed multi-state unjust enrichment

classes.[61]

_____

[59] *See In re Gen. Motors*, 339 F. Supp. 3d at 335 ("an adequate legal remedy does not bar a damages claim for unjust enrichment under Connecticut law"); *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 386 (N.D. Ill. 2010) (under Illinois law, "restitution, *i.e.*, money damages under an unjust enrichment theory, *is* a legal remedy").

[60] *See Porter*, 169 P.3d at 1008 (requirement does not bar an unjust enrichment claim that is founded on the same wrongful conduct as a tort claim if "the remedies sought are sufficiently distinct . . . to exclude th[e] case from the realm of 'double recovery' situations"); *Mosebach v. Blythe*, 282 N.W.2d 755, 761 (Iowa Ct. App. 1979) ("[e]quity generally will not provide relief where an adequate remedy at law existed and defendant was denied that relief for appropriate legal reasons"); *Mountain State Coll.*, 742 S.E.2d 94 (W. Va. 2013) ("[a] court of equity is without jurisdiction to entertain a suit" where there is a "plain, adequate and complete" remedy at law, whether the plaintiff is guaranteed success); *Batman*, 2018 WL 4038983, at *8 ("a claim must first be made against the one who violated a duty, and a remedy at law must be unavailable before equitable relief is allowed"); *EllisDon Constr*, 707 S.E.2d at 401 ("A party failing to fulfill the requirements of its legal remedy cannot later come to the courts complaining of hardship, seeking an equitable remedy."); *VCS, Inc.*, 293 P.3d at 299-300 ("A party invoking equity is generally required to first exhaust any legal remedies available . . . because equitable remedies are secondary gap-fillers.").

[61] Wal-Mart has also argued that no multi-state classes should be certified to bring claims again Wal-Mart because the proposed class representative from Illinois (Liberov) lacks standing to

## III.    SINGLE-STATE CLASSES

Having concluded that none of the proposed multi-state classes should be certified, the Court turns to plaintiffs' alternative request to certify single-state classes.  Plaintiffs' motion, as modified, seeks certification of four single-state consumer protection classes and seven single-state unjust enrichment classes.  Each class would consist of purchasers who resided in the state and would bring claims under the consumer protection statute and/or the common law of unjust enrichment in that state, with only the Illinois classes bringing claims against Wal-Mart.

As the Court did not need to analyze the Rule 23(a) requirements with respect to the multi-state classes, it will consider those requirements now, along with the implied requirement of ascertainability, and then turn to the Rule 23(b)(3) requirements of predominance and superiority.  As noted, plaintiffs bear the burden of proving that the Rule 23(a) requirements are met and showing that Rule 23(b)(3) is "satisf[ied] through evidentiary proof."  *Comcast*, 569 U.S. at 33.  And, because this is an MDL, the D.C. Circuit's interpretations of Rule 23 provide the controlling law, but where the D.C. Circuit has not addressed an issue, and there is a divergence among the circuits, this Court must apply the interpretation of Rule 23 it finds most persuasive.  (*See supra* pp. 31-32 & n.43.)

### A.    Numerosity (Rule 23(a)(1))

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Impracticable means "difficult or

---

bring claims on behalf of the residents of other states under those other states' laws, even if the states have materially identical legal standards.  (*See* 7/10/18 Tr. at 44; Wal-Mart's Opp. at 2.)  According to Wal-Mart, a class representative from one state cannot suffer the necessary injury to represent a plaintiff from another state because each state defines "what the injury is." (7/10/18 Tr. at 45.)  Given the Court's conclusion that the multi-state classes founder on the requirement of predominance, this argument is moot.

inconvenient" rather than impossible. *Coleman v. District of Columbia*, 306 F.R.D. 68, 76

(D.D.C. 2015). "The numerosity requirement requires examination of the specific facts of each

case and imposes no absolute limitations." *Gen. Tel. Co. v. Equal Employment Opportunity*

*Comm'n*, 446 U.S. 318, 330 (1980); *see also Council of & for the Blind v. Regan*, 709 F.2d 1521,

1544, 1543 n.48 (D.C. Cir. 1983) ("Although the absolute number of class members is not the

sole determining factor, joinder will usually be impracticable when the class is large.") Plaintiffs

must provide some evidence that a class is numerous, but courts may draw "reasonable

inferences from the facts presented to find the requisite numerosity." *Coleman*, 306 F.R.D. at

76. As a rule of thumb, a class of over 40 members satisfies the numerosity requirement. *See,*

*e.g.*, *id.*[62]

Here, it is undisputed that there were far more than 40 purchasers of Slack-Filled Pepper

Products in each potential class. (*See* Levy Rep., Tables 3, 5, 6.) Accordingly, the Court finds

that each proposed single-state class satisfies the numerosity requirement.

### B.     Commonality (Rule 23(a)(2))

The requirement of "commonality" is satisfied when there are "questions of law or fact

common to the class." Fed. R. Civ. P. 23(a)(2). "If the class members' claims involve no

common question of law or fact, there will be 'no cause to believe that all their claims can

productively be litigated at once.'" *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019) (quoting

*Wal-Mart*, 564 U.S. at 350)). As explained by the Supreme Court, "even a single common

question will do." *Wal-Mart*, 564 U.S. at 359; *see J.D.*, 925 F.3d at 1321 ("The presence of a

---

[62] The D.C. Circuit has not yet spoken on this issue, *see Hoyte v. District of Columbia*, 325
F.R.D. 485, 490 (D.D.C. 2017), but other circuits have and apply a similar standard. *See*
*Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *Marcus v. BMW of North America, LLC*,
687 F.3d 583, 595 (3d Cir. 2012); *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir.
2003).

single such common question can suffice to satisfy Rule 23(a)(2).").  But the "common contention" "must be of such a nature that it is capable of classwide resolution–which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  "What matters to class certification . . . is not the raising of common questions–even in droves–but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id*.

Plaintiffs have identified several common questions that satisfy the commonality requirement of Rule 23(a).  First, whether the Slack-Filled Pepper Products contained nonfunctional slack-fill is a common question of fact.  (*See* 2d Am. Compl. ¶¶ 116, 127; *see also*, *e.g.*, *Hendricks v. StarKist Co.*, No. 13-cv-00729, 2015 WL 4498083, at *3 (N.D. Cal. July 23, 2015) (commonality satisfied by common question of whether cans of tuna fish were underfilled).  Defendants argue this is not a "common question" because plaintiffs may suffer a failure of proof.  (*See* McCormick's Opp. at 16 (citing Hester Decl. ¶ 11, which states that all of the Slack-Filled Pepper Products were "overfill[ed]" if necessary to meet a minimum 80% fill level).)[63]  But to satisfy the requirement of commonality, plaintiffs need not show that a common question will be answered in their favor.  *See Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-cv-2335, 2018 WL 6300479, at *5 (S.D. Cal. Nov. 29, 2018) (it "requires too much of the plaintiff by demanding a common contention that 'will be answered, on the merits in favor of the class' instead of simply showing there is a 'common contention capable of classwide resolution'" (quoting *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015))).  Rather,

---

[63] Defendants' related argument that there is no evidence that the Slack-Filled Pepper Products contained nonfunctional slack-fill is addressed as part of the analysis of predominance.  (*See infra* Section III.F.1.b.)

they need only show that the common question is capable of generating a "common answer" even if that answer defeats their claim.

A second common question is whether the packaging of the Slack-Filled Pepper Products – to which all consumers were uniformly exposed – was deceptive or misleading. (*See* 2d Am. Compl. ¶¶ 119, 127.) As numerous courts have recognized, "a claim concerning alleged misrepresentations on packaging to which all consumers were exposed is sufficient to satisfy the commonality requirement because it raises the common question of whether the packaging would mislead a reasonable consumer." *Broomfield v. Craft Brew Alliance, Inc.*, No. 17-cv-01027, 2018 WL 4952519, at *5 (N.D. Cal. Sept. 25, 2018) (commonality satisfied by common question of whether representations on Kona Beer packaging would have deceived a reasonable consumer into believing beer was brewed in Hawaii).[64]

Both questions identified above are central to the validity of each class member's consumer protection and/or unjust enrichment claim and will drive the resolution of this litigation. Indeed, as discussed in the analysis of predominance, if plaintiffs do not prevail on either question, their claims will fail. (*See infra* Section III.F.1.a & b.) Accordingly, the Court finds that each proposed single-state class satisfies the commonality requirement.

---

[64] *See also, e.g., In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1096-97 (C.D. Cal. 2015) ("There is no question that all class members were exposed to the product packaging; this suffices to show commonality."); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 151 (N.D. Ill. 2017) ("Courts routinely find that whether a product packaging, seen by all purchasers of the product, is misleading is an issue that satisfies commonality."); *White II*, 2018 WL 3748405, at *4 ("The question of whether the slack-fill in [defendant's] candy packaging violates the [Missouri consumer protection statute] will be susceptible to a common answer."); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 693 (S.D. Fla. 2014) ("[W]hether the 'All Natural' label is deceptive to an objective consumer is an issue common to all class members. Accordingly, the element of commonality is satisfied.").

## C.     Typicality (Rule 23(a)(3))

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "Typicality differs from commonality in that typicality concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." *J.D.*, 925 F.3d at 1322. "Yet they '[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical.'" *Id.* (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). The purpose of the typicality requirement is "to assess whether the action can be efficiently maintained as a class [action] and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." *Kifafi v. Hilton Hotels Ret. Plan,* 189 F.R.D. 174, 177 (D.D.C. 1999).

The typicality requirement is "liberally construed." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002). "[T]o destroy typicality, a distinction must differentiate the '*claims or defenses*' of the representatives from those of the class." *J.D.*, 925 F.3d at 1322 (quoting Fed. R. Civ. P. 23(a)(3)). "As a result, typicality is ordinarily met 'if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory.'" *Id.* (quoting 7A Fed. Prac. & Proc. Civ. § 1764); *see also Wal-Mart*, 564 U.S. at 348-49 (a class representative must "possess the same interest and suffer the same injury as the [putative] class members"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 94 (D.D.C. 2017) (typicality "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability").

Plaintiffs initially proposed that all twelve named plaintiffs from the Second Amended Complaint be selected as class representatives – with each plaintiff acting as a representative for any proposed class of which he or she was a member.  According to plaintiffs' opening brief, the named plaintiffs' claims and experiences were typical of the class because (1) they all "allege common wrongdoing by [d]efendants directed toward all class members," specifically "that the 'Black Pepper Net Weight Reduction' project . . . covertly raised prices to every single [p]laintiff and [c]lass member by decreasing the amount of pepper in their non-transparent tins and grinders"; (2) they were all "victims" of defendants' deception because they "all purchased pepper products that contained less black pepper than such products previously had contained, even though the size of the package remained the same"; (3) they all "believed–at the time of their purchase–that they were purchasing a product that was full, rather than one that contained as much as 25% nonfunctional slack-fill"; and (4) that it did not matter that "they (and the absent class members) may have purchased different brands (e.g. McCormick vs. private label), varieties (e.g. ground vs. whole pepper), and sizes (e.g. 1.5 oz, 2 oz, 6 oz) of pepper" because their claims still arise from same course of conduct and rest on the same legal theories.  (Pls.' Mem. at 11, 23-24.)  Although defendants do not dispute any of plaintiffs' affirmative contentions, they persist in arguing that typicality is not satisfied.

Defendants initially argued that the deposition testimony of eight of the twelve proposed class representatives (Fernandez (Connecticut), Jones (District of Columbia), Pellitteri (Florida), Bittle (Illinois), Theis (Illinois), Robinson (Maryland), Grindel (Missouri), and Gerstnecker (Pennsylvania)) revealed that they were not typical because they did not suffer the "same injury" as putative class members.  (See Defs. Opp. at 17 n.23, 20-21.)  Specifically, defendants argued that the testimony of these proposed class representatives "powerfully demonstrates that, for

many consumers who purchase McCormick black pepper, they do so for reasons quite apart from the price or fill level." (McCormick's Opp. at 22; *see also* 7/10/18 Tr. at 66 (statement of defense counsel that "majority of [plaintiffs] testified they basically would have made the same purchase decision anyway because they like McCormick pepper, they've always bought it, their grandmother bought it, the husband likes the way it's – the granulation of it or whatever the reason was, they were perfectly happy to keep on buying it").).[65]  According to defendants, this testimony is inconsistent with the injury alleged in the complaint – that plaintiffs "would not have paid for [d]efendants' black pepper had they known that the containers were under-filled" (2d Am. Compl. ¶ 122) – and thus, these proposed class representatives are not typical.

Plaintiffs did not respond to this argument in their reply brief.  When asked about it during the first motions hearing, plaintiffs' counsel told the Court that they did not believe that plaintiffs' deposition testimony, viewed in its entirety and leaving any credibility determinations to the trier of fact, was inconsistent with paragraph 122.[66]  (*See* 7/10/18 Tr. at 29-31, 35-36.) They faulted defendants for "selectively" choosing quotes to support their characterizations of plaintiffs' testimony.  (*See* 7/10/18 Tr. at 30.)  As a fallback, plaintiffs argued that if the Court were to conclude that one or more of the challenged plaintiffs were "atypical," it would not matter as long as there remained at least one viable representative per class.  (*See* 7/10/18 Tr. at 32, 36, 37.)  Finally, plaintiffs proffered that if a proposed class was left without a viable class representative, they could, if permitted by the Court , easily substitute a new plaintiff.  (*See* 7/10/18 Tr. at 40.)

---

[65] Defendants also reference the testimony of a former named plaintiff, Anne Marron, but her "typicality" is not at issue.  Her testimony, though, remains part of the record even though she voluntarily dismissed her lawsuit after her deposition.

[66] Plaintiffs' counsel told the Court that plaintiffs "stand by th[e] allegation[]" in ¶ 122.  (7/10/18 Tr. at 30.)

In response to the Court's request that plaintiffs further address the typicality question as part of their supplemental briefing as to the consumer protection classes (*see* 9/18/18 Order at 1), plaintiffs abandoned their request that plaintiffs Bittle and Theis serve as class representatives for Illinois and withdrew their request to certify consumer protection classes in Connecticut and the District of Columbia, thereby rendering moot the issue of whether plaintiffs Fernandez and Jones would satisfy the typicality requirement for those classes.  (Pls.' Supp. Br. at 12.)  They also submitted additional deposition testimony excerpts from the six remaining proposed class representatives for the consumer protection classes (Esparza and Marsh (California), Pellitteri (Florida), Liberov and Vladimirskiy (Illinois), and Grindel (Missouri)), which they argue demonstrates that each would testify, consistent with ¶ 122, that "I bought this believing that it was a hundred percent full, and I wouldn't have bought it if I had known [that it was not]." (10/24/18 Tr. at 32.; Pls.' Supp. Br. at 5, 7, 10, 12.)

In response, defendants argue that the proposed class representatives for the four remaining consumer protection classes do not satisfy typicality for two reasons:  (1) none can "testify of their own personal knowledge about the fill level of the tins they purchased"; and (2) Grindel and Pellitteri are "brand loyal and pay no attention to price."  (Defs.' Supp. Br. at 1-2 & n.2.)  Neither argument is persuasive.

Defendants' first point, while accurate, has no bearing on typicality.  Plaintiffs have never suggested that they intend to prove that the Slack-Filled Pepper Products contained nonfunctional slack-fill through the testimony of individual consumers, so the fact that the proposed class representatives cannot testify to actual fill levels does not render them atypical. In addition, the reason that plaintiffs cannot offer such testimony is not their fault; rather, defendants' conduct made it impossible for plaintiffs to see the actual fill line.  Finally, and most

importantly, the proposed class representatives are bringing the same claims, arising out of the same events, and pursuant to the same legal theories, as class members, which is the critical inquiry for typicality.

Defendants' second point is undercut by plaintiffs' submission of additional deposition testimony for Grindel and Pellitteri. While both testified that they are brand loyal, and in the past they paid little attention to price, they also testified that they would consider whether a pepper product contains nonfunctional slack-fill to be a material fact in their purchasing decisions. For example, Pellitteri answered "yes" when asked if he "takes into account anything like the packaging of the product in making your purchase decision for pepper." (Pellitteri Dep. at 47.) He then explained that what he takes into account about the packaging is that "[i]t's just the same size can I've always bought." (*Id*.) He also testified that his complaint about the new reduced weights was that he was "being deceived"; he was "spending money [but] wasn't getting a full tin." (*Id*. at 21.) Finally, he was asked "[w]ould you have still bought the McCormick brand pepper" if McCormick "had simply raised the price by 25 percent," to which he responded "[i]t could sway me one way or the other." (*Id*. at 46.) Grindel testified that she would purchase McCormick pepper again "[o]nly if they change the label" to "make people aware that they changed the weight without changing the size of the can and somehow make restitution to all those people who have been duped into buying less pepper in the same size can." (Grindel Dep. at 16, 19.) Given that a consumer could be brand loyal and pay little attention to price, but also consider nonfunctional slack-fill to be a material fact, the Court finds that the testimony of these two consumers does not conflict with plaintiffs' theory of liability.

Accordingly, the Court finds that the six proposed class representatives for the four

single-state consumer protection classes satisfy the typicality requirement.[67]

### D. Adequacy (Rule 23(a)(4))

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement aims to ensure that absent class members will not be bound by the outcome of a suit in which they were not competently and fairly represented." *J.D.*, 925 F.3d at 1312. "Two criteria for determining the adequacy of representation are generally recognized: (1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Nat'l Ass'n of Regional Med. Programs, Inc. v. Mathews,* 551 F.2d 340, 345 (D.C. Cir. 1976); *see also J.D.*, 925 F.3d at 1312. "Among the many factors governing the district court's decision that the [class members] are adequately represented are the quality of class counsel, any disparity in interest between class representatives and members of a would-be subclass, communication between class counsel and the class, and the overall context of the litigation." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).

Plaintiffs argue that these requirements have been satisfied. First, they note that "plaintiffs are members of the class(es) they seek to represent": each resides in the state he or

---

[67] As for the proposed single-state unjust enrichment classes, defendants challenge the typicality of seven of the proposed class representatives: Fernandez (Connecticut), Jones (District of Columbia), Bittle and Theis (Illinois), Robinson (Maryland), Grindel (Missouri), and Gerstnecker (Pennsylvania). (*See* McCormick's Opp. at 20-21.) Plaintiffs are presumably no longer seeking appointment of Bittle and Theis given that they withdrew their request to have them selected as class representatives for the Illinois consumer protection class, and the Court has determined that Grindel satisfies typicality. As for the others, there is no need to decide whether defendants' challenges to typicality have merit because, as explained *infra*, the unjust enrichment classes they propose to represent will not be certified for other reasons.

she seeks to represent and purchased a Slack-Filled Pepper Product for personal or household use. (Pls.' Mem. at 25 (citing 2d Am. Compl. ¶¶ 10-21).) Next, they contend that "[t]here are no conflicts of any kind between [the proposed representatives'] interests and the interests of the [c]lasses" because the representatives, like class members, "have an interest in obtaining compensation from [d]efendants for the unfair, deceptive, and misleading conduct of under-filling their pepper products" and because "[p]laintiffs' claims can only be successful if the claims of all [c]lass members are successful. (*Id*.) They also maintain that "the proposed representatives . . . have demonstrated their commitment to pursuing these claims on behalf of absent class members" because each "has responded to written discovery requests . . . [and] sat for a deposition." (*Id*.)[68]

Defendants do not challenge any of plaintiffs' affirmative assertions, which the Court finds to be supported by the record. Indeed, in their initial briefing defendants did not address adequacy. In their supplemental filing, they merely asserted that the proposed class representatives for the single-state consumer protection classes are not adequate for the same reasons they are not typical. (*See* Defs.' Supp. Br. at 1-2.) These arguments, however, have already been rejected by the Court. (*See supra* Section III.C.)

Accordingly, the Court concludes that the adequacy requirement is satisfied for all the proposed single-state classes.

### E.    Ascertainability

Rule 23 does not expressly require that a class be "ascertainable," and the D.C. Circuit "has not addressed whether Rule 23 contains an ascertainability requirement for class

---

[68] Plaintiffs also assert that "[p]laintiffs' Interim Co-Lead Counsel are qualified to lead a certified class." (Pls.' Mem. at 25.) The adequacy of counsel is addressed *infra* Section III.H.

certification." *J.D.*, 925 F.3d at 1320. Nonetheless, defendants argue that the proposed classes fail to satisfy the requirement of "ascertainability," which they claim requires that the class be defined by "objective criteria" and that it be "administratively feasible" for the court to determine whether a particular individual is a member. (McCormick's Opp. at 7.)

Most federal circuits (unlike the D.C. Circuit) have held that "ascertainability" is an implied requirement under Rule 23. *See Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (citing cases from First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth and Eleventh Circuits). However, the circuits "diverge" as to the meaning of ascertainability. *Id*. As a baseline, courts generally agree that ascertainability means that a class definition must render potential class members identifiable according to objective criteria. *See, e.g.*, *Mullins v. Direct Digital*, LLC, 795 F.3d 654, 657 (7th Cir. 2015) ("[A] class must be defined clearly and . . . by objective criteria rather than by, for example, a class member's state of mind."); *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017) (class should be "defined using objective criteria that establish a membership with definite boundaries"); 1 Newberg on Class Actions § 3:3 ("All courts essentially focus on the question of whether the class can be ascertained by objective criteria."). The Third Circuit has added the additional requirement that "[t]he method of determining whether someone is in the class must be administratively feasible," *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013)),[69] while the Seventh and Ninth

---

[69] The Eleventh Circuit has also endorsed administrative feasibility in an unpublished opinion. *See Karhu v. Vital Pharm., Inc.*, 621 Fed. App'x 945, 950 (11th Cir. 2015) ("[A] plaintiff establishes Rule 23's implicit ascertainability requirement by proposing an administratively feasible method by which class members can be identified."). But the unpublished decision in *Karhu* is not "binding precedent," *see* U.S. Ct. of App. 11th Cir. R. 36-2, and it appears to conflict with published Eleventh Circuit decisions approving the certification of classes that raise the same type of administrative feasibility issues. *See, e.g.*, *Fitzpatrick*, 635 F.3d at 1283 (approving class certification subject to the district court on remand defining the class to include

Circuits have expressly rejected that interpretation.[70]

Absent any controlling precedent in the D.C. Circuit, the first question for the Court is which ascertainability test should be applied. *See In re Korean Air Lines Disaster*, 829 F.2d at 1176. Although only the Seventh and Ninth Circuits have expressly rejected imposition of an administrative feasibility requirement, often referred to as "heightened ascertainability," the Sixth and Eighth Circuits have done so by implication,[71] and the remaining circuits have not clearly adopted a position.[72]

The transferor courts for the majority of the cases in this MDL (13) are in circuits that have not adopted "administrative feasibility" as part of ascertainability.[73] *See In re Korean Air*

---

all purchasers of YoPlus yogurt during the relevant time period).

[70] *See Mullins v. Direct Digital*, 795 F.3d at 662 ("Nothing in Rule 23 mentions or implies this heightened requirement under Rule 23(b)."); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) ("A separate administrative feasibility prerequisite to class certification is not compatible with the language of Rule 23.").

[71] *Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (ascertainability is not a separate preliminary requirement but part of a "rigorous analysis of the Rule 23 requirements"); *see Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) (explaining that for "a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria").

[72] *Compare In re Petrobras Sec.*, 862 F.3d at 264 (2d Cir. 2017) (rejecting "freestanding administrative feasibility requirement" as a prerequisite to class certification) *with Brecher v. Republic of Argentina,* 806 F.3d 22, 24 (2d Cir. 2015) ("the touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."); *see also EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (recognizing "an implicit threshold requirement that the members of a proposed class be readily identifiable . . . in reference to objective criteria"); *John v. Nat'l Sec Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of [Rule 23].").

[73] Eight cases originated in California, Illinois or Nevada (Seventh and Ninth Circuits); one case came from Missouri (Eighth Circuit); one case came from New York (Second Circuit); and three cases were filed in the District of Columbia. The two remaining cases came from Pennsylvania (Third Circuit) and Florida (Eleventh Circuit). However, plaintiffs are not seeking to certify a

*Lines Disaster*, 829 F.2d at 1176 ("the law of a transferor forum on a federal question . . . merits

close consideration"). Moreover, the reasoning of those courts that have rejected this

requirement is persuasive. As those courts have noted, "[n]othing in Rule 23 mentions or

implies this heightened requirement." *Mullins v. Direct Digital*, 795 F.3d at 658. In addition,

such a requirement would "skew[] the balance that district courts must strike when deciding

whether to certify classes," *id.*, and would likely be the death-knell to consumer protection class

actions involving low-cost products. *See id.* at 668 ("class certification provides the only

meaningful possibility for bona fide class members to recover anything at all"); *Briseno v.*

*ConAgra Foods, Inc.*, 844 F.3d 1121, 1129 (9th Cir. 2017) ("[L]ow-value consumer class actions

. . . typically involve low-cost consumer products and, as a result, recoveries too small to

incentivize individual litigation.").[74]

---

consumer protection class in Pennsylvania and the unjust enrichment class will not be certified
for other reasons. In addition, as noted, the Eleventh Circuit has only endorsed the
administrative feasibility test in an unpublished opinion, *see Karhu*, 621 Fed. App'x at 950,
although several district courts in Florida have followed that decision. *See, e.g., Randolph*, 303
F.R.D. at 684-85 (putative class not ascertainable as plaintiff had not offered feasible mechanism
for identifying purchasers of oils containing "All Natural" label).However, under the D.C.
Circuit's opinion in *In re Korean Air Lines Disaster*, this Court must, in the case of a circuit
split, only apply one interpretation of Rule 23, and where there is no D.C. Circuit precedent on
point, "the transferee court [should] be free to decide a federal claim in the manner it views as
correct without deferring to the interpretation of the transferor circuit." 829 F.3d at 1174; *see
also supra* pp. 30-32 & n.43.

[74] Part of the Third Circuit's justification for imposing a heightened ascertainability requirement
was its conclusion that defendants "must be able to challenge class membership" and that absent
class members' claims should be protected from dilution "by fraudulent or inaccurate claims."
*Carrera*, 727 F.3d at 309-10. But, as the Seventh and Ninth Circuits have pointed out, these
issues do not arise in a case (like this one) where the amount of damages is the same for each
unit sold and liability can be determined on an aggregate basis by multiplying that amount by the
number of units sold during the class period. *See Briseno*, 844 F.3d at 1132; *Mullins v. Direct
Digital*, 795 F.3d at 670. Under those circumstances, "the identity of particular class members
does not implicate the defendant's due process interest . . . because the addition or subtraction of
individual class members affects neither the defendant's liability nor the total amount of
damages it owes to the class." *Briseno*, 844 F.3d at 1132 (quoting *Mullins v. Direct Digital*, 795

Accordingly, plaintiffs need only establish that the proposed classes are defined by "objective criteria." Plaintiffs' proposed class definitions satisfy this requirement: each proposed class includes residents of a particular state who purchased a Slack-Filled Pepper Product, and the Slack-Filled Pepper Products are identified by brand, container size, type of pepper, and a unique SKU number. The Court therefore finds that the proposed single-state classes satisfy ascertainability.

### F.      Predominance (Rule 23(b)(3))

To authorize a class action under Rule 23(b)(3), the court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

Rule 23(b)(3)'s predominance requirement is "more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34. It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, by "ask[ing] whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Thus, the predominance inquiry

> calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (quoting 2 Newberg on Class Actions § 4:50 at 196-97 (5th ed. 2012)). "When one or more

---

F.3d at 670). In addition, the amount of damages per unit is so small as to discourage fraudulent claims.

of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to individual class members . . . ." *Id.*

"In determining whether class or individual issues predominate in a putative class action suit, [courts] must take into account the claims, defenses, relevant facts, and applicable substantive law, to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Klay*, 382 F.3d at 1254; *see also In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, No. 2:11-cv-07382, 2019 WL 2521958, at *6 (D.N.J. June 18, 2019) ("The Court must examine through the prism of Rule 23(b)(3) the elements of each of the causes of action for certification and ask whether proof of the essential elements require individual treatment."). But ultimately, the predominance standard is a "pragmatic" one. *McKinney v. U.S. Postal Serv.*, 292 F.R.D. 62, 65 (D.D.C. 2013); *see also In re Vitamins*, 209 F.R.D. at 262 ("There is no definitive test for determining whether common issues predominate . . . ."); *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("[P]redominance requires a qualitative assessment . . . ; it is not bean counting.").

Plaintiffs bear the burden of satisfying Rule 23(b)(3) "through evidentiary proof." *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350), which includes "establish[ing] that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 35. With the application of only one state's law, it is undisputed that any questions of law are common, so the focus of the predominance analysis for the single-state classes is on questions of fact. The Court will first address the four single-state consumer protection classes, as to which it finds that in three of the four states, plaintiffs have sufficient evidentiary proof to satisfy predominance. It

will then turn to the seven single-state unjust enrichment classes, finding that each fails to satisfy predominance.

### 1. Single-State Consumer Protection Classes

Plaintiffs' single-state consumer protection classes seek to bring claims under the following state consumer protection statutes: (1) the California Consumer Legal Remedies Act, Cal. Civ. Code § 1770 ("CLRA"), and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"); (2) the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Stat. § 501.201, *et seq*.; (3) the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann. § 505/1, *et seq*.; and (4) the Missouri Merchandising Practices Act ("MMPA"), Mo. Ann.. Stat. § 407.010, *et seq*.

To decide whether plaintiffs have proven predominance for each proposed class, the Court will first consider four issues that are common to all four states, and it will then analyze the state-specific differences.

### a. Deception

Each state's consumer protection law requires proof of an unfair or deceptive act.[75]

---

[75] In California, the CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. In Florida, the FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1). In Illinois, the ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. Ann. § 505/2. In Missouri, the MMPA declares unlawful the use of "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or

Although the states vary in how they define deception, proof of deception in each is judged by an objective, reasonable consumer standard[76] and can be satisfied in each state without any individualized proof of reliance.[77]  In addition, the alleged deception here is subject to common proof.  Most importantly, it is undisputed that the purchasers of the Slack-Filled Pepper Products were uniformly exposed to the same alleged misrepresentation – pepper containers that did not have visible fill lines and that allegedly contained nonfunctional slack-fill.  There is also ample common evidence that the challenged action was deceptive.  That evidence includes:

(1) the product packaging itself – the tin containers and the opaque labels both hid the fill levels from consumers at the time of purchase and ensured that the fill levels were not apparent even after the product was opened (*see* Fegan Decl. ¶¶ 62-64, 66-68, 81 (citing Pls.' Ex. 110),

advertisement of any merchandise."  Mo. Ann. Stat. § 407.020.

[76] In the four states, claims of deceptive conduct are governed by the objective, "reasonable consumer" test.  *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1116 (N.D. Cal. 2018) (in California, a "[p]laintiff must 'show that members of the public are likely to be deceived,'" which requires "an objective showing of a probability that a 'significant portion' of the relevant consumers acting reasonably 'could be misled'" (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016))); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (in Florida, a "deceptive act" is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment"); *Mednick v. Precor, Inc.*, 320 F.R.D. at 151 (in Illinois, a claim of deceptive packaging requires proof that "the packaging was likely to deceive a reasonable consumer" (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014))); *Webb v. Dr Pepper Snapple Grp., Inc.*, No. 4:17-cv-00624, 2018 WL 1955422, at *3 (W.D. Mo. Apr. 25, 2018) ("Whether the conduct alleged is deceptive under the MMPA is to be analyzed under the "reasonable consumer" standard." (quoting *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 312 (Mo. Ct. App. 2016))).

[77] *See, e.g.*, *Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 254 (9th Cir. 2018) (unpublished) ("[C]lass members in CLRA and UCL actions are not required to prove their individual reliance on the allegedly misleading statements."); *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) ("the FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct") (unpublished); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 218-19 (S.D. Ill. 2018) ("ICFA does not require proving reliance, only that a defendant intended that a consumer would rely on a deceptive or unfair practice"); *Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 702-03 (E.D. Mo. 2018) ("A plaintiff need not even allege or prove reliance on an unlawful practice to state a claim under the [MMPA].")

¶ 82 (citing Pls.' Ex.. 143); Powerpoint at 4);

(2) McCormick's internal documents, which reflect a conscious decision to try to hide a price increase from consumers by reducing the net weight of the product without changing the container size (*see, e.g.*, Fegan Decl. ¶ 27 (citing Pls.' Ex. 105), ¶ 29 (citing Pls.' Ex. 107), ¶ 37 (citing Pls.' Ex. 113), ¶ 40 (citing Pls.' Ex. 115));

(3) federal and state laws and regulations that directly or indirectly deem nonfunctional slack-fill misleading or deceptive, *see* 21 C.F.R. § 100.100(a) (nonfunctional slack-fill in opaque containers is "misleading")); Cal. Bus. & Prof. Code § 12606.2(c) (same); Fla. Stat. Ann. § 500.11 (food is "misbranded . . . [i]f its container is so made, formed, or filled as to be misleading); Mo. Ann. Stat. § 196.075 (same); 815 Ill. Comp. Stat. Ann. 510/2 (unfair or deceptive acts include "[r]epresenting that goods . . . have . . . quantities that they do not have"); s*ee also Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 703 (E.D. Mo. 2018) ("Regardless of whether [p]laintiff may prove her MMPA claim by pointing to [a] violation [of the federal slack-fill regulation] . . . the existence of the Federal prohibition against slack-fill supports the reasonableness of a consumer's belief that the package of candy she purchases will not have 45% non-functional slack-fill."); and

(4) decisions on motions to dismiss by courts in California, Illinois and Missouri that recognize that a plausible allegation that a consumer product violates the federal prohibition on nonfunctional slack-fill in an opaque container states a claim for a deceptive act under that state's consumer protection statute, *see, e.g., Kamal v. Eden Creamery, LLC*, No. 18-cv-01298, 2019 WL 2617041, at *14 (S.D. Cal. June 26, 2019) (ice cream); *Escobar v. Just Born Inc.*, No. 17-cv-01826, 2017 WL 5125740, at *14 (C.D. Cal. June 12, 2017) (candy); *Stemm v. Tootsie Roll Indus.*, 374 F. Supp. 3d 734, 741-42 (N.D. Ill. 2019); *Hawkins*, 309 F. Supp. 3d at 703

(candy); *Benson v. Fannie May Confections Brands, Inc.*, No. 17-cv-3519, 2018 WL 1087639, at
*5 (N.D. Ill. Feb. 28, 2018) (candy).

For purposes of class certification, therefore, whether defendants' alleged conduct
constituted a deceptive act under each state's consumer protection statute is a common question
susceptible to common proof.

### b. Existence of Nonfunctional Slack-Fill

Underlying plaintiffs' claim that defendants' alleged actions constituted deception under
each state's consumer protection law is the common factual allegation that the Slack-Filled
Pepper Products contained nonfunctional slack-fill. (*See* Powerpoint at 7-8.) Although this is a
common question *capable* of classwide proof, *see infra* Section III.B, defendants argue that the
evidence shows that plaintiffs will not be able to prove a "uniform reduction in fill " so
individualized inquiries will be required to prove the existence of nonfunctional slack-fill for
each class member. Defendants' argument suffers from two fatal flaws.

First, defendants assert that "there is zero common evidentiary support for plaintiffs'
claims of a uniform reduction in fill." (McCormick's Opp.. at 18-19; *see also* 7/10/18 Tr. at 128
("absolutely no evidence that anything was slack-filled").) But this contention is not supported
by the record. To justify this assertion, defendants point out that: (1) none of the named
plaintiffs observed the fill level of any black pepper product that he or she purchased; and (2) the
"uncontroverted" Hester Declaration states that the fill levels of pepper containers after the
weight reduction program was implemented varied but were still maintained at anywhere from
80% to 100% full. (*See* Hester Decl. ¶¶ 11-13.) However, the absence of a certain type of
evidence (plaintiffs' testimony as to actual fill levels) or the existence of contrary evidence (the
Hester Declaration) does not necessarily mean that there is "zero" evidentiary support for
plaintiffs' allegation that the pepper products contained nonfunctional slack-fill. In addition,

plaintiffs cannot be criticized for their inability to testify to actual fill levels since this inability is attributable to the success of defendants' deception. Nor should plaintiffs be faulted for the absence of any contemporaneous fill records that might have challenged the "uncontroverted" Hester Declaration since McCormick chose not to keep such records. (*See* 7/10/18 Tr. at 88.) More importantly, defendants ignore plaintiffs' affirmative evidence that the Slack-Filled Pepper Products contained non-functional slack-fill, including corporate records that document the adoption of the Net Weight Reduction Project; pictures showing visual fill differences between the old and new products; a reduced weight on the container; and corporate documents that reflect internal discussions about the deceptive nature of the inadequate fill levels. (*See* Powerpoint at 4; Pls.' Exs. 125, 130, 133, 140, 141, 143.)

Second, even if plaintiffs may not be able to prove a "uniform reduction in fill," a failure of proof will not mean that individualized inquiries would be required. Plaintiffs' theory of liability is that McCormick's decision to reduce the net weight in certain lines of pepper products (identified by UPC codes) resulted in those products having reduced fill levels by approximately the same percentage as the weight reductions. All class members' claims rest on this common contention. If they are unable to prove this allegation, then their claims will fail. Thus, whether plaintiffs will be able to prove the existence of nonfunctional slack-fill is solely a merits issue and has no relevance to class certification. *See, e.g.*, *Hilsley*, 2018 WL 6300479, at *5 ("On class certification, the Court does not resolve issues of disputed facts."); *Alcantar*, 800 F.3d at 1053 ("We conclude that the district court erred in denying class certification because it evaluated the merits rather than focusing on whether the questions presented–meritorious or not– were common to the class.").

Accordingly, the Court finds that whether there was nonfunctional slack-fill in the Slack-

Filled Pepper Products is a common question for purposes of Rule 23(b)(3).

### c.     Damages

In *Comcast*, the Supreme Court held that in order to prove predominance plaintiffs have to "establish[] that damages are capable of measurement on a classwide basis."  569 U.S. at 35. "Calculations need not be exact, but . . . any model supporting a plaintiff's damages case must be consistent with its liability case."  *Id*.  The Court explained that it was imposing this burden on plaintiffs because otherwise "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  *Id*.

Plaintiffs' theory of liability is straightforward – consumers were deceived into paying for a "full" container of pepper when in fact they received a container with nonfunctional slack-fill.  They submitted an expert report from Dr. Armando Levy to demonstrate that two theories of injury/damages could be calculated on a classwide basis: "out-of-pocket loss" and "benefit of the bargain."  (Levy Rep. ¶¶ 10-11.)  Levy concludes that under either theory damages can be estimated as the value of the missing black pepper (the "overcharge").  (Levy Rep. ¶¶ 13, 32.) He then proposes that the overcharge could be calculated taking the percentage reduction in weight (e.g., 25% for the 4-ounce container that became a 3-ounce container) and multiplying that by the average price of the product.  (Levy Rep. ¶ 32.)  The damages for each product code could then be calculated by multiplying the overcharge by the number of units sold, and the total damages would be the sum of those damages for each product code.  (Levy Rep. ¶ 33.)

Defendants object to Dr. Levy's proposed method of calculating damages on several grounds and have moved to exclude his report and opinions.  None of their arguments is persuasive.

First, defendants object to Dr. Levy's use of net weight because plaintiffs' theory of liability is based on an alleged reduction in volume.  But using a weight reduction as a proxy for

volume reduction is consistent with plaintiffs' theory of liability – that the weight reduction resulted in a comparable volume reduction. In fact, defendants' contention that it had to overfill its products in order to maintain its self-imposed minimum fill level, even if that exceeded the net weight represented on the package, is consistent with that theory.

Defendants also argue that plaintiffs have not provided any methodology for determining individual damages. (*See* McCormick's Opp. at 25 ("To determine what amount any purchaser might claim, one would have to know which specific product(s) the individual purchased, how many of each and at what price(s)."). But plaintiffs "[a]t the class certification stage . . . are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a classwide basis." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 144 (E.D. Pa. 2011); *see also In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at *9 (D.N.J. Jan. 25, 2011) (plaintiffs "need only show that a viable method is available to prove damages on a class-wide basis"); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) ("[A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class member's damages."). "The mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification." *Hoyte v. District of Columbia*, 325 F.R.D. 485, 494 (D.D.C. 2017) (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984)).

While it may well be a challenge to figure out how to identify class members and to allocate damages among them, plaintiffs have met their burden at the class certification stage to prove that damages are calculable on a classwide basis.

### d. Extrinsic Evidence of Consumer Perceptions and Behavior

According to defendants, plaintiffs cannot satisfy the predominance requirement because

"common evidence such as empirical research, surveys, studies or expert testimony demonstrating consumer perceptions is required" in order for plaintiffs to prove "materiality/causation/injury" on a classwide basis.  (Defs.' Supp. Br. at 9.)

Typically, plaintiffs do rely on such extrinsic evidence at the class certification stage. *See, e.g.*, *Farar v. Bayer AG*, No. 14-cv-04601, 2017 WL 5952876, at *12 (N.D. Cal. Nov. 15, 2017) (plaintiffs proffered market research to show that claims that multivitamins are good for heart health, immunity, and physical energy are material); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 752 (7th Cir. 2014) (plaintiffs proffered marketing studies, expert surveys, and focus-group testing to show that whether the coffee in coffee pods for the Keurig coffee machine is instant or ground is material); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1018 (C.D. Cal. 2015) (plaintiffs proffered third-party surveys and market research to support their contention that the "100% Natural" label on Wesson Oils is material), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) *and* 674 F. App'x 654 (9th Cir. 2017); *Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016) (plaintiffs proffered market research and expert testimony to prove that the representation that olive oil was "Imported from Italy" is material); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (plaintiff proffered market research and expert testimony of a marketing expert to show that health benefit claims on cereal products are material).

Plaintiffs concede they do not have this type of evidence.  (*See* 10/24/18 Tr. at 73 ("[W]e made the strategic decision . . . not to do a consumer survey. . . . [O]bviously this Court would find it helpful, and I recognize that.").)  But they argue that such evidence is not required because they have other evidence of materiality, specifically the "slack-fill regulations [which] demonstrate that a reasonable consumer would consider whether a product contains non-

functional slack-fill to be material" and "[d]efendants' documents show[ing] that price is material to pepper consumers."  (Pls.' McCormick Reply at 8-9; *see also* Pls.' Supp. Resp. at 5-6 ("[d]efendants' documents . . . demonstrate how reasonable consumers interact with and make decisions about the products at issue"); *id*. at 8-10 ("the regulations prohibiting such packaging demonstrate the misleading nature and materiality of the same"); 10/24/18 Tr. at 73 (plaintiffs "made the decision to submit the record as it is" "given that we had the regulation and we had defendant's documents" as evidence of materiality).)

Plaintiffs' evidence of materiality is, at best, meager.  While the regulatory prohibition of nonfunctional slack-fill is expressly tied to deceptiveness, its evidentiary value for proving materiality is less clear.  *Compare Kumar*, 2016 WL 3844334, at *8 (prohibition on misrepresenting a good's country of origin is evidence of materiality) *with Victor v. R.C. Bigelow, Inc.*, No. 13-cv-02976, 2014 WL 1028881, at *17 (N.D. Cal. Mar. 14, 2014) ("what a reasonable consumer expects . . . may have absolutely no relation to FDA regulations").

As for McCormick's corporate documents. plaintiffs rely on fewer than a dozen internal company communications.  (*See* Powerpoint at 25-29 (citing Pls.' Exs. 113, 133, 139, 142); Pls.' Supp. Resp. at 5-6 (citing Fegan Decl. ¶¶ 25, 27, 37, 38, 78-79, 82 (relying on Pls.' Exs. 104, 105, 106, 112, 113, 142, and 143)).)  Several show that McCormick employees thought that raising shelf prices was not a viable option so they came up with the alternative plan of reducing fill.[78]  The documents also show that McCormick employees were concerned that consumers

---

[78] *See, e.g.*, Fegan Decl. ¶¶ 27, 38 (citing Pls.' Ex. 106 (Agenda/Meeting Minutes from an internal McCormick meeting, dated June 30, 2014, stating "Extensive discussion as prep mode for ELT [Executive Leadership Team] on 7/1.  If we don't do this, we must take a price increase- not an acceptable solution.")); Fegan Decl. ¶ 38 (citing Pls.' Ex. 112 (internal McCormick emails, dated from September 16 to 22, 2014, which reflect that McCormick concluded that the only option for offsetting the commodity price increases without increasing the absolute price of

might react negatively if they realized that the weight reduction was a "price increase in disguise."[79] Other documents show that McCormick wanted to hide this effective price increase from consumers by keeping the same container sizes with no visible fill lines,[80] and that it took an additional step to avoid discovery by enlisting the private-labels, including Wal-Mart, to make the same changes.[81] Finally, the documents show that in May 2015, a Wal-Mart employee opined that the reduced-weight products had "too much air space."[82]

---

their products was a reduction in fill)).

[79] *See* Fegan Decl. ¶ 39 (quoting Pls.' Ex. 112 (internal McCormick email expressing concern "that such price increases in disguise (ie weight reduction for same price) are just as challenging as RSP [retail sales price] increases")).

[80] *See* Fegan Decl. ¶ 78 (citing Pls.' Ex. 142 (slide from an internal McCormick presentation in November 2014, which shows that one of the reasons why McCormick is "not reducing the can dimensions to adjust for non-functional slack fill after the net weight reduction" is to "minimize[] visible change to consumers")); Fegan Decl. ¶ 82 (quoting Pls.' Ex. 143 (internal McCormick emails, dated November 3, 2014, regarding labeling recommendations, which include one employee's statement that "Our primary concern with the label will be the consumer's ability to see the product (specifically the visual fill line). It would be our preference to mitigate this risk as much as possible, especially with all of the changes that will be occurring related to the net weight reduction project.")).

[81] *See* Fegan Decl. ¶ 37 (citing Pls.' Ex. 113 (internal McCormick emails, dated June 9, 2014, discussing the proposed "net weight reduction" project with one McCormick employee writing that a unilateral reduction might be "deceptive and could very well back fire on us[,]" since McCormick's private label customers would likely "advertise '10% more vs [McCormick]'" and thus "point[] this deception out to our loyal branded customer")); Powerpoint at 26 (quoting Pls.' Ex. 133 (internal McCormick emails, dated October 28, 2014, noting that one of the private label brands "believes we are headed for a pepper sales disaster and a consumer nightmare resulting from the 'same package, 25% less weight' strategy. They are basing this on first hand experiences from other weight reductions in other product lines as well as the consumer complaints that came with those changes at retail. They think by using the same package we look like we are trying to pull a fast one. They asked why we didn't consider a combination of weight reduction+ price increase to mitigate the huge weight % reduction." The response: "When I see the words 'disaster' and 'nightmare' being communicated related to our number one initiative, I'm not feeling too great.")).

[82] Powerpoint at 29 (quoting Pls.' Ex. 139 (email from a Wal-Mart executive to McCormick asking, "Do you have another size can, we think we want to move GV [Great Value], too much air space.")).

Plaintiffs argue that "the corporate strategies reflected in [d]efendants' documents, which are based on their own research and experience, demonstrate how reasonable consumers interact with and make decisions about the products at issue." (Pls.' Supp. Resp. at 5-6) *see also* 10/24/18 Tr. at 26 (documents "reflect[] [McCormick's] consumer marketing and brand teams that do exactly that type of research [and] that are discussing what they believe consumers will do based on their experience").) Contrary to plaintiffs' insinuations, there is no reference in the documents to research or studies of consumer perceptions or behavior. Rather, we only learn that McCormick employees were concerned about fill levels, price and deception, arguably because they believed consumers would find those to be material considerations.

Unlike the "internal documents" that other courts have relied upon in finding plaintiffs' evidence of materiality to be sufficient, these documents do not include or reflect actual market research or consumer surveys. *See, e.g.*, *Kumar*, 2016 WL 3844334, at *8 (internal documents included defendant's "own market research evidence, along with other industry research, to show that Italian origin is important to consumers' olive oil purchasing decisions"); *Farar*, 2017 WL 5952876, at *12 (internal documents included results of extensive market research showing "that defendants thoroughly investigated the types of health claims most effective to various types of consumers in order to shape their brand marketing and strategy, and these claims included heart health, immunity, and physical energy claims"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 613-14 (N.D. Cal. 2018) (internal documents revealed that the purpose of the "Made from Real Ginger" claim was to make people believe that Canada Dry Ginger Ale offers the health benefits of real ginger, that the "Real Ginger" marketing program was working to increase sales volume, and that a consumer survey showed that 25% of consumers who drink Canada Dry gave their reason for drinking it as "*Canada Dry is made with real ginger*"); *Martin*

*v. Monsanto Co.*, No. 16-cv-2168, 2017 WL 1115167, at *7 (C.D. Cal. Mar. 24, 2017) (internal

documents showed that Monsanto considered the claim that concentrated weed killer would

result in 23 gallons of product to be a "key claim[ ]" and included "results of a 3,000 person

consumer research study" and "a series of focus groups"); *Mullins v. Premier Nutrition Corp.*,

No. 13-cv-01271, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) (internal documents

included defendant's own "[m]arketing research  suggest[ing] the overwhelming majority of [the

product's] users purchased the product to obtain [the represented health] benefits" that plaintiffs

were challenging).

Indeed, some courts have found that evidence of a defendant's opinion as to materiality is

not an adequate substitute for extrinsic evidence. *See, e.g.*, *In re 5-Hour Energy Mktg. & Sales

Practices Litig.*, No. 13-ml-2438, 2017 WL 2559615, at *7 (C.D. Cal. June 7, 2017) (testimony

of defendant's former marketing director was insufficient because it "addresse[d] only how

[defendant] perceived its own branding techniques, and not how consumers reacted to the

product name or the alleged misstatements on the [product's] label"); *Cormier v. Carrier Corp.*,

No. 2:18-cv-07030, 2019 WL 1398903, at *13 (C.D. Cal. Mar. 25, 2019) (rejecting plaintiffs'

argument that "materiality can be proven on a classwide basis because . . . [the defendant] itself

believed that the alleged defect was material" on the ground that "the materiality analysis focuses

on whether a reasonable *consumer*–not [the defendant]–would have considered information

about the alleged defect to be important in their decision to purchase").

Given the relatively limited showing of materiality, the Court must confront the question

whether plaintiffs' evidence of materiality is enough for class certification in each of the four

states.  This question is not susceptible to a uniform answer; nor are there many cases to guide

the Court in its search for an answer.  In addition, in at least two of the states, there is arguably

tension between two Supreme Court cases, *Amgen* and *Comcast*, which bear on this subject.  In *Amgen*, the Court considered whether plaintiffs in a securities fraud case had to proffer evidence of materiality to prove predominance.  The Court held that they did not because (1) for purposes of Rule 23(b)(3), "materiality" was necessarily a "common question" because it was judged by an "objective standard," *Amgen*, 568 U.S. at 467 ("because [t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor, materiality can be proved through evidence common to the class"); and (2) "a failure of proof on the issue of materiality would end the case for one and for all," *id*. at 468.  Thus, the Court concluded that "[a]s to materiality, therefore, the class is entirely cohesive:  It will prevail or fail in unison.  In no event will the individual circumstances of particular class members bear on the inquiry."  *Id.* at 460.  In reaching its decision, the Court emphasized that to gain certification under Rule 23(b)(3), plaintiffs need not establish that they will "win the fray" because "the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'"  *Id.*

A month later, the Supreme Court emphasized that a party seeking class certification "must . . . satisfy [Rule 23(b)(3)] through evidentiary proof."  *Comcast*, 569 U.S. at 33.  But, in *Comcast*, the Court only addressed the scope of plaintiffs' evidentiary burden with respect to damages.

Only a few courts have grappled with the question of what "evidentiary proof" is needed to satisfy Rule 23(b)(3).  As discussed more extensively *infra*, several recent California cases, including a decision by the Ninth Circuit, have held that in light of the objective standard for materiality under California law, extrinsic evidence of materiality is not required.  *See Bradach*

*v. Pharmavite, LLC*, 735 F. App'x 251, 254 (9th Cir. 2018) (unpublished); *Hadley*, 324 F. Supp. 3d at 1115.[83]  But the Seventh Circuit's decision in *Suchanek* and several subsequent district court cases in Illinois strongly suggest that even when materiality is judged by an objective standard, extrinsic evidence of materiality may be necessary for class certification of a consumer protection claim where there may be several explanations for consumers' behavior and motivations.  *See Suchanek*, 764 F.3d at 760-61; *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 582-83 (N.D. Ill. 2014); *Clark v. Bumbo Int'l Trust*, No. 15-cv-2725, 2017 WL 3704825, at *6-8 (N.D. Ill. Aug. 28, 2017).  In contrast, courts in Florida and Missouri have not addressed the issue.

Given the above, the Court cannot accept defendants' argument that plaintiffs *must* proffer extrinsic evidence of materiality/causation/injury across-the-board in order to prove predominance under Rule 23, irrespective of the product involved, the type of deception, the elements of the relevant state consumer protection statute, and the state court decisions interpreting those statutes.  Thus, the Court will revisit this issue in the context of its analysis of each state's consumer protection statute.

### e.     California Consumer Protection Class

Given California federal and state case law, the Court concludes that a class can be certified under the California consumer protection statutes.

To prevail on a claim under the CLRA, plaintiffs must prove a deceptive act, causation of injury and reliance on the deceptive practice.  *See Hilsley*, 2018 WL 6300479, at *11.  However,

---

[83] *See also Hilsley*, 2018 WL 6300479, at *11; *Broomfield*, 2018 WL 4952519, at *11; *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364-66 (N.D. Cal. 2018); *Lewert v. Boiron, Inc.*, No. 2:11-cv-10803, 2014 WL 12626335, at *6 (C.D. Cal. Nov. 5, 2014); *Escobar*, 2019 WL 2619636, at *2.

in a class action "[c]ausation, on a classwide basis, may be established by materiality," and "if . . . material misrepresentations have been made to the entire class, an inference of reliance arises as to the class."  In re *Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Cal. Ct. App. 2009).  The Court has already concluded that whether defendants committed a deceptive act is a common question. It is also undisputed that the alleged misrepresentation was made to the entire class, allowing for an inference of reliance as to the class if the deception was "material."  The only outstanding issue, and the focus of the parties' dispute, is whether plaintiffs have proven that "materiality" is a common question susceptible to common proof.

To prove materiality, a plaintiff must establish that "a reasonable [person] would attach importance to [the misrepresentation's] existence or nonexistence in determining his choice of action."  *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 892 (Cal. 2011); *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009); *see also Racies v. Quincy Bioscience, LLC*, No. 15-cv-00292, 2017 WL 6418910, at *3 (N.D. Cal. Dec. 15, 2017) ("California's consumer protection laws evaluate materiality under a reasonable person standard, not on an individualized basis.").[84] Thus, materiality is judged by an objective "reasonable person" standard.

Since the Supreme Court's decision in *Amgen*, a growing number of cases in California have concluded that when a case "presents specific alleged misrepresentations common to the class," materiality is necessarily a common question for purposes of Rule 23(b)(3) because it is judged by an objective "reasonable person" standard and, therefore, *no* evidence of materiality is

---

[84] Causation is also a required element under the UCL.  *See Kwikset*, 246 P.3d at 887.  However, to establish causation in a class action, only the class representatives must establish reliance on the alleged misrepresentation, unnamed class members need not.  *In re Tobacco II Cases*, 207 P.3d at 35 (class "relief under the UCL is available without individualized proof of deception, reliance and injury").

necessary for purposes of class certification. *Werdebaugh v. Blue Diamond Growers*, No. 12-cv-2724, 2014 WL 2191901, at *14(N.D. Cal. May 23, 2014); *see also*, *e.g.*, *Hadley*, 324 F. Supp. 3d at 1115 ("because deception and materiality are objective questions, they are 'common question[s] for purposes of Rule 23(b)(3)'" (quoting *Amgen*, 568 U.S. at 467)).[85]  The Ninth Circuit has also held that CLRA claims are "ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." *Bradach*, 735 F. App'x at 254-55 (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012)).  The court in *Bradach* then proceeded to summarily reverse the district

---

[85] *See also Lewert v. Boiron,* 2014 WL 12626335, at *6 ("Materiality is an objective inquiry, determinable on a classwide basis."); *Mullins v. Premier Nutrition*, 2016 WL 1535057, at *5 ("As a general rule, materiality may be established by common proof '[b]ecause materiality is judged according to an objective standard,' and so '[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.'" (quoting *Amgen*, 568 U.S. at 459)); *id*. ("question of materiality remains a common one" even where marketing surveys arguably "showed that whether a statement is material varies from consumer to consumer"; defendant was free to make that argument at trial); *Fitzhenry-Russell*, 326 F.R.D. at 613 ("As a general rule, materiality may be established by common proof '[b]ecause materiality is judged according to an objective standard,' and so '[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.'" (quoting *Amgen*, 568 U.S. at 459)); *Broomfield*, 2018 WL 4952519, at *11 ("Though both [p]laintiffs and [d]efendants spend most of their time disagreeing as to whether [the expert's] declaration sufficiently proves materiality, the question at this stage is not whether [p]laintiffs have successfully proven materiality, but rather whether the materiality inquiry is a common question susceptible to common proof that helps to establish predominance. . . . Because materiality is an objective question based on the reasonable consumer, it is common to the class and 'ideal for certification.'" (quoting *Amgen*, 568 U.S. at 481)); *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 539-40 (N.D. Cal. 2018) ("In cases alleging misrepresentation, 'common issues predominate when plaintiffs are exposed to [a] common set of representations about a product.'" (quoting *Butler v. Porsche Cars N. Am., Inc.*, No. 16-cv-2042, 2017 WL 1398316, at *10 (N.D. Cal. Apr. 19, 2017)); *Hilsley*, 2018 WL 6300479, at *11 (observing that defendants correctly "d[id] not challenge [p]laintiff's predominance argument" as "causes of action requiring an objective test make such claims amenable to class actions").

court's finding that plaintiffs had failed to provide sufficient evidence of materiality to prove predominance on the ground that "the district court's conclusion that it would need to inquire into the motives of each individual class member was premised on an error of law." *Id*. at 255; *see also Escobar*, 2019 WL 2619636, at *2 (C.D. Cal. Mar. 25, 2019) (relying on *Bradach* to certify a class to bring slack-fill claims under California law without any discussion of the evidence or the need for evidentiary proof). In *Hadley*, Judge Koh explained:

> [B]ecause deception and materiality under the [] CLRA[] and UCL are objective questions, they are ideal for class certification because they will not require the court to investigate class members' individual interaction with the [challenged] product[s]. . . . As a result, "[t]here is no risk whatever that a failure of proof on the common question[s] of [deception and] materiality will result in individual questions predominating. Instead, the failure of proof on the element[s] of [deception and] materiality would end the case for one and for all; no claim would remain in which individual . . . issues could potentially predominate."

324 F. Supp. 3d at 1115-16 (quoting *Amgen*, 568 U.S. at 467-68) (internal citations omitted).

Despite the California cases that apply *Amgen* to the element of materiality under California law and the Ninth Circuit's decision in *Bradach*, defendants insist that plaintiffs are required to proffer "sufficient" evidence of materiality at class certification and that evidence must include extrinsic evidence such as consumer surveys, market research or expert testimony. (Defs.' Supp. Br. at 9.) To support this argument, defendants cite several California cases where courts have required extrinsic evidence of materiality. (*See* Defs.' Supp. Br. at 3-4, 9 (citing *In re 5-Hour Energy*, 2017 WL 2559615, at *8 ("Absent a consumer survey or other market research to indicate how consumer reacted to the [challenged] statements, and how they valued these statements compared to other attributes of the product and the [relevant] market generally, [p]laintiffs have not offered sufficient evidence of materiality across the class."); *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 224-25, 230 (N.D. Cal. 2015) (evidence of materiality required and the plaintiff's evidence was insufficient where expert's "fill-in-the-blanks" opinion

was too generic to constitute a "method of classwide proof to show that a 'reasonable consumer' would find the challenged statements deceptive and material to their purchasing decision"); *Jones v. ConAgra*, No. 12-cv-01633, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (evidence of materiality insufficient because plaintiffs provided only the conclusory declaration of an expert who stated that "reasonable consumers would rely on [the] label to identify products that are natural" but "did not explain *how* the challenged statements, together or alone, were a factor in any consumer's purchasing decisions"); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1044 (C.D. Cal. 2018) (expert report presenting survey evidence was insufficient evidence of materiality where surveys "d[id] not provide insight into consumer purchasing decisions").

For several reasons, these cases do not help defendants. First, the underlying facts and claims are distinguishable from the present case. All the above cases involved allegations that statements on a product's packaging were misleading, not that the packaging itself was misleading. As a result, there could be (and were) disputes about the meaning of the alleged misrepresentation. For example, in *In re 5-Hour Energy*, the court concluded that plaintiffs had not shown that materiality was susceptible to common proof in part because "plaintiffs fail[ed] to establish a controlling definition for a key term in an alleged misstatement." 2017 WL 2559615, at *8 ("the meaning of the term 'energy' [was] disputed," and plaintiffs "ha[d] offered no evidence of a common definition of 'energy' among a substantial number of consumers"); *see also Jones v. ConAgra*, 2014 WL 2702726, at *15-16 (no clear meaning to claim of "100% Natural"). Here, no such questions of interpretation are present. *See Alvarez v. NBTY, Inc.*, No. 17-cv-00567, 2019 WL 2223929, at *5 (S.D. Cal. May 22, 2019) (finding that these and other cases requiring survey evidence were distinguishable because in those cases the "allegedly false

word ha[d] no fixed meaning").

In addition, in several cases there were disputes about whether there was classwide exposure to the alleged deception. For example, in *Kosta*, "the variations [we]re so great that at least half the challenged products would not evidence the violations alleged, either because they did not appear on the products or because the [challenged statements] were truthful." *Kosta*, 308 F.R.D. at 229. As a result, the court found that there was "no cohesion among the members because they were exposed to quite disparate information." *Id.* (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)). Here, though, the meaning of the alleged deception and the uniformity of exposure are undisputed.

Second, all of these cases were decided before the Ninth Circuit's decision in *Bradach*, which holds (albeit in an unpublished opinion) that it is an error of law for courts at class certification to require extrinsic evidence of materiality to prove predominance.

Third, neither Rule 23 nor California law requires plaintiffs to proffer a certain type of evidence at class certification. There is nothing in the Supreme Court's decisions in *Comcast*, *Amgen*, or *Tyson* to suggest that "evidentiary proof" of predominance must take a certain form. In addition, the Court is disinclined to interpret Rule 23 as requiring plaintiffs to proffer a particular type of evidence when such evidence is not required under state law for plaintiffs to prevail on the merits of their claims. *See Brockey v. Moore*, 131 Cal. Rptr. 2d 746, 756 (Cal. Ct. App. 2003) (rejecting argument that "anecdotal" evidence is necessarily insufficient under California law to prove that a statement is misleading); *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) ("surveys and expert testimony regarding consumer assumptions and expectations may be offered but are not required; anecdotal evidence may suffice"); *Hadley* 324 F. Supp. 3d at 1115 ("California courts have explicitly 'reject[ed] the view

that a plaintiff must produce' extrinsic evidence 'such as expert testimony or consumer surveys' in order 'to prevail on a claim that the public is likely to be misled by a representation.'" (quoting *Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 48 (Cal. Ct. App. 2006))); *Mullins v. Premier Nutrition*, 2016 WL 1535057, at *5 ("The California Court of Appeal has expressly rejected the 'view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation.'" (quoting *Colgan*, 38 Cal. Rptr. 3d at 48)).

Fourth, even though plaintiffs' deposition testimony indicates that not all purchasers would find the alleged deception to be material,[86] it is clear under California law that not only is materiality judged by an objective standard, but also materiality to a reasonable consumer does not mean it has to be material to every consumer. *See Fitzhenry-Russell*, 326 F.R.D. at 613-14 (evidence that 25% of consumers cared about alleged misrepresentation was sufficient evidence of materiality for class certification). Also, more than one consideration can be material to a reasonable consumer. *See Hadley*, 324 F. Supp. 3d at 1116-17 ("[U]nder California law, [p]laintiff is not required to prove that the challenged [] statements were 'the sole or even the predominant or decisive factor influencing' the class members' decisions to buy the challenged

---

[86] While the six class representatives of the four consumer protection states testified that they would consider fill level to be a material factor in their purchasing decision (Esparza Dep. at 45; Marsh Dep. at 17, 35-36; Pellitteri Dep. at 21, 46; Grindel Dep. at 16, 19; Vladimirsky Dep. at 12, 25; Liberov Dep. at 16; *see also supra* Section III.C (analysis of typicality)), other deponents attributed their purchasing decisions to brand loyalty, including the plaintiffs who were withdrawn as Illinois class representatives (*see* Bittle Dep. at 27 ("I just grab the McCormick"); Theis Dep. at 21 (buys McCormick spices and will continue to buy because "McCormick is a good name. It's a good brand, and my mother used to use McCormick."), the plaintiff from Connecticut (*see* Fernandez Dep. at 25-26 ("we've just always bought McCormick, so it's kind of out of habit"), and the plaintiff from New Jersey who voluntarily dismissed her suit prior to the filing of the motion for class certification (*see* Marron Dep. at 16 ("Q. Is it fair to say you just grabbed the McCormick tin? A. Yes.")).

products." (quoting *In re Tobacco II Cases*, 207 P.3d at 39)). Thus, the court in *Hadley* rejected the argument that "predominance is not met in the instant case because the evidence 'shows that people buy [defendant's] products for reasons other than 'health [the challenged claim], such as taste, price, brand loyalty, nostalgia, and convenience." *Id.* at 1116. Rather, the court explained, a defendant's argument that "consumers have a variety of reasons for purchasing [the product]" is "a merits dispute as to materiality," and is therefore a dispute "that can be resolved classwide." *Id.* at 1117. The same analysis applies here.

Finally, under California law, "materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.'" *Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 338–39 (Ct. App. 2010), *as modified on denial of reh'g* (Feb. 8, 2010) (quoting *Engalla v. Permanente Medical Grp., Inc.*, 938 P.2d 903, 920 (Cal. 1997)).

In sum, the Court concludes that in this case – where there is no inherent ambiguity as to the misrepresentation, no question as to the uniformity of exposure, and an objective, reasonable person standard applies – materiality is a common question for purposes of Rule 23(b)(3) and plaintiffs are not required to proffer extrinsic evidence such as a consumer survey, market research, or an expert opinion.

This conclusion is bolstered by the fact that California has expressly adopted verbatim the federal regulation (21 C.F.R. 100.100(a)) that prohibits nonfunctional slack-fill. *See* Cal. Bus. & Prof. Code § 12606(c). Plaintiffs concede that such prohibitions are "not dispositive" of the issue of materiality (*see* 10/24/18 Tr. at 74), but federal and state courts in California have concluded that laws prohibiting certain conduct can be evidence of materiality. *See, e.g.*, *Kwikset*, 246 P.3d at 890 ("by specifically outlawing deceptive and fraudulent 'Made in

America' representations," the "Legislature has recognized the materiality of this representation"); *Kumar*, 2016 WL 3844334, at *8 (same); *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) ("the legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and courts must defer to that determination"); *but see Victor*, 2014 WL 1028881, at *17 ("the ultimate question in UCL [and] CLRA fraud claims is what a reasonable consumer expects, which may have absolutely no relation to FDA regulations").

Accordingly, the Court finds that the California consumer protection class satisfies the predominance requirement of Rule 23(b)(3).

### f. Illinois Consumer Protection Class

For the Illinois consumer protection class, plaintiffs have not shown that common questions predominate.

To recover damages under the ICFA, a plaintiff must prove "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse*, 922 N.E.2d at 313. "That the plaintiff must prove that actual damages were suffered 'as a result' of the deceptive act imposes an obligation on the plaintiff to prove the deceptive act proximately caused any damages." *Id*. In addition, "[t]o be actionable under the ICFA, a representation must be 'material,' which is established by applying an objective standard." *Clark v. Bumbo*, 2017 WL 3704825, at *5 (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996)). "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick*, 675 N.E.2d at 595; *see also Lateef v. Pharmavite LLC*,

No. 12-cv-5611, 2013 WL 1499029, at *3 (N.D. Ill. Apr. 10, 2013) ("A representation of fact is material if a reasonable person could be expected to rely on a statement or omission in deciding to enter into a transaction.").

With the exception of proving deception, the elements of a claim under the ICFA are different than those required under the California statutes. Although "materiality is judged on an objective, reasonable person standard," *Mednick*, No. 14-cv-3624, 2017 WL 2619139, at *8 (N.D. Ill. June 16, 2017), "proximate causation" and "actual damages" are individualized inquiries, *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010), and require proof "that the plaintiff was deceived in some manner and damaged by the deception." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-14 (7th Cir. 2006); *see also Avery*, 835 N.E.2d at 861 ("it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, 'in some manner, deceived' by the misrepresentation" (quoting *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002))). As such, "absent proof as to why a particular plaintiff purchased a particular [product], [plaintiff] cannot establish that the defendants' conduct caused him or her to make that purchase." *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010). In addition, in a class action in Illinois plaintiffs must prove proximate causation and actual damages as to each class member. *See Clark v. Experian Info. Solutions, Inc.*, 256 Fed. App'x 818, 822 (7th Cir. 2007) ("Illinois law requires a finding of proximate causation under ICFA, and does not provide for such causation to be inferred."); *Walsh Chiropractic, Ltd. v. StrataCare, Inc.*, No. 09-cv-1061, 2011 WL 4336727, at *9 (S.D. Ill. Sept. 14, 2011) ("[C]ausation cannot be inferred; each member of the class must prove that the misrepresentation deceived them."); *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 927 (Ill. 2007) ("plaintiffs must prove that each and every consumer who seeks redress actually saw and was deceived by the statements in question).

By comparison, in California, the reasons for individual purchasing decisions are irrelevant at the class certification stage.

But it has been recognized by the Seventh Circuit that the mere presence of individualized issues does not require denial of certification of an ICFA class. *See Suchanek*, 764 F.3d at 759 ("error of law" to find "that individual issues necessarily predominate in cases requiring individual subjective inquiries into causality"); *see also Pella Corp,* 606 F.3d at 394 ("Proximate cause . . . is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification."); *In re IKO Roofing Shingle Prods. Liab. Litig.,*757 F.3d 599, 601-04 (7th Cir. 2014) (reaffirming *Pella* and remanding for reconsideration of class certification despite the existence of potential individualized questions of causation); *see also Tyson Foods,* 136 S. Ct. at 1045 (2016) (predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case"). Accordingly, the Court must decide whether the plaintiffs have shown that common issues will predominate despite the need under Illinois law for individualized inquiries into proximate causation and damages.

Given the evidence and the fact that under Illinois law individual consumer reactions to the deception are of importance, the Court is not persuaded that this class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. In California, the Court found the class to be cohesive despite plaintiffs' divergent testimony about their purchasing decisions because for purposes of a class action under California law, plaintiffs did not need to prove anything about the individual class members' purchasing decision in order to prove liability. Under the ICFA, at class certification it is necessary to proffer common evidentiary proof as to the reasons behind class member's purchasing decisions if the issues of

proximate causation and actual damages are not straightforward. Yet, that is precisely the evidence that is lacking in this case.

As previously noted, there is no classwide evidence of materiality in the form of a consumer survey, market research or an expert opinion. While not necessarily required in every case, such evidence has played an important role in Illinois in establishing the cohesiveness of a proposed class. *See Suchanek*, 764 F.3d at 760-61 (suggesting that one way for plaintiffs to meet their burden to show that "class allegations are 'satisf[ied] through evidentiary proof'" would be through "survey or other evidence suggesting the relevant common traits of the class members [or] expert testimony supporting the classwide allegations" (quoting *Comcast*, 569 U.S. at 33)). Second, the only evidence of actual consumer reaction comes from plaintiffs' testimony which, as set forth above, *see supra* note 86, demonstrates differing motivations for consumers' purchasing decision. Therefore, this is not a case where the nature of the deception means that the only possible reason for the consumers' decision to purchase the product is the deception. *Cf. Suchanek*, No. 11-cv-565, 2018 WL 6617106, at *12-13 (S.D. Ill. July 3, 2018) (evidence showed that the "the only logical reason for [p]laintiffs' behavior is that they purchased [the product] as a result of the deception"). Indeed, of the four plaintiffs who were originally proposed as class representatives for Illinois, two testified that the existence of nonfunctional slack-fill would *not* factor into their purchasing decision. (*See* Bittle Dep. at 13-14, 18-19, 25-27; Theis Dep. at 20-21, 28-29, 31.) Although plaintiffs have withdrawn their names as proposed class representatives, their testimony is still relevant evidence. Considering their testimony, and the similar testimony of several of the other plaintiffs who were deposed, it is arguable that "more than a few" class members did not suffer a compensable injury under Illinois

law.[87]

For all of the above reasons, the present case is very different from *Suchanek*, a deceptive packaging case where a class was certified to bring claims under the ICFA. The defendant in *Suchanek* marketed and sold single-cup coffee pods for use with Keurig-brand coffee machines. But unlike Keurig-brand pods, which utilized a patented filter system to deliver "ground coffee," the defendant's product contained almost exclusively instant coffee, a difference that went to the very essence of the product being sold. Indeed, the class certification record included extensive evidence that the defendants intended to and succeeded in deceiving consumers into believing they were purchasing ground coffee[88] and, importantly, that consumers would not have purchased the defendant's pods had they known it was instant coffee. *Suchanek*, 764 F.3d at 758 ("The plaintiffs proffered evidence to show the overwhelmingly negative response to the [defendant's] product, the flood of complaints that followed the introduction of [the defendant's product], and numerous surveys that shed light on the preferences of Keurig users for premium (freshly brewed) coffee."). In light of this evidentiary record, the district court on remand granted class certification, observing that causation was likely to be defeated only as to "a few" class members. *Suchanek*, 311 F.R.D. 239, 259 (S.D. Ill. 2015); *see also Suchanek*, 764 F.2d at

---

[87] This conclusion is reinforced by the substantial possibility that more than a few class members already knew about the alleged nonfunctional slack-fill at the time of purchase given the publicity starting in June 2015 in the *Wall Street Journal* and the *Minneapolis Star Tribune*. These class members were not "actually deceived" and thus cannot recover under Illinois law.

[88] For example, the defendant's consultant warned it against using the term "instant coffee"; "[n]umerous expert surveys in the record concluded that few consumers understood the true nature of [defendants'] product"; the defendant conducted "focus-group testing to determine whether participants would notice anything amiss about [its product]"; one expert opined that as the product was "three to four times more expensive than the typical instant coffee that may be spooned into a cup of hot water," "only a very 'price insensitive' consumer, or one who was misled, would use a $100 brewer [*i.e.,* the Keurig machine] to heat water to make instant coffee." *Suchanek*, 764 F.3d at 753-54.

758 ("From the record amassed for the class certification decision, it is apparent that this is not a case where few, if any, of the putative class members share the named representative's grievance against the defendant. If it were, things would be different.").

By contrast, in this case there is no extrinsic evidence that illuminates consumer preferences in terms of Slack-Filled Pepper Products. On the contrary, while the deception here involved misleading packaging, as was the case in *Suchanek*, the deposition testimony of half of the plaintiffs indicates that they would have still bought the Slack-Filled Pepper Products even if they knew about the deception. Unlike the coffee pods, the McCormick consumer still received the product they intended to buy and any deception did not render the product effectively worthless. *Suchanek*, 2018 WL 6617106, at *11. Moreover, plaintiffs failed to proffer any extrinsic evidence to support an inference that there existed common proof that the putative class members shared the two proposed class representatives' complaints about the Slack-Filled Pepper Products. Therefore, unlike *Suchanek*, the issue of class certification cannot be solved by reference to the "commonsensical notion that people generally won't pay something for nothing," and, as a result, "the issues of proximate cause [will not] be relatively simple to resolve on a classwide basis." *Id.*

Much closer to the present case is the record in *Langendorf*, 306 F.R.D. at 584, where the court found the plaintiff had failed to prove predominance. In *Langendorf*, the plaintiff sought to certify a class of purchasers of a pre-mixed alcoholic beverage, claiming that the defendant had fraudulently labeled and marketed the product as "all natural" even though it contained the non-natural preservative sodium benzoate. The court found that plaintiff "failed to carry her burden to show that common issues predominate" because she "produced *no* evidence to show that causation will be defeated only as to 'a few' class members; in other words, she has not

demonstrated the materiality of the 'all natural' text" to all class members. *Id*. at 583. The court noted that "such a showing could have been attempted through survey evidence," but that the plaintiff had "submitted no evidence, survey or otherwise, to show what portion of purchasers likely relied on the 'all natural' text, or the degree to which the label 'all natural' had a tendency to influence the decision to purchase the product." *Id*.

Similarly, in *Clark v. Bumbo*, , the court found the plaintiff had failed to prove predominance because she "d[id] not submit any evidence to show that the [alleged misrepresentation] was material to any portion of [the product's] purchasers and thus caused them to suffer damages" while the defendant submitted evidence showing that other purchasers had purchased the product for a variety of other reasons. 2017 WL 3704825, at *7.

The limited evidence here shows that consumers of black pepper, like the consumers in *Skinnygirl* and *Bumbo* (and unlike the consumers in *Suchanek*), are not necessarily a cohesive group when it comes to the reasons for purchasing the product at issue. In a state such as Illinois, where the individual reasons for purchasing a product are relevant under the consumer protection statute, there needs to be evidence of classwide materiality so that a court can have confidence that class members share plaintiffs' grievance and that the individualized inquiries necessary to prove causation and injury will be relatively simple and straightforward. Where such evidence is lacking, a court must decide, based on the nature of plaintiffs' claim and evidence before it, whether such individualized inquiries predominate.

In this case, plaintiffs could have attempted to obtain classwide evidence of materiality but they opted not to do so. In the absence of this evidence, the Court concludes that plaintiffs have failed to establish that individualized inquiries into causation and injury will not predominate over the common issues.

As a finding of predominance is essential to class certification, the Court will not certify the proposed Illinois consumer protection class.

### g.    Florida Consumer Protection Class

For the Florida consumer protection class, plaintiffs have shown that common questions predominate.

To prevail on a claim for damages under FDUTPA, a plaintiff must prove "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)); *see also Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). "A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000). As the Court has already concluded that whether there was a deceptive act is a common question, *see supra* Section III.F.1.a, only the elements of causation and actual damages remain to be addressed.

Importantly, in Florida both are judged by objective standards. To prove causation, "a plaintiff must simply prove that an objectively reasonable person would have been deceived." *Fitzpatrick*, 635 F.3d at 1283. "The mental state of each class member is irrelevant." *Carriuolo*, 823 F.3d at 985; *see also State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1310 (S.D. Fla. 2018) ("[plaintiff's] knowledge has no bearing on the FDUTPA claim"). "Actual damages" are incurred if the plaintiff does not receive the "benefit of the bargain," which is measured according to "'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Carriuolo*, 823 F.3d at 986 (quoting *Rollins, Inc. v. Heller,* 454 So. 2d 580, 585 (Fla.

Dist. Ct. App. 1984)); *State Farm*, 315 F. Supp. 3d 1291, 1310 (S.D. Fla. 2018) ("[A] plaintiff must prove the gap in value between what was promised and what was delivered.").

Defendants offer two related arguments against a finding of predominance for the Florida class.

First, they argue that plaintiffs have failed to prove predominance because they lack classwide evidentiary proof of causation, such as a survey, market research, or an expert. (Defs.' Supp. Br. at 6 (under FDUTPA "whether a reasonable consumer would have been deceived is assessed by evidentiary proof").)

There is no Florida case that has expressly confronted the question of whether plaintiffs bringing claims under FDUTPA have an evidentiary burden with respect to proving causation at the class certification stage. However, the Supreme Court's holding in *Amgen*, and the California cases applying that holding to the element of materiality under California law, suggest that causation under the FDUTPA is a "common question" for purposes of Rule 23(b)(3). It is judged by an objective, reasonable person standard and a failure of proof on that element will lead to the failure of all claims. Notably, causation under the FDUTPA does not even require proof of materiality to the reasonable consumer; it only requires proof that a reasonable consumer would have been deceived. In addition, state courts, applying a similar standard, have concluded that "[i]ssues pertaining to the proof of the alleged deceptive practice and issues relating to causation and damages will be common to all members of the class." *Davis*, 776 So. 2d at 975. And, there is a long line of similar cases involving allegedly deceptive marketing of a consumer good where courts have certified FDUTPA classes without any evidentiary proof of causation. *See, e.g.*, *Carriuolo*, 823 F.3d at 985 (predominance finding upheld in case alleging that defendant put an inaccurate sticker on cars); *Fitzpatrick*, 635 F.3d at 1282-83 (predominance

finding upheld in case claiming that defendant misrepresented the digestive health benefits of a yogurt product); *Hasemann v. Gerber Prod. Co.*, No. 15-cv-2995, 2019 WL 1434263, at *30-31 (E.D.N.Y. Mar. 31, 2019) (predominance met under FDUTPA in case alleging that defendant misrepresented infant formula as reducing the risk that infants would develop allergies); *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 696-98 (S.D. Fla. 2010) ("[I]ndividual class members may establish a FDUTPA claim by submitting identical proof that [d]efendant's representations about [infant formula] would deceive an objective reasonable consumer.").

The cases cited by defendants, *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679 (S.D. Fla. 2014) and *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677 (S.D. Fla. 2008), do not undercut this conclusion. In both cases, unlike the present case, "different representations were made to different class members." *See Bowe v. Pub. Storage*, 318 F.R.D. 160, 182 (S.D. Fla. 2015). Under those circumstances, even though causation is judged by an "objective" test, it is not a "common question" in the sense that no single causation question would apply to the entire class. *See also Miami Auto. Retail, Inc. v. Baldwin*, 97 So. 3d 846, 856 (Fla. Dist. Ct. App. 2012) (causation not a common question where plaintiff had not proven that each class member received the same misrepresentation); *Rollins v. Butland*, 951 So. 2d at 872-73 ("class-wide proof of causation is impossible" where plaintiffs claimed defendants were "guilty of no less than fourteen separate deceptive acts and unfair practices"); *Perisic v. Ashley Furniture Indus., Inc.*, No. 8:16-cv-3255, 2018 WL 3391359, at *3 (M.D. Fla. June 27, 2018) (no predominance where "evidence . . . fails to demonstrate a systematic or uniform marketing scheme" because "examining the merits of each potential class member's claim is needed to determine whether each is the victim of a deceptive act or unfair trade practice"); *Hummel v. Tamko Bldg. Prods.*, 303 F. Supp. 3d 1288, 1300 (M.D. Fla. 2017) (predominance requirement not met "because the

nature of the case will require the Court to conduct an inquiry into what, if any, misrepresentations were made to each individual class member.").  In other words, if a putative class has not all been exposed to the same representations, it is not possible to determine on a classwide basis whether an objectively reasonable consumer would have been deceived.  No such issue arises in the present case where purchasers were uniformly exposed to the same opaque, allegedly deceptively-filled containers.

Defendants' second argument is that causation is not subject to common proof because plaintiffs "fail to take into account purchasers who knew the weight had changed and those who, like most of the named Plaintiffs, did not care and would have purchased the pepper anyway." (Defs.' Supp. Resp. at 8.)  Such evidence is, however, simply irrelevant to plaintiffs' FDUTPA claims.  *See Carriuolo*, 823 F.3d at 985; *State Farm*, 315 F. Supp. 3d at 1310.

Accordingly, the Court finds that plaintiffs have met their burden to prove that common questions will predominate for their FDUTPA claims.

### h.     Missouri Consumer Protection Class

For the Missouri consumer protection class, plaintiffs have shown that common questions predominate.

"To prevail on a claim under the MMPA, a plaintiff must plead and prove he or she (1) purchased merchandise (which includes services) from defendants; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the Merchandising Practices Act."  *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016).  As the Court has already concluded that whether there was an unlawful act is a common question (*see supra* Section III.F.1.a), only the elements of causation and ascertainable loss remain to be addressed.

Causation under the MMPA requires a showing that the unlawful practice caused the

loss, but "the statute does not require that the purchase be caused by the unlawful practice." *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009); *see also Murphy*, 503 S.W.3d at 313; *Hawkins*, 309 F. Supp. 3d at 706; *White v. Just Born, Inc.*, No. 2:17-cv-04025, 2017 WL 3130333, at *9 (W.D. Mo. July 21, 2017) ("*White I*"); *Bratton v. Hershey Co.*, No. 2:16-cv-4322, 2017 WL 2126864, at *8 (W.D. Mo. May 16, 2017) ("*Bratton I*"). Thus, "class members are not individually required to show what they would or would not have done had the product not been misrepresented and the risks known." *Plubell*, 289 S.W.3d at 714.

As for the element of ascertainable loss, "Missouri courts apply the 'benefit of the bargain' rule when determining if a plaintiff has suffered an ascertainable loss under the MMPA." *George v. Omega Flex, Inc.*, No. 2:17-cv-3114, 2018 WL 3559184, at *3 (W.D. Mo. July 24, 2018) (quoting *Polk v. KV Pharm. Co.*, No. 4:09-cv-00588, 2011 WL 6257466, at *5 (E.D. Mo. Dec. 15, 2011)); *see Hawkins*, 309 F. Supp. 3d at 706; *White I*, 2017 WL 3130333, at *9; *Bratton I*, 2017 WL 2126864, at *8. The benefit-of-the-bargain rule under Missouri law "compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Murphy*, 503 S.W.3d at 313; *Plubell*, 289 S.W.3d at 715; *see also Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014) ("benefit of the bargain rule" awards a prevailing party "the difference between the value of the product as represented and the actual value of the product as received"); *Hawkins*, 309 F. Supp. 3d at 706; *White I*, 2017 WL 3130333, at *9; *Bratton I*, 2017 WL 2126864, at *8.

Given plaintiffs' theory of liability, both causation and ascertainable loss are common questions for purposes of Rule 23(b)(3). Plaintiffs' MMPA claim is that defendants' unlawful act (deceptively underfilling the Slack-Filled Pepper Products) caused an ascertainable loss because the value of the pepper received by all purchasers was less than the value of the pepper

as represented by the container size.  Plaintiffs' theory of liability plainly states a claim under the

MMPA, *see, e.g.*, *White I*, 2017 WL 3130333, at *1 ; *Hawkins*, 309 F. Supp. 3d at 701-06;

*Bratton I*, 2017 WL 2126864, at *2-8, and all elements of this theory of liability are subject to

common proof, so no individualized inquiries will be necessary in order for plaintiffs to prove

their claims.

Defendants interpret the MMPA differently.  They argue that individualized inquiries will

be required to prove causation and ascertainable loss because "a plaintiff who did not care about

an alleged MMPA violation, or who knew about the violation and purchased the products

anyway, has not been injured under the MMPA."  (Defs.' Supp. Br. at 8.)  Their position is

supported by a Missouri federal court's recent decision in *White v. Just Born*, where the court

reached the same conclusion and thus found that common questions did not predominate for a

MMPA claim alleging nonfunctional slack-fill in boxes of candy.  *See White*, No. 2:17-cv-

04025, 2018 WL 3748405, at *3 (W.D. Mo. Aug. 7, 2018) ("*White II*").  But the case relied on

by the court in *White II* – the Missouri Supreme Court's decision in *State ex rel. Coca-Cola Co.*

*v. Nixon*, 249 S.W.3d 855, 862 (Mo. Banc. 2008) – does not, upon closer examination, support

the court's conclusion.

In *Nixon*, the plaintiff claimed that "she and many other consumers would not have

purchased fountain Diet Coke if they had known it contained saccharin" and that "the deception,

itself, resulted in irreparable harm."  249 S.W.2d at 859.  After the lower state court certified a

class of all purchasers of fountain Diet Coke during a specified time period, the Supreme Court

of Missouri reversed, finding that the proposed class was impermissibly overbroad because it

"undoubtedly includes an extremely large number of uninjured class members, that is, those who

did not care if the Diet Coke they purchased contained saccharin."  *Id.* at 862.  The court noted

that plaintiff's "own expert witness indicated that only twenty percent of those who currently consume fountain Diet Coke would not continue to do so if they knew it contained saccharin," which meant that "eighty percent of the putative class suffered no injury." *Id.* However, *Nixon* did not hold that in every MMPA case there would not be an injury if the plaintiff "did not care" about the alleged MMPA violation. To the contrary, it emphasized that the "alleged injury was based on a subjective preference against saccharin," such that a consumer who did not share that preference could not have been injured, but that the outcome could be different in a case which alleged an "economic injury that was based on an objective characteristic," such that individual preferences were irrelevant. *Id.* at 863. Importantly, it distinguished *Craft*, a decision by the Missouri Court of Appeals approving the certification of a class of purchasers of "light" cigarettes who "thought they had purchased 'light' cigarettes, but the cigarettes they received had the characteristics of regular cigarettes." *Id.* (citing *Craft v. Philip Morris Cos.*, 190 S.W.3d 368, 387 (Mo. Ct. App. 2005)). In *Craft*, the alleged injury was that plaintiffs "failed to receive the qualities and economic value of a low tar, low nicotine cigarette." *Nixon*, 249 S.W. 2d at 863; *see also Hope v. Nissan N.A.*, *Inc*., 353 S.W.3d 68, 80 (Mo. Ct. App. 2011) (observing that a case like *Nixon* where the basis of the injury was a subjective consumer preference is on a different footing from a case where the alleged injury is diminished economic value of the product received by every purchaser, such as a car with a latent dashboard bubbling defect); *Plubell*, 289 S.W.3d at 715; (plaintiffs' theory that medication with undisclosed safety risks was worth less than it cost was subject to common proof).

The current case is similar to the *Craft*, *Hope* and *Plubell* cases. Plaintiffs' claim is that they thought they were purchasing a certain amount of pepper based on the container size but that they instead received less pepper. The alleged injury is the difference in value of the pepper

as represented and the value of the pepper as received.  Thus, they have alleged an economic injury based on an objective characteristic, not an injury that is dependent on class members' subjective preferences.  Under plaintiffs' theory of causation and ascertainable loss, every purchaser would have suffered the same loss irrespective of their motivations for purchasing the Slack-Filled Pepper Product.  Thus, this is a case where "class members are not individually required to show what they would or would not have done had the product not been misrepresented and the risks known."  *Plubell*, 289 S.W.3d at 714.  Under such circumstances, the elements of causation and ascertainable loss are subject to common proof and are thus "common questions" for purposes of analyzing predominance.

Accordingly, the Court concludes that common questions predominate for the proposed Missouri consumer protection class.

### 2.      Single-State Unjust Enrichment Classes

Plaintiffs argue that the single-state unjust enrichment classes satisfy predominance because no individualized inquiries will be required to resolve their unjust enrichment claims.  Rather, they assert, the answer to the question of "whether it would be unjust for [d]efendants to retain the benefits of the 'Black Pepper Net Weight Reduction' project" depends "solely" on defendants' conduct.  (*See* Pls.' Mem. at 35; 7/10/18 Tr. at 114 ("[I]n the context of consideration of whether the retention of the benefit is unjust.  That looks solely at the defendants.").)

But in none of the seven single states does an unjust enrichment claim depend "solely" on defendant's conduct.  To the contrary, each state's unjust enrichment law requires consideration of both plaintiff's and defendant's conduct, as well as the factual context.  In California, for example, "[t]he elements for a claim of unjust enrichment are receipt of a benefit and unjust retention of the benefit *at the expense of another*."  *Lyles v. Sangadeo-Patel*, 171 Cal. Rptr. 3d

34, 40 (Cal. Ct. App. 2014) (emphasis added). "Even when a person has received a benefit from another, he is required to make restitution only if the circumstances of its receipt or retention are such that, *as between the two persons*, it is unjust for him to retain it." *Ghirardo v. Antonioli*, 924 P.2d 996, 1003 (Cal. 1996) (emphasis added). Under Connecticut law, "[p]laintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) *that the failure of payment was to the plaintiffs' detriment*." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 649 A.2d 518, 522 (Conn. 1994); *see also id.* at 521 ("With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, *it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties* and apply this standard." (emphasis added)). In the District of Columbia, "every unjust enrichment case is factually unique . . . [and] *must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next*." *4934, Inc. v. District of Columbia Dep't of Emp't Servs.*, 605 A.2d 50, 56 (D.C. 1992) (emphasis added). In Illinois, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit *to the plaintiff's detriment*, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (1989) (emphasis added). In Maryland, a person is not unjustly enriched unless "the circumstances of the receipt of the benefit are such *as between the two* that to retain it would be unjust." *First Nat'l Bank of Md. v. Shpritz*, 493 A.2d 410, 419 (Md. Ct. Spec. App. 1985) (emphasis added). In Missouri, "there can be no unjust enrichment *if the parties receive what*

*they intended to obtain*." *Am. Std. Ins. Co*, 103 S.W.3d at 293 (emphasis added). Finally, in

Pennsylvania, "[w]hether the doctrine [of unjust enrichment] applies depends on the *unique*

*factual circumstances* of each case." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993),

*aff'd*, 637 A.2d 276 (Pa. 1994) (emphasis added).

Thus, when confronted by motions for class certification of unjust enrichment claims

under the laws of the states at issue, courts have denied such motions, concluding that the need

for individualized inquiries into purchasers' knowledge and motivations precluded a finding of

predominance. For example, in *In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*,

the court concluded that the California unjust enrichment claim was unsuited to class-wide proof

because "the record reflects that purchasers bought [the product] for a variety of reasons" and

"many purchasers indisputably received the benefits that they sought from their purchases." *In*

*re Tropicana*, 2018 WL 497071, at *5 (D.N.J. Jan. 22, 2018).

Similarly, in *In re Dial Complete Mktg. & Sales Practices Litig.*, the court concluded that

California, Illinois and Missouri unjust enrichment claims were not subject to common proof

"[g]iven the necessity for individualized inquiries into motivations and purchasing decisions" to

prove unjust enrichment. *In re Dial*, 312 F.R.D. 36, 63, 67, 70 (D.N.H. 2015). The court

explained that "the problem [was] largely a function of how plaintiffs ha[d] defined the class"

because "[p]laintiffs ha[d] defined the purported class in such a way that, by definition, it

include[d] consumers with a variety of motivations for purchasing [the product]." *Id*. at  62, 66.

As a result, the "the purported class would include, for example, consumers who would not have

acted any differently had they known that Dial Complete was not more effective than ordinary

hand soap," and "[t]hus, a class member's right to recover for unjust enrichment would

necessarily require individualized inquiry into the equities." *Id*. at 67.

In *Lipton v. Chattem, Inc.*, an Illinois district court concluded that plaintiffs challenging the presence of hexavalent chromium in a diet product (Dexatrim) could not prove their unjust enrichment claim under Illinois law on a classwide basis because "[t]he proposed class include[d] individuals who: (1) were unaware of the presence of hexavalent chromium in Dexatrim and who would not have purchased the product had they been so aware; (2) were unaware of the presence of hexavalent chromium but may have still purchased the product had they been so aware; and (3) were aware of the presence of hexavalent chromium and purchased the product anyway." *Lipton*, 289 F.R.D. 456, 462 (N.D. Ill. 2013). The court explained that "[t]hese differences among the proposed class require that the key liability issues–whether a given class member was deceived by [defendant's] labeling of Dexatrim and whether she suffered damages as a result–can be resolved only on an individual basis." *Id*.

Finally, applying Missouri law in *In re BPA*, the court concluded that plaintiffs' unjust enrichment claim would require "individual inquiry [into] whether [p]laintiffs purchased [d]efendants' products because they thought the products were BPA-free or were manufactured with substances about which there was no scientific controversy." *In re BPA*, No. 08-md-1967, 2011 WL 6740338, at *6 n.11 (W.D. Mo. Dec. 22, 2011).

In each of the above cases, the proposed classes were defined as *all* purchasers (within the state) of a certain consumer product, and each proposed class included purchasers with varying degrees of knowledge and differing motivations. Similarly, plaintiffs here have proposed classes that include all the purchasers of Slack-Filled Pepper Products within each state, and the record suggests that class members could have had widely varying reasons for making their individual purchasing decisions. In addition, the variations among class members are relevant to the viability of each class member's unjust enrichment claim. For example, it

would be relevant whether a purchaser knew about the alleged nonfunctional slack-fill before the purchase was made – certainly a possibility since the first newspaper articles and lawsuits occurred in June 2015, almost 9 months before the products were no longer on store shelves.  It would also be relevant if a purchaser would not have cared about any resulting change in fill level even if he or she had not known about the weight reduction.  Whether it would be unjust for McCormick to retain the money of a purchaser who was unaware of the deception and would not have bought the product had she known about the nonfunctional slack-fill is a different question than whether it would be unjust for McCormick to retain money from a purchaser who knew about the nonfunctional slack-fill prior to purchase or who did not know but would have bought the product even if he had known because the purchasing decision was entirely driven by other considerations.  Because individualized inquiries would be required to determine which class members had viable unjust enrichment claims, the Court is not persuaded that the proposed single-state unjust enrichment classes are sufficiently cohesive to warrant a finding of predominance.

Accordingly, the Court finds that plaintiffs have not met the predominance requirement for the single-state unjust enrichment classes.

### G.        Superiority (Rule 23(b)(3))

The superiority requirement asks whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  It aims to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 adv. comm. n. to 1966 amend.).  The "matters pertinent" to a finding of superiority include:  "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the

extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Despite the potential difficulties of identifying class members, a class action is superior to any other method for adjudicating this controversy. The most important factor is that given the small dollar value of retail black pepper purchases and the correspondingly low dollar value of any individual recovery, a class action will "enable[] 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" 2 Newberg on Class Actions § 4:65 (quoting *Amchem*, 521 U.S. at 617). As the Eleventh Circuit Court of Appeals has explained:

> [C]lass actions often involve an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit. The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually. . . . This consideration supports class certification in cases where the total amount sought by each individual plaintiff is small in absolute terms. . . . It also applies in situations where, as here, the amounts in controversy would make it unlikely that most of the plaintiffs, or attorneys working on a contingency fee basis, would be willing to pursue the claims individually.

*Klay*, 382 F.3d at 1270-71; *Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654, 657 (9th Cir. 2017) ("[T]he benefits of the class mechanism are best realized in cases like this, where the likely recovery is too small to incentivize individual lawsuits, and the realistic alternative to class litigation will be no adjudication at all."); *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

While manageability is a concern, defendants' contention that the manageability issues in

this case are "insurmountable" assumes that a heightened ascertainability standard applies. But, for the reasons discussed *supra* Section III.E, the Court is not applying that requirement. In addition, "manageability is only one of the elements that goes into the balance to determine the superiority of a class action in a particular case. Other factors must also be considered, as must the purposes of Rule 23, including: conserving time, effort, and expense; providing a forum for small claimants; and deterring illegal activities." *McKinney*, 292 F.R.D. at 66 (D.D.C. 2013).

Here, manageability concerns do not outweigh the other factors that must also be considered. Accordingly, the Court finds that the superiority requirement is satisfied for the California, Florida and Missouri consumer protection classes.

## H. Appointment of Class Counsel (Rule 23(g))

Rule 23(g) requires that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, this Court "must consider" four factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Moreover, the Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Plaintiffs request "that the Court appoint Elizabeth A. Fegan of Hagens Berman Sobol Shapiro LLP and Scott A. Kamber of KamberLaw as Co-Lead Class Counsel as [they] have and will continue to 'fairly and adequately represent the interests of the class.'" (*See* Class Cert. Mot. at 4-5 (quoting Fed. R. Civ. P. 23(g)(4)).) In support of their request, they stated the following:

Plaintiffs' counsel has performed substantial work to date litigating claims against

Defendants. Plaintiffs' counsel has invested thousands of hours prosecuting claims on behalf of the class members, defeating Defendants' motions to dismiss and aggressively pursuing class discovery. Moreover, Plaintiffs' counsel possesses extensive experience in prosecuting complex class actions, including in consumer class actions like this. See Firm Resume of Hagens Berman Sobol Shapiro LLP (Ex. 33); Firm Resume of KamberLaw LLC (Ex. 34). And, as evidenced by the fact that they have already devoted substantial time and effort to the prosecution of this proceeding, there can be no doubt that Plaintiffs' counsel will continue to devote the necessary resources necessary to representing the Class following appointment as Class Counsel.

(Pls.' Mem. at 44.) Defendants have wisely raised no objection to the above statements, since proposed Class Counsel have demonstrated their extensive experience and fulsome abilities over the last few years in their role as Interim Co-Lead Counsel. However, since the time of plaintiffs' request, Ms. Fegan has notified the Court that she is no longer associated with the law firm of Hagens, Berman. Ms. Fegan's notice indicates that she will continue to represent Plaintiffs as Interim Co-Lead Counsel, but it does not address the issue of Class Counsel or provide any information about her new law firm or whether her change in firms will affect her ability to act as Class Counsel. As her former law firm's expertise in class actions was part of the Court's consideration when it appointed her as Interim Co-Lead Counsel, the Court will defer the appointment of Class Counsel until the upcoming status conference so the Court can ascertain Ms. Fegan's status.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for class certification is granted in part and denied in part, and defendants' motion to exclude plaintiffs' expert is denied. The Court will not certify plaintiffs' proposed multi-state classes, any of the proposed single-state unjust enrichment classes, or a consumer protection class in Illinois, but it will certify consumer protection classes in California, Florida, and Missouri.

A separate Order, ECF No. 213, accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date: July 10, 2019